# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID C. RODEARMEL,      )
                                 )
       Plaintiff,        )
                                 )     No. 1:09-cv-00171-RBW-JR
 v.                         )
                                 )     Honorable Karen LeCraft Henderson
HILLARY RODHAM CLINTON, *et al.*  )     Honorable James Robertson
                                 )     Honorable Reggie B. Walton
       Defendants.     )
_____ )

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules 12(b)(1) and 12(b)(6), Defendants hereby move the Court to dismiss Plaintiff's Complaint with prejudice. The bases for this Motion are set forth in the accompanying Memorandum.

May 20, 2009                      Respectfully submitted,
                                   TONY WEST
                                   Assistant Attorney General

                                   JEFFREY A. TAYLOR
                                   United States Attorney

                                   JENNIFER R. RIVERA
                                   Branch Director

                                   SUSAN K. RUDY
                                   Assistant Branch Director

                               */s/ Jeffrey M. Smith*
                                 JEFFREY M. SMITH (D.C. Bar # 467936)
                                 ERIC J. SOSKIN (PA Bar # 200663)
                                 United States Department of Justice
                                 20 Massachusetts Ave., NW,
                                 Washington, D.C. 20001
                                 Tel: (202) 514-5751
                                 Fax: (202) 616-8202

                                 *Counsel for Secretary of State Hillary Rodham*
                                 *Clinton and the United States Department of State*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID C. RODEARMEL,         )
                                  )
        Plaintiff,        )
                                  )     No. 1:09-cv-00171-RBW-JR
 v.                         )
                                  )     Honorable Karen LeCraft Henderson
HILLARY RODHAM CLINTON, *et al.*   )     Honorable James Robertson
                                  )     Honorable Reggie B. Walton
        Defendants.      )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

TONY WEST
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director

JEFFREY M. SMITH (D.C. Bar # 467936)
ERIC J. SOSKIN (PA Bar # 200663)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW,
Washington, D.C. 20001
Room 7144
Tel: (202) 514-5751
Fax: (202) 616-8202

*Counsel for Secretary of State Hillary Rodham
Clinton and the United States Department of State*

# TABLE OF CONTENTS

**PAGE**

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      Plaintiff Lacks Standing to Challenge Secretary Clinton's Appointment. . . . . . . . . . . . . 5

        A.      Plaintiff Has Not Alleged a Concrete and Particularized Injury. . . . . . . . . . . . . . 7

                1.      Plaintiff Has Not Alleged a Concrete Injury. . . . . . . . . . . . . . . . . . . . . . . 7

                2.      Plaintiff Has Not Alleged an Injury that Is Particularized
                        as to Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Plaintiff's Supposed Injury Is Not Judicially Redressable. . . . . . . . . . . . . . . . . 12

                1.      Plaintiff's "Injury" Cannot Be Redressed Through an
                        Injunction Directed at the Secretary of State. . . . . . . . . . . . . . . . . . . . . . 13

                2.      Plaintiff's "Injury" Cannot Be Redressed Through an
                        Order Directed to the Department of State. . . . . . . . . . . . . . . . . . . . . . . . 17

                3.      Plaintiff's "Injury" Cannot Be Redressed Through a
                        Declaratory Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.     Plaintiff's Complaint Fails To State a Claim Upon which Relief May
        Be Granted Because Secretary Clinton Has Properly Been Appointed. . . . . . . . . . . . . . 21

        A.      Because There Was No Net Increase in the Emoluments of the
                Office of Secretary of State During Secretary Clinton's Senate
                Term, Her Appointment Is Consistent with the Plain Language
                of the Ineligibility Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        B.      The Purpose of the Ineligibility Clause Demonstrates that It
                Bars Appointment Only Where the Emoluments Have Been
                Increased on Net During the Member's Current Term. . . . . . . . . . . . . . . . . . . . 25

        C.      Consistent Constitutional Practice Demonstrates that the
                Ineligibility Clause Bars Appointment Only Where the
                Emoluments Have Been Increased on Net During the
                Member's Current Term. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

i

**TABLE OF AUTHORITIES**

**CASES**                                                                                      **PAGE(S)**

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227 (1937). . . . . . . . . . . . . . . . . . . 18

*Alden v. Maine*, 527 U.S. 706 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Allen v. Wright*, 468 U.S. 737 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*ASARCO v. Kadish*, 490 U.S. 605 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Baker v. GMC*, 522 U.S. 222 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Bell v. Maryland*, 378 U.S. 226 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Board of Education v. Allen*, 392 U.S. 236 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Board of Educ. v. New York State Teachers Retirement Sys.*,
    60 F.3d 106 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bowsher v. Synar*, 478 U.S. 714 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Buckley v. Valeo*, 424 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Clinton v. Jones*, 520 U.S. 681 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cole v. Richardson*, 405 U.S. 676 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Bergen v. Edenfield*, 701 F.2d 906 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Chao*, 540 U.S. 614 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Edmond v. United States*, 520 U.S. 651 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ex parte Levitt*, 302 U.S. 633 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*Florence v. Frontier Airlines, Inc.*, 2003 U.S. Dist. LEXIS 25750
    (N.D. Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*,
    740 F. Supp. 1535 (D. Kan.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)...................................... 19, 20

*Frothingham v. Mellon*, 262 U.S. 447 (1923)........................................ 10

*Hein v. Freedom From Religion Foundation*, 551 U.S. 587, S.Ct. 2553 (2007).............. 10

*Humane Soc'y of United States v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995). ................... 8

*J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). ...................... 14

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004). .......................... 18

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). ................................. 5, 6

*McCabe v. Atchison, T. & S. F. R. Co.*, 235 U.S. 151 (1914)............................ 17

*McClure v. Carter*, 513 F. Supp. 265 (D. Idaho 1981), *aff'd sub nom.*
    *McClure v. Reagan*, 454 U.S. 1025 (1981). ...................................... 6

*Metropolitan Washington Airports Authority v. Citizens for Abatement*
    *of Aircraft Noise*, 501 U.S. 252 (1991). ...................................... 16

*Mississippi v. Johnson*, 71 U.S. 475 (1866)............................................ 19

*Mistretta v. United States*, 488 U.S. 361 (1988). ..................................... 32

*Morrison v. Olson,* 487 U.S. 654 (1988)............................................... 14

*Myers v. United States*, 272 U.S.52 (1926)............................................ 13

*M'Culloch v. Maryland*, 17 U.S. 316 (1819)................................... *passim*

*In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008)................................. 8

*Newdow v. Eagen*, 309 F. Supp. 2d 29 (D.D.C. 2004), *appeal dismissed*,
    No. 04-5195, 2004 WL 1701043......................................... 12

*Nguyen v. United States*, 539 U.S. 69 (2003). ................................... 15, 16

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ........................................... 20

*North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642 (7th Cir. 1998)..................... 20

*Olympic Federal Savings and Loan Ass'n v. Director, Office of Thrift Supervision*,
    732 F. Supp. 1183 (D.D.C. 1990). ........................................... 16

*Powell v. McCormack*, 395 U.S. 486 (1969)................................... 32, 33

*Rae v. Johnson*, 1993 WL 544295, at *1 (D.D.C. Dec. 22, 1993)..................... 16, 17

*Raines v. Byrd*, 521 U.S. 811 (1997)............................................ 5, 7

*Renne v. Geary*, 501 U.S. 312 (1991). ............................................ 6

*Ritter v. United States*, 84 Ct. Cl. 293 (Ct. Cl. 1936). .................................. 15

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993). .................................... 18

*Ryder v. United States*, 515 U.S. 177 (1995)................................... 14, 16

*Schaffer v. Clinton,* 240 F.3d 878 (10th Cir. 2001). .................................... 5

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208(1974). .............. *passim*

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).................................... 18

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). ............................ 26

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976). .......................... 5

*South Lake Tahoe v. California Tahoe Regional Planning Agency,*
    625 F.2d 231 (9th Cir. 1980). ................................................ 10

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998). ...................... 6

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996). ................................. 13, 19

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995). .............................. 26, 32

*United States v. Classic*, 313 U.S. 299 (1941)..................................... 25

*Valley Forge Christian College v. Americans United for Separation of*
    *Church and State*, 454 U.S. 464 (1982).................................. 8, 11, 12

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000). ......... 6, 18

*Warth v. Seldin*, 422 U.S. 490 (1975). ........................................... 11

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). ................................... 20

*Youngstown Co. v. Sawyer,* 343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**UNITED STATES CONSITUTION**

U.S. Const. Art. I, § 6, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. Art. I, § 8, cl. 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. Const. Art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. Art. VI, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**STATUTES**

5 U.S.C. § 3331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

35 Stat. 184 (1908). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

35 Stat. 845 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

94 Stat. 343 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

103 Stat. 1748 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

107 Stat. 4 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

122 Stat. 5036 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

123 Stat. 3 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D.C. Stat. §§ 16-3502-3503. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**LEGISLATIVE MATERIAL**

43 Cong. Rec. 2390 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

43 Cong. Rec. 2402 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

43 Cong. Rec. 2415 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

44 Cong. Rec. 6-7 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

119 Cong. Rec. 37,017 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

119 Cong. Rec. 38,315 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

119 Cong. Rec. 39,234 (1973)................................................ 35

121 Cong. Rec. 42,018 (1975)............................................. 34, 36

121 Cong. Rec. 42,158 (1975)............................................... 35

126 Cong. Rec. 10,279 (1980)............................................... 35

139 Cong. Rec. 389 (1993)................................................. 36

154 Cong. Rec. D1314-01 (Dec. 10, 2008)........................................ 2

154 Cong. Rec. S10885-03 (Dec. 10, 2008)...................................... 2

155 Cong. Rec. S663 (Jan. 20, 2009).......................................... 36

155 Cong. Rec. S679 (Jan. 21, 2009).......................................... 36

155 Cong. Rec. S693 (Jan. 21, 2009)....................................... 36, 37

Hearing Before the Committee on the Judiciary
    on S. 2673, 93rd Cong., at 69-74 (Nov. 19, 1973). ......................... 34, 37

Hearing Before the Committee on Post Office
    and Civil Service on S. 2673, 93rd Cong. (Nov. 18, 1978)........................ 37

Senate Report 93-499 (Nov. 13, 1973)......................................... 37

## MISCELLANEOUS

3 Op. O.L.C. 286 (1979)................................................... 37

3 Op. O.L.C. 298 (1979)................................................... 37

The Federalist No. 55 (Madison)............................................. 30

The Federalist No. 76 (Hamilton)............................................ 30

Hay's History of Chichester, 1804 (West Sussex Co. and
    Diocesan Record Office 1974)....................................... 23

History of Europe, 7 Edinburgh Annual Register 305 (1816)......................... 23

I Farrand, Records of the Federal Convention of 1787 (1966 ed.)................... *passim*

vi

II Farrand, Records of the Federal Convention of 1787 (1966 ed.).. . . . . . . . . . . . . . . . . . . . *passim*

Jeong Hong-Lee, *The Have Perfect in Old English* in Studies in the History of the English
    Language (Donka Minkova and Robert Stockwell, eds., 2002). . . . . . . . . . . . . . . . . . . 24

Joseph Story, Commentaries on the Constitution of the United
    States, § 864 (1970 ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Memorandum for the Attorney General, from David J. Barron,
    Acting Assistant Attorney General, Office of Legal Counsel,
    *Re: Validity of Statutory Rollbacks as a Means of Complying*
    *with the Ineligibility Clause* (May 20, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Memorandum for the Counselor to the Attorney General, from
    Charles J. Cooper, Assistant Attorney General, Office
    of Legal Counsel, *Re: Ineligibility of Sitting Congressman*
    *to Assume a Vacancy on the Supreme Court* (Aug. 24, 1987) . . . . . . . . . . . . . . . . . . . . . 37

New Shorter Oxford English Dictionary at 1342 (3d ed. 1993). . . . . . . . . . . . . . . . . . . . . . . 22

Opposition to the Excise Law in Pennsylvania, *reprinted in* American
    State Papers 037, Misc. Vol. 1, 3d Cong., 2d Session (Pub. No. 56). . . . . . . . . . . . . . . 24

Rodney D. Huddleston and Geoffrey K. Pullum, The Cambridge Grammar
    of the English Language (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Rodney D. Huddleston and Geoffrey K. Pullum, A Student's Introduction
    to English Grammar at 116-17 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Samuel Johnson, A Dictionary of the English Language (1804). . . . . . . . . . . . . . . . . . . . . . . 22

Plaintiff requests that this Court render an advisory opinion on a Constitutional issue, and in doing so, upset a century of practice of the political branches. This Court should deny Plaintiff's request because Plaintiff lacks Article III standing and, as a result, the Court does not have jurisdiction over his claims. Moreover, even if this Court had jurisdiction, Plaintiff's claims lack legal merit.

Plaintiff asks this Court to remove Secretary of State Hillary Rodham Clinton from office because he believes that her appointment was unconstitutional. However, Plaintiff's Complaint points to no action of Secretary Clinton that aggrieves him, nor to any concrete or particularized harm that inures to him from her appointment. His alleged psychic injury from observing what he believes to be a Constitutional violation is clearly insufficient to give him standing. Further, this so-called "injury" is not judicially redressable, as the relief sought by Plaintiff would require the Court to usurp the President's exclusive removal power. Because Plaintiff lacks standing, his claims should be dismissed.

Even if Plaintiff had standing, moreover, his complaint is without merit. Congress anticipated the precise potential constitutional issue with Secretary Clinton's appointment that Plaintiff raises in the lawsuit, and passed a statute with the purpose of remedying any problem. Congress's statutory solution is hardly novel, having been employed multiple times in the past hundred years to resolve this potential constitutional issue. More importantly, an examination of the clause's text, purpose, and history leads to the inevitable conclusion that the legislative solution satisfied the purpose of the Ineligibility Clause and ensured Secretary Clinton's eligibility for appointment.

# BACKGROUND

On January 3, 2007, Hillary Rodham Clinton began her second term as an elected United States Senator representing the State of New York. *See* Compl. ¶ 9. In late 2008, President-Elect Obama announced his intention to nominate Senator Clinton to be the Nation's 67th Secretary of State. On December 10, 2008, both Houses of Congress passed, without opposition, a statute entitled Compensation and Other Emoluments Attached to the Office of Secretary of State. Pub. L. 110-455, 122 Stat. 5036 (codified at 5 U.S.C. § 5312 note) (hereinafter "Secretary of State Emoluments Act"); 154 Cong. Rec. S10885-03 (Dec. 10, 2008); 154 Cong. Rec. D1314-01 (Dec. 10, 2008). President George W. Bush signed the Secretary of State Emoluments Act on December 19, 2008.

The Secretary of State Emoluments Act provides–

> The compensation and other emoluments attached to the office of Secretary of State shall be those in effect January 1, 2007, notwithstanding any increase in such compensation and emoluments after that date under any provision of law, or provision which has the force of and effect of law, that is enacted or becomes effective during the period beginning at noon of January 3, 2007, and ending at noon of January 3, 2013.

Secretary of State Emoluments Act, at § 1(a).[1] The Act further provides–

> Any person ***aggrieved by an action of the Secretary of State*** may bring a civil action . . . to contest the constitutionality of the appointment and continuance in office of the Secretary of State on the ground that such appointment and continuance in office is in violation of article I, section 6, clause 2, of the Constitution.

*Id.*, at § 1(b)(1) (emphasis supplied). The Secretary of State Emoluments Act thus sets the

---

[1] The pay of the Secretary of State is set by statute at level I of the Executive Schedule. *See* 5 U.S.C. § 5312. Pursuant to 5 U.S.C. §§ 5303, 5318, cost of living adjustments were made to the Executive Schedule by Executive Order 13420, dated December 21, 2006, Executive Order 13454, dated January 4, 2008, and Executive Order 13483, dated December 18, 2008.

compensation of the Office of Secretary of State at the level that it was on January 1, 2007, two days before Secretary Clinton started her most recent Senate term. Article I, Section 6, Clause 2 of the United States Constitution, known as the Ineligibility Clause, states:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time[.]

U.S. Const. Art. I, § 6, cl. 2.[2]

Plaintiff, a United States Foreign Service Officer employed by the Department of State, seeks to debate whether the Secretary of State Emoluments Act indeed removed any Ineligibility Clause obstacles to Secretary Clinton's appointment. Compl. ¶ 3. Plaintiff does not, however, allege that he has been aggrieved by any action taken by Secretary Clinton. And although Plaintiff has, like all government employees, taken an oath to support and defend the Constitution, he has not been required to do anything that would violate that oath; to the contrary, Plaintiff admits that he "has remained true to his oath." Compl. ¶ 7, ¶ 8. Nevertheless, Plaintiff seeks an extraordinary remedy: to have the Court "enjoin[] [Secretary] Clinton from continuing to serve as U.S. Secretary of State." *Id.* at 8.

Secretary Clinton's appointment was, moreover, consistent with the Constitution. As a result of the Secretary of State Emoluments Act, the "emoluments" of the office of Secretary of State were the same on the first day of her Senate term as they were on the day of her appointment – because there was no net increase from the beginning of the term to the time of

---

[2] Article I, Section 6, Clause 2 actually contains two sub-clauses. The second sub-clause, known as the Incompatibility Clause states that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." The Incompatibility Clause is not at issue here, as Secretary Clinton has resigned her Senate seat.

appointment, the Emoluments were not "encreased" during Secretary Clinton's Senate term. Plaintiff argues to the contrary, asserting that the term "shall have been encreased" refers to an increase in emoluments at any point during the term, even if the increase was repealed by the time of appointment. But both rules of grammar and historical usage from the time of the Framers refute Plaintiff's effort to find clarity in the text. *See infra* Part II.A. Moreover, a review of the purpose of the Ineligibility Clause as evidenced by the debate at the Constitutional Convention makes clear that the Defendants' interpretation is the proper one. *See infra* Part II.B. And, various Presidents and Congresses, adhering to the purposes of the Framers, have consistently concluded that the Ineligibility Clause does not prevent the appointment of a Member to an office where any increases in emoluments during the Member's current term have been repealed prior to the appointment. *See infra* Part II.C. Indeed, prior to Secretary Clinton's appointment, Members had been appointed to Executive Office, by Presidents of both political parties, under similar circumstances (*i.e.*, the salary of the office had been increased and then the increase repealed prior to the Member's appointment in the Executive Branch) at least a half dozen times during the last hundred years. *See id.*

Because Plaintiff lacks standing, however, the Court should not involve itself in this question, even to confirm the longstanding, correct view of the political branches that Secretary Clinton's appointment was constitutional.

<u>**ARGUMENT**</u>

**I.     Plaintiff Lacks Standing to Challenge Secretary Clinton's Appointment.**

Plaintiff's claims must be dismissed because he lacks Article III standing.  Article III of the Constitution restricts the federal courts to the adjudication of "Cases" or "Controversies." U.S. Const. Art. III, § 2.  As the Supreme Court has explained, "the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the federal government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984).  Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

A core element of Article III's case or controversy requirement is that a plaintiff must establish that he or she has standing to sue.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").  "[T]he law of Art. III standing is built on a single basic idea – the idea of separation of powers."  *Allen*, 468 U.S. at 752.  And, the "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines*, 521 U.S. at 819-20; *see also Schaffer v. Clinton*, 240 F.3d 878, 882-83 (10th Cir. 2001) (relying on *Raines* to reject standing for a 27th Amendment challenge to congressional cost-of-living adjustments).

Plaintiff bears "the burden of establishing [the] existence" of standing because federal courts should presume they lack jurisdiction "unless the contrary appears affirmatively from the record." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998); *Renne v. Geary*, 501 U.S. 312, 316 (1991). To satisfy his burden, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. Thus, to satisfy "the irreducible constitutional minimum of standing," Plaintiff must satisfy three elements. *Lujan*, 504 U.S. at 560. First, Plaintiff must show an injury-in-fact – "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). Second, Plaintiff must show "a causal connection between the injury" and the challenged action. *Id.* "Third, it must be likely, as opposed to merely speculative, that the [Plaintiff's] injury will be redressed by a favorable decision." *Id.* at 561 (quotation and citation omitted); *accord Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (redressability requires a "substantial likelihood that the requested relief will remedy the alleged injury in fact").

Plaintiff, like previous plaintiffs who have sought to bring challenges pursuant to their interpretations of the Ineligibility Clause, simply does not meet these requirements. *See Ex parte Levitt*, 302 U.S. 633 (1937) (rejecting challenge by a member of the Supreme Court Bar to the appointment of Senator Hugo Black as Associate Justice of the United States Supreme Court); *McClure v. Carter*, 513 F. Supp. 265 (D. Idaho 1981) (three-judge panel), *aff'd sub nom. McClure v. Reagan*, 454 U.S. 1025 (1981) (dismissing challenge by Senator McClure to the appointment of Representative Abner Mikva to the U.S. Court of Appeals for the D.C. Circuit).

## A.     Plaintiff Has Not Alleged a Concrete and Particularized Injury

The Supreme Court has "consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is ***particularized*** as to him." *Raines*, 521 U.S. at 819 (emphasis supplied). This particularized injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations omitted).

### 1.     Plaintiff Has Not Alleged a Concrete Injury

Plaintiff's complaint is notably devoid of any allegation of a concrete injury. Plaintiff alleges no way in which the appointment of Secretary Clinton aggrieves him in any way other than his dislike for it. He has alleged no change in his job duties or conditions of employment traceable to the challenged appointment. He has not alleged that he is personally required to carry out a purportedly unconstitutional law or policy. As Congress confirmed in the Secretary of State Emoluments Act, Plaintiff must be "aggrieved by an action of the Secretary of State" in order to satisfy the concrete injury-in-fact requirement of Article III standing. *See* Secretary of State Emoluments Act at §1(b)(1) (providing that [a]ny person ***aggrieved by an action of the Secretary of State*** may bring a civil action" (emphasis supplied)); *cf. Doe v. Chao*, 540 U.S. 614, 624 (2004) ("The phrase 'person adversely affected or aggrieved' is a term of art used in many statutes to ***designate those who have standing***" (emphasis supplied)).

Here, Plaintiff's concerns are nothing more than generalized feeling of discomfort about the Secretary's appointment, and this "abstract injury in [alleged] nonobservance of the Constitution" is clearly insufficient to confer Article III standing. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 223 n.13 (1974). As the Supreme Court has held,

"psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Article III, even though the disagreement is phrased in constitutional terms." " *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 485-86 (1982). Nor does "personal offense to government action" or "general emotional harm, no matter how deeply felt," give rise to standing to sue. *In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008); *see also Humane Soc'y of United States v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (holding that allegations of "sleeplessness, depression, and anger" could not suffice to establish injury for standing purposes).

Plaintiff's dislike for Secretary Clinton's appointment does not constitute a concrete injury merely because he, like all government employees, has taken an oath to support and defend the Constitution. Compl. ¶ 7; 5 U.S.C. § 3331; *see also* U.S. Const. Art. VI, § 3 (requiring State and Federal officers and legislators to take an oath or affirmation "to support this Constitution"). Plaintiff contends that "[r]equiring [him] to serve under, take direction from, and report to Defendant Clinton harms [him] because it is in direct and unequivocal conflict with the oath Plaintiff took . . . to the U.S. Constitution." Compl. ¶ 17. However, an oath to support and defend the Constitution cannot reasonably be construed to require its adherent to personally vindicate every perceived Constitutional wrong in the government. *See, e.g., Cole v. Richardson*, 405 U.S. 676, 684 (1972) (an oath to "support" and "defend" the Constitution does not "impose obligations of specific, positive action on oath takers," but merely assures that he is "willing to commit [himself] to live by the constitutional processes of our system"). Nor can it be construed to prevent its adherent from coming to work just because he believes an agency

official was improperly appointed. *See id.*

Indeed, Plaintiff's attempt to use his oath to convert his feelings of discomfort into Article III standing is analogous to the similar attempt at standing rejected decades ago by the Supreme Court in *Ex Parte Levitt*. *See* 302 U.S. 633 (1937). As one of thousands of Foreign Service Officers who have taken the same oath, Plaintiff's relationship to the Secretary is analogous to the relationship between a member of the Supreme Court bar and a Supreme Court Justice–notably, members of the Court's bar also take an oath to uphold the Constitution, *see Richardson,* 405 U.S. at 681, and they are, of course, subject to the rules and discipline of the Supreme Court, *e.g.,* Sup. Ct. R. 8.1. Notwithstanding these facts, the Supreme Court summarily found this relationship to be an inadequate basis for standing to bring an Ineligibility Clause challenge. *See Ex parte Levitt*, 302 U.S. 633 (1937).

Nor has Plaintiff alleged that he is suffering concrete injury because he is faced with the choice of either engaging in conduct that would itself violate the Constitution or being removed from office. This case is thus entirely distinguishable from *Board of Education v. Allen*, 392 U.S. 236 (1968). In *Allen*, the Supreme Court held that members of a school board specifically directed by state law to lend textbooks without charge to parochial schools could bring an Establishment Clause challenge based on the choice "between violating their oath" by complying with an unconstitutional law and "refus[ing] to comply" with the statute and losing their jobs. *Id.* at 241 n.5. Precedents applying *Allen* demonstrate that both the explicit statutory command to engage in an unconstitutional act and the genuine threat of removal are required to create "the dilemma that gave rise to standing in *Allen*." *Board of Educ. v. New York State Teachers Retirement Sys.*, 60 F.3d 106, 112 (2d Cir. 1995). Where "plaintiffs do not contend that any

actual threat has been made to remove them from their positions," the threat of harm found in *Allen* is lacking. *Id.* at 112. By contrast, a statute directing officials to "actively execute the law's commands" brings the personal stake and harm described in *Allen*. *See South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231 (9th Cir. 1980). But *Allen* standing does not reach to suits such as this one, where a plaintiff suffers nothing more than "abstract outrage," as recognizing such harm as sufficient for Article III purposes would "convert all officials . . . into potential litigants, or attorneys general," whenever they believed they had witnessed unconstitutional conduct. *Id.* at 238. Here, Plaintiff faces no such choice.

Because Plaintiff's alleged injury is nothing more than a general desire to see the Constitution, as he interprets it, followed, he lacks the type of concrete injury required for Article III standing.

### 2. Plaintiff Has Not Alleged an Injury that Is Particularized as to Him

In addition to being abstract, the "injury" Plaintiff cites is also insufficient for Article III standing because it is not particularized as to him. To establish Article III standing, a plaintiff must be able to show "that he has sustained or is immediately in danger of sustaining some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally." *Hein v. Freedom From Religion Foundation*, 551 U.S. 587, __, 127 S.Ct. 2553, 2562 (2007) (quoting *Frothingham v. Mellon*, 262 U.S. 447, 488 (1923)). Plaintiff's alleged "oath-based injury" is anything but a particularized injury.

Hundreds of thousands of federal employees and millions of active-duty and reserve members of the armed forces swear an oath to the Constitution. All of those millions are situated similarly to Plaintiff – serving under and taking their ultimate control and direction from a leader

(the President) who has allegedly violated the Constitution by appointing Secretary Clinton.

Such "abstract questions of wide public significance" amount to "generalized grievances,

pervasively shared and most appropriately addressed in the representative branches." *Valley*

*Forge*, 454 U.S. at 475 (quoting *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975)).

The essence of the requirement that a plaintiff's injury be "particularized" to satisfy

Article III is that the injury not be a "'generalized grievance' shared in substantially equal

measure by all or a large class of citizens." *Warth*, 422 U.S. at 499 (citing *United States v.*

*Richardson*, 418 U.S. 166, 176-77 (1974)). The reason for this limitation is straightforward:

"because of the necessarily abstract nature of the injury all citizens share," it is "the legislative

function . . . inherently general rather than particular," that is entrusted by the Constitution with

resolving such injuries. *Schlesinger*, 418 U.S. at 220-21 & n.10.[3] Because the alleged

Constitutional violation cited by Plaintiff originates at the top of the government – *i.e.,* it is

action of the President and the Senate that is challenged – it is impossible to distinguish

Plaintiff's interest from those of other oath-takers, given the lack of any specific allegation of

harm to him or of conduct that involves him personally. And while, as a Foreign Service

Officer, Plaintiff may have a specific interest in the conduct of foreign policy, a specific policy

interest is insufficient to establish particularity for purposes of satisfying Article III's

requirements. *See ASARCO v. Kadish*, 490 U.S. 605, 616 (1989) (holding that teachers' unions'

"special interest in the quality of education" was insufficient to confer standing to challenge

legislation that impacted on schools).

---

[3] Notably, the very Constitutional question that Plaintiff seeks to raise here has been
debated at length in Congress on more than one occasion, with substantial majorities in Congress
finding against Plaintiff's proposed interpretation of the Ineligibility Clause. *See supra* Part II.C.

Congress recognized the need for an Article III injury to be "particularized" in establishing the cause of action Plaintiff seeks to bring in the Secretary of State Emoluments Act, which expressly limits such actions to those who have been aggrieved by "an ***action*** of the Secretary." Pub. L. No. 110-455, 122 Stat. 5036 (emphasis supplied). This clause clearly excludes Plaintiff, as he does not allege that he was aggrieved by any ***action*** taken by the Secretary, but rather that he is offended by her ***presence*** as Secretary. This requirement for an "action" excludes "necessarily abstract" harms such as Plaintiff's purported constitutional debate, *see Schlesinger*, 418 U.S. at 220, as well as other "inherently general" injuries. *Id.* Thus, even to the extent that plaintiff might encounter Secretary Clinton's name on official documents or correspondence, or walk past her in the halls of the State Department, any emotional response he experienced would still fail to satisfy the need for a "concrete and particularized" injury under Article III. *See, e.g., Newdow v. Eagen*, 309 F. Supp. 2d 29, 32-35 (D.D.C. 2004), *appeal dismissed*, No. 04-5195, 2004 WL 1701043 (D.C. Cir. July 29, 2004 (alleged injury of being "forced to confront religious dogma [found] offensive" is the type of emotional harm rejected as a basis of standing in *Valley Forge*).

As Plaintiff's claimed injury is not particularized to him, he lacks Article III standing.

**B.     Plaintiff's Supposed Injury Is Not Judicially Redressable**

In addition to lacking a Constitutionally sufficient injury, Plaintiff's claims fail for the independent reason that his concern is not judicially redressable. Plaintiff's vaguely-described injury stems not from "an action of the Secretary," *see* Secretary of State Emoluments Act, at § 1(b)(1), but rather, from her "continuance in office as U.S. Secretary of State," Compl. ¶ 21. Plaintiff accordingly asks that the Court "enjoin[] [Secretary] Clinton from continuing to serve

as U.S. Secretary of State," and declare that the Secretary's appointment and continuance in office are unconstitutional. *Id.* at 8. Neither of these forms of relief is judicially available, and thus Plaintiff's "injury" is not redressable.

1.    **Plaintiff's "Injury" Cannot Be Redressed Through an Injunction Directed at the Secretary of State**

Plaintiff's prayer that the Court order the Secretary to halt her service is nothing short of a request that the Court unconstitutionally exercise a power it lacks – that of removal of a principal officer. Because the "exclusive power of removal" of principal officers in executive agencies is vested by the Constitution in the President[4] (except in cases of impeachment), the Court cannot direct an injunction to the Secretary of State requiring her to leave office. *See Youngstown Co. v. Sawyer*, 343 U.S. 579, 638 n.4 (1952) (Jackson, J., concurring) (the President's "exclusive power of removal in executive agencies[] [was] affirmed in *Myers v. United States*").

Article II of the Constitution "grants to the President the executive power of the government – *i.e.*, the general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Myers v. United States*, 272 U.S.52, 163-64 (1926). It also "excludes the exercise of legislative power by Congress to provide for appointments and removals" because "the power of removal" is "a necessary incident" to the appointment power. *Id.* at 126, 164. The Constitution has reserved the power of removal in the

---

[4] Because Plaintiff has not named the President as a Defendant in this action, the question of whether Plaintiff's alleged injury would be redressable by order to the President is not presented here. Nevertheless, there is substantial reason to doubt that the Court could permissibly issue such an order to the President. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996); *cf. infra* Part I.B.3.

President because "[t]he power to remove officers . . . is a powerful tool for control," that must remain in the control of the President to ensure the independence of the Executive Branch. *Edmond v. United States*, 520 U.S. 651, 664 (1997). The Appointments Clause "is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is more: it preserves another aspect of the Constitution's structural integrity by preventing the diffusion" of the appointment and removal powers. *Ryder v. United States*, 515 U.S. 177, 182 (1995). These principles apply not just to the separation of powers between the executive and legislative branches, but between the executive and judicial branches as well. *See J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]t is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power."); *accord Morrison v. Olson*, 487 U.S. 654, 687 (1988) (The checks and balances and system of separation of powers enshrined in the Constitution are "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." (quotation omitted)). Thus, any attempt by another branch to remove a principal officer of the Executive Branch "would be to go beyond the words and implications of the [Appointments Clause] and to infringe the constitutional principle of the separation of governmental powers.'" *Morrison*, 487 U.S. at 686 (quoting *Myers* 272 U.S. at 161) (alteration in original).

Although no Supreme Court decision has squarely addressed an attempted judicial usurpation of the removal power, language in legislative removal cases demonstrates that this would be impermissible. For example, in *Morrison*, the Court reviewed whether there was "any judicial usurpation of properly executive functions." 487 U.S. at 695. In holding that there was

14

not, the Court stressed the textual foundation for "vest[ing] the appointment of an inferior office in the 'courts of Law,'" as distinct from the unique Executive authority over "principal officers." *Id.* As the Court observed, any tinkering by the judicial branch with removals could create a "constitutional problem." *See Id.* at 693 n. 33. Similarly, in *Bergen v. Edenfield*, the Eleventh Circuit Court of Appeals recognized that methods of removal are incontestably limited by the grants of authority in the Constitution. 701 F.2d 906, 908 (11th Cir. 1983). Considering an attorney's challenge to the conduct of a judge, the Court of Appeals observed that "[t]he only mechanism for removal of a federal judge provided in the Constitution is the impeachment process." Although the *Edenfield* court considered the question as a merits issue of whether there existed a "legal basis for th[e] suit," *id.*, the absence of a permissible, constitutional remedy is equally a question for the standing analysis. *Accord Florence v. Frontier Airlines, Inc.*, 2003 U.S. Dist. LEXIS 25750 (N.D. Tex. 2003); *Ritter v. United States*, 84 Ct. Cl. 293 (Ct. Cl. 1936) (courts lack power to review impeachment and removal of federal judge by the Senate).

Historical judicial practice adds further weight to the conclusion that Plaintiff cannot obtain judicial removal of a principal officer. In cases brought as general challenges to the validity of appointments vested exclusively in the President, courts have declined to order removal of an officer from office. Although courts have considered challenges to the validity of appointments under several provisions of the Constitution, including the Appointments Clause, the Incompatibility Clause, and the Ineligibility Clause, even where a court concludes that an appointment was unlawful, it never attempts to remove the appointee. Rather, the principal remedy courts have granted is invalidation of the appointee's action that caused the requisite concrete harm to the plaintiff. *See Nguyen v. United States*, 539 U.S. 69, 83 (2003) (vacating

decision of Court of Appeals where panel had been improperly constituted); *Ryder v. United States*, 515 U.S. 177, 178 (1995) (ordering "a hearing before a properly appointed panel" as remedy for unconstitutional appointments to a military appeals court).[5]

In cases where, as here, plaintiffs have not challenged specific actions, courts have declined to interfere with the President's exclusive power of removal. Indeed, even when considering the remedy for appointments where the President's power had been unconstitutionally usurped by the Congress, the Supreme Court has nevertheless stopped short of ordering removal. *See Buckley v. Valeo*, 424 U.S. 1 (1976) (identifying specific powers of the Federal Elections Commission and ordering the legislatively-appointed members not to exercise those powers)*; see also Bowsher v. Synar*, 478 U.S. 714, 735 (1986) (authorizing Congress to implement "fallback provisions" where the delegation of authority to the Comptroller General was held unconstitutional).

Plaintiff's failure to identify a concrete, particularized harm, and the inability of the Court to redress his purported injury, are not unrelated.[6] Plaintiff's "desire to obtain sweeping

---

[5] Even in those cases where plaintiffs have alleged concrete harms pertaining to impending actions rather than past actions, the remedy granted has not been to remove the officeholder. *See, e.g.*, *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252 (1991); *Olympic Federal Savings and Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183 (D.D.C. 1990)); *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 740 F. Supp. 1535, 1541 (D. Kan.1990).

[6] The D.C. Court of Appeals has observed that a plaintiff who seeks to directly attack the appointment of an official (as opposed to attacking an action of that official) will rarely if ever have standing. *See Andrade v. Lauer*, 729 F.2d 1475, 1496-97 (D.C. Cir. 1984). In the same case, the court suggested that the only proper way to assert such a direct attack is through an action for a writ of *quo warranto*. *See id.* at 1497 (citing cases). A *quo warranto* action may only be brought by the Attorney General of the United States or the United States Attorney or, if these Executive Branch officials decline a request, by a private party who has obtained leave of court. *See* D.C. Stat. §§ 16-3502-3503; *see also Rae v. Johnson*, 1993 WL 544295, at *1

relief cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." *Schlesinger*, 418 U.S. at 221-22 (quoting *McCabe v. Atchison, T. & S. F. R. Co.*, 235 U.S. 151, 164 (1914)) (alteration omitted). The standing requirements operate together to ensure that disputes are presented in "a form traditionally capable of judicial resolution [with] the essential dimension of specificity . . . [because] a court must rely on the parties' treatment of the facts and claims before it to develop its rules of law." *Id.* at 220-21. These requirements "further serve[] the function of insuring that [] adjudication does not take place unnecessarily. This principle is particularly applicable here, where respondents seek an interpretation of a constitutional provision which has never before been construed by the federal courts." *Id.* at 221.

Because only the President may remove a principal officer, the judiciary does not have the power to enjoin Secretary Clinton from serving as Secretary of State.

### 2. Plaintiff's "Injury" Cannot Be Redressed Through an Order Directed to the Department of State

Plaintiff has also named the Department of State as a defendant, but the inclusion of the agency does not alter the non-redressability of Plaintiff's injury. Although Plaintiff suggests that the Court "enjoin[] Defendant U.S. Department of State from requiring Plaintiff to serve under, take direction from, and report to Defendant Clinton," Compl. at 8, there appears to be no way that such relief could be effectuated without removing either plaintiff or defendant from their

---

(D.D.C. Dec. 22, 1993). Moreover, it appears that the only private person who may permissibly bring such an action (after obtaining leave of court) is a person who has a claim that he has a right to occupy the disputed office that is being wrongfully occupied by another. *See Andrade*, 729 F.2d at 1498.

respective positions. There can be no doubt that the Department of State lacks the ability to remove its own department head from office and that such a power cannot be conferred upon it. *See In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (characterizing removal as "a quintessential and non-delegable Presidential power"); *accord Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1115 (D.C. Cir. 2004) ("the appointment and removal power for heads of Executive Departments" is "a non-delegable duty of the President"). As such, no injunctive relief against the Department of State could remedy Plaintiff's purported injury.

### 3. Plaintiff's "Injury" Cannot Be Redressed Through a Declaratory Judgment

The requirement of redressability is similarly not satisfied by Plaintiff's request for a declaration about the constitutionality of the Secretary's appointment. A declaratory judgment must "admit[] of specific relief through a decree of a conclusive character." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937). Thus, "[f]or a plaintiff to have standing to request injunctive or declaratory relief, the injury alleged must be capable of being redressed through injunctive relief . . . ." *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993). This requirement ensures that declaratory judgments are "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Haworth*, 300 U.S. at 240.

The declaration sought by Plaintiff would fail to "remedy the alleged injury in fact." *Vt. Agency of Natural Res.*, 529 U.S. at 771. Because only the President has the constitutional authority to remove the Secretary, such a declaration would not halt the "continuance in office" that Plaintiff states is the basis for his purported injury. Compl. ¶ 22. Nor does the possibility of a declaratory judgment enable Plaintiff to sidestep the constitutional issues that preclude

injunctive relief.  As noted, the gravamen of Plaintiff's Complaint is that **the President** acted

unconstitutionally in the exercise of the Appointments power.  *See supra* Part I.A.1.  Yet the

inappropriateness of declaring invalid the President's exercise of his official powers is supported

by the same legal authority noting that courts should not issue injunctions against the President.

*See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion) ("[I]n general,

'this court has no jurisdiction of a bill to enjoin the President in performance of his official

duties.'" (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866));[7] *Clinton v. Jones*, 520 U.S.

681, 718-19 (1997) (Breyer, J., concurring) ("constitutional principles counsel caution when

judges consider an order that directly requires the President properly to carry out his official

duties"); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (citing *Franklin* to explain why

injunctive relief against the President personally is disfavored).

        This line of authority regarding injunctive relief bears directly on Plaintiff's request for a

declaratory judgment, as a declaratory judgment against the President would raise the exact same

separation of powers concerns.  *See Swan*, 100 F.3d at 976 n.1 ("Although the following

discussion is couched in terms of our ability to grant injunctive relief against the President,

similar considerations regarding a court's power to issue relief against the President himself

apply to Swan's request for a declaratory judgment.").  As Justice Scalia has stated:

> I think we cannot issue a declaratory judgment against the President.  It is
> incompatible with his constitutional position that he be compelled personally to
> defend his executive actions before a court. . . . The President's immunity from
> such judicial relief is "a functionally mandated incident of the President's unique

_____

[7] While the plurality in *Franklin* did not reach the question on the facts of that case of
whether an injunction against the President was appropriate, the Court nonetheless noted that
"the District Court's grant of injunctive relief against the President himself is extraordinary, and
should have raised judicial eyebrows."  *Franklin*, 505 U.S. at 802 (plurality opinion).

office, rooted in the constitutional tradition of the separation of powers and
supported by our history." Permitting declaratory or injunctive relief against the
President personally would not only distract him from his constitutional
responsibility to "take Care that the Laws be faithfully executed," U.S. Const.,
Art. II, § 3, but, as more and more disgruntled plaintiffs add his name to their
complaints, would produce needless head-on confrontations between district
judges and the Chief Executive.

*Franklin*, 505 U.S. at 827-28 (Scalia, J., concurring) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731,

749 (1982) (internal footnote omitted)).[8]

Because any declaratory judgment in this case would be a declaration against the

President and his use of his Constitutional appointment power, the separation of powers doctrine

prohibits such relief.

* * *

In sum, plaintiff lacks standing because he has alleged no concrete injury, because he has

alleged no particularized injury, and because his supposed "injury" is not judicially redressable.

For any one of these reasons, his claims should be dismissed.

---

[8] Even if the Court had the Constitutional power to issue a declaratory judgment against
the President directed at his use of Constitutional powers, it would be prudent for the Court to
exercise its "unique and substantial discretion in deciding whether to declare the rights of
litigants," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), and decline to issue such a
declaration. *See, e.g.*, *North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 647 (7th Cir. 1998)
(Declaratory Judgment Act "does not obligate courts to issue declaratory judgments. Instead,
district courts have wide discretion to decline to hear such actions.").

**II.     Plaintiff's Complaint Fails To State a Claim Upon which Relief May Be Granted Because Secretary Clinton Has Properly Been Appointed**

Even if Plaintiff had Article III standing, and he does not, his Complaint must still be dismissed because his legal claims are without merit.  The Ineligibility Clause bars the appointment of a Member of Congress to an office where the emoluments of that office "have been encreased during" the Member's current term.  It is undisputed that the emoluments of the office of Secretary of State were the same when Secretary Clinton was appointed as they were at the beginning of her most recent term.  Because the emoluments at the time of appointment were not increased from the time her most recent term began, her appointment does not violate the clause.

Plaintiff is able to contend that there is a violation only by interpreting the phrase "have been encreased during" to refer to any historical increase even if it was repealed before the appointment at issue and therefore had no effect on the person in question.  By Plaintiff's analysis, the stock market was increased during 2008–even though the Dow Jones Industrial Average lost about a third of its value–because it had some positive days.  *Cf.* Exhibit 1, at 4.  Those with stock investments during that time would not agree.  In any event, Plaintiff's reading is not compelled by the constitutional text, is squarely at odds with the purpose of the clause, and is inconsistent with the long history of practice by Presidents and Congress.

**A.     Because There Was No Net Increase in the Emoluments of the Office of Secretary of State During Secretary Clinton's Senate Term, Her Appointment Is Consistent with the Plain Language of the Ineligibility Clause**

Plaintiff would have this Court take one look at the Constitutional provision, declare it unambiguous, and apply it without regard to the provision's purpose or history.  Under

Plaintiff's construction of the Ineligibility Clause, ineligibility inures if the Emoluments of the office have "increased at any historical point" during the period, even if the increase was subsequently repealed during the same period. Given this meaning, it is not the overall condition of the Emoluments that determine eligibility, but rather, the act of "increase" itself, if it occurs at any point after the beginning of the Member's term. And, Congress may not restore eligibility to the Member by adjusting the emoluments prior to the Member's appointment to restore them to the original level.

The plain text of the Ineligibility Clause, however, does not compel Plaintiff's reading. To the contrary, the word "encreased" and the phrase "shall have been encreased during" are comfortably read to require ineligibility only if the emoluments of the office have "increased on net" during the period.[9] Under this reading, so long as the emoluments existing at the time of the Appointment do not exceed those that existed at the commencement of the Member's term of election, the Member is eligible for office. Notwithstanding Plaintiff's breezy assumption that his embrace of the latter interpretation is correct, nothing in the text of the Constitution requires this conclusion. Indeed, rules of grammar and common usage from the time of the Framers make clear that the phrase "shall have been increased during" can reasonably be understood to carry the "on net" meaning that Plaintiff seeks to foreclose.

First, that the plain language does not compel Plaintiff's interpretation is confirmed by the fact that "increased" is one of many words that can serve as either an adjective or a verb,

---

[9] "Encreased" is a now-disused spelling of the word "increased," and has retained its meaning from the 18th century to the present. *Compare* New Shorter Oxford English Dictionary at 1342 (3d ed. 1993) (listing as the primary meaning "make or become greater in size, amount, duration, or degree") *with* Samuel Johnson, A Dictionary of the English Language (1804) ("To grow more in number, or greater in bulk, to advance in quantity or value.").

depending on the context. Because "increased" is more familiar to modern readers as a verb, the similar word "damaged" provides a helpful illustration. As a verb, in a sentence like "The vase was damaged by accident," "damaged" describes as event that has taken place, and it acts as a verb. Yet in a sentence such as "The vase did not appear damaged after it fell," the word "damaged" describes the condition of the vase, and is therefore adjectival. The word "increased" in the Eligibility Clause may likewise describe either an event that has taken place or the condition of the emoluments.[10] Such ambiguity between a verb form and an adjective is not unique, and is particularly likely where, as in the Ineligibility Clause, "the verb-form involved is a . . . past-participle form," and is occurring "after 'be' in the progressive and passive constructions." *See* Rodney D. Huddleston & Geoffrey K. Pullum, A Student's Introduction to English Grammar, at 116-17 (2005); *accord* Rodney D. Huddleston & Geoffrey K. Pullum, The Cambridge Grammar of the English Language, at 1436-41 (2002).

   Usage examples from the early 18th century confirm that "increase" sometimes served as an adjective describing a state of affairs during the era of the Constitution and the time thereafter. For instance, Englishman Alexander Hay wrote the following in 1804:

> There is no reason to doubt the accuracy of the survey of 1801, unless it should be suspected that it, as well as the general survey of the kingdom then had, was taken at the desire of the ministry, who doubtless were solicitous that the population of the kingdom should appear increased, and not diminished, after a long and destructive war, in which so many lives were lost.

Hay's History of Chichester, 1804 at 574 (West Sussex Co. and Diocesan Record Office 1974).

---

   [10] A word such as "increased" is particularly susceptible to being read as an adjective describing a condition or state of affairs, as in the "on net" interpretation of the Emoluments Clause, if it can complement a verb such as "seem" or "appear," as in the broken-vase example above. "Increase" passes the test by doing so in a sentence such as: "The water level in the river seems increased since yesterday."

This use of "increased" extends to constructions similar to the Ineligibility Clause, including

alongside a passive form of the "be" verb and the word "during" in describing a change during a

specified period. Thus, Sir Walter Scott wrote: "Their dislike to the Prussian government and

nation had been increased during the wars of the great Frederick . . . ." History of Europe, 7

Edinburgh Annual Register 305 (1816). Likewise, in a report to Congress, an organization of

manufacturers observed that: "The value of goods manufactured in the United States . . .

amounted, as early as 1810, to upwards of one hundred and seventy-two millions of dollars,

which value was very greatly increased during the late war." 16th Cong. Rec. at 441 (Dec. 20,

1819).[11]

      Consistent with these examples, the phrase "shall have been increased during" can

reasonably be interpreted to describe a net change in the condition of the emolument, in which

case the Secretary of State Emoluments Act properly rendered Secretary Clinton eligible for

appointment as Secretary of State.

---

[11] Although the possibility of interpreting "increased" as an adjective describing the "state" or "condition" of the emoluments is sufficient to establish the ambiguity of the Clause, it is also possible to read "increased" as a verb in the resultative perfect tense, which similarly describes a state of existence, particularly in connection with a past act. *See* Jeong Hong-Lee, *The Have Perfect in Old English* at 375, in Studies in the History of the English Language (Donka Minkova and Robert Stockwell, eds., 2002). In such fashion, three Pennsylvania politicians reporting on the Whiskey Rebellion reported in 1794 that "[t]he militia (which by late orders from the President, have been increased to 15,000 men . . .), have received orders to assemble . . . ." Letter of Sept. 1, 1794, Opposition to the Excise Law in Pennsylvania, *reprinted in* American State Papers 037, Misc. Vol. 1, 3d Cong., 2d Session (Pub. No. 56).

**B.**    **The Purpose of the Ineligibility Clause Demonstrates that It Bars Appointment Only Where the Emoluments Have Been Increased on Net During the Member's Current Term**

Where a constitutional provision is open to more than one construction, it is the duty of the courts to choose the construction that fits with the purpose of the provision. *E.g.*, *United States v. Classic*, 313 U.S. 299, 316 (1941) ("If we remember that 'it is a Constitution we are expounding,' we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the Constitutional purpose."). Indeed, at least since the seminal case of *M'Culloch v. Maryland*, 17 U.S. 316 (1819), nearly two hundred years ago, it has been settled that constitutional provisions must be construed in accordance with their purpose. In that case, Chief Justice Marshall confronted a State's claim that a federal law did not satisfy the Constitution's necessary and proper clause[12] because, while it was helpful to Congress' purpose, it was not truly "necessary." *See id.* at 413. The Supreme Court rejected what Chief Justice Marshall called this "strict and rigorous meaning" of the word "necessary," finding that the word was also susceptible to a second, less rigorous construction of "convenient, or useful." *Id.* at 413, 419. Chief Justice Marshall noted:

> Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. ***It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense – in that sense which common usage justifies***.

*Id.* at 414 (emphasis supplied). In choosing between the "rigorous" and "more mitigated" constructions of the word, the Court looked to "the intention of those" who drafted the

---

[12] U.S. Const. Art. I, § 8, cl. 18.

Constitution. *Id.* at 415. Finding that the "strict and rigorous meaning" advanced by the State of Maryland "could not [have been] intended," the Supreme Court chose the construction that would allow the federal government to function as the Framers intended. *Id.* at 419.[13]

Applying this principle here, it is clear that, while the text of the Ineligibility Clause is susceptible to two different constructions, only Defendants' construction is consistent with the purpose of the clause, as demonstrated by the drafting history of the clause at the Constitutional Convention.

The Ineligibility Clause emerged from the Constitutional Convention as a compromise between two strong and competing concerns expressed by the Framers. On the one hand, there was concern that unlimited Congressional eligibility to Executive Branch positions could lead to Legislative corruption or undue Executive Branch influence over Congress as legislators created or enhanced positions and then sought appointment to those same positions or Presidents offered newly enhanced offices in exchange for votes. On the other hand, there was concern that an overbroad disqualification of Members would significantly disserve the Nation by robbing it of the public service of talented and experienced individuals in the Executive, Judicial, and

---

[13] *Accord Alden v. Maine*, 527 U.S. 706, 741 (1999) (interpreting the Constitution in light of "history, practice, precedent, and the structure of the Constitution"); *Baker v. GMC*, 522 U.S. 222, 231-32 (1998) (progressing from an analysis of the text of the Full Faith and Credit Clause to an analysis of its purpose); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("Although the text of the [Eleventh] Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms." (quotation omitted) (alteration in original)); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 806-14 (1995) (interpreting Constitution by reviewing history of Constitutional Convention to determine the Framers' intended purpose); *Bell v. Maryland*, 378 U.S. 226, 288-89 (1964) (Goldberg, J., concurring) ("Our sworn duty to construe the Constitution requires [that] we read it to effectuate the intent and purposes of the Framers.").

Legislative Branches. The resulting compromise advanced by James Madison thus sought to prevent Members of Congress from enjoying gains from decisions made during the term for which they were elected, without limiting the pool of qualified appointees where this concern is not present.

As originally proposed, the language that would become the Ineligibility Clause was substantially broader than the clause as ultimately enacted. As reported by committee on June 13, 1787, the proposal stated that Members were–

> to be ineligible to any Office established by a particular State or under the authority of the United States (except those peculiarly belonging to the functions of the [respective House of Congress]) during the term of service, and under the national government for the space of one year after its expiration.

I Farrand, Records of the Federal Convention of 1787, at 228 (1966 ed.).[14]

On June 22, Delegates at the Convention, mainly Federalists, raised objections to the breadth of the disqualification inherent in this version of the clause. For example, James Wilson of Pennsylvania stressed the cost that the Federal Government would pay if it were unable to choose the best people for Executive and Judicial positions:

> Strong reasons must induce me to disqualify a good man from office. . . . [W]e ought to hold forth every honorable inducement for men of abilities to enter the service of the public. – This is truly a republican principle. . . . Suppose a war breaks out, and a number of your best military characters were members; must we lose the benefit of their services?

*Id.* at 379-80. Alexander Hamilton was even more vigorously opposed to the clause:

> We have been taught to reprobate the danger of influence in the British

---

[14] Notably, at this point the proposed Constitution would have vested much of the appointment power in the Legislature rather than the Executive. *Id.* at 230-31. During the course of the Convention, the appointment power moved to the Executive and the scope of the Ineligibility Clause, which is targeted in part at Congressional self-dealing, was reduced accordingly.

government, without duly reflecting how far it was necessary to support a good government. . . . Our [mankind's] prevailing passions are ambition and interest; and it will ever be the duty of a wise government to avail itself of these passions, in order to make them subservient to the public good – for these ever induce us to action.  Perhaps a few men in a state, may, from patriotic motives, or to display their talents, or to reap the advantage of public applause, step forward; but if we adopt the clause we destroy the motive.  I am therefore against all exclusions and refinements, except only in this case; that when a member takes his seat, he should vacate every other office.

*Id.* at 381-82.  Anti-Federalists such as George Mason of Virginia took the opposite view:

[The proposed clause] is necessary to shut the door against corruption.  If otherwise, they [Members of Congress] may make or multiply offices, in order to fill them. . . . If not checked, we shall have ambassadors to every petty state in Europe – the little republic of St. Marino not excepted.  We must in the present system remove the temptation.  I admire many parts of the British constitution and government, but I detest their corruption.

*Id.* at 380.

The next day, James Madison proposed a compromise that would render Members "ineligible during their term of service, [and] for one year after – to such offices only as should be established, or the emoluments thereof, augmented by the Legislature of the U[nited] States during the time of their being members." *Id.* at 386.  Madison "supposed that the unnecessary creation of offices, and increase of salaries, were the evils most experienced [and] that if the door was shut ag[ain]st them, it might properly be left open for the appoint[ment] of members to other offices as an encouragm[ent] to the Legislative service." *Id.*

Madison had been led to this motion as a middle ground between an eligibility in all cases, and an absolute disqualification. . . . The question was not to be viewed on one side only.  The advantages [and] disadvantages on both ought to be fairly compared.  ***The objects to be aimed at were to fit all offices with the fittest – characters [and] to draw the wisest [and] most worthy citizens into the Legislative service***. . . . As to the next object, the impulse to the [State] Legislative service, was evinced by experience to be in general too feeble with those best qualified for it.  This inconveniency w[ould] also be more felt in the Nat[iona]l Gov[ernmen]t than in the State Gov[ernmen]ts as the sacrifices

28

req[uired] from the distant members w[ould] be much greater, and the pecuniary provisions, probably, more disproportionate. It w[ould] therefore be impolitic to add fresh objections to the [Legislative] service by an absolute disqualification of its members. The point in question was whether this would be an objection with the most capable citizens. Arguing from experience [Madison] concluded that it would.

*Id.* at 388-89 (emphasis supplied).[15]

The debate continued on August 14, with Federalist Delegates continuing to stress that any disqualification of Members that was any broader than absolutely necessary to prevent corruption was an evil that would hinder the operation of the national government. Charles Pinckney of South Carolina–

argued that the making the members ineligible to offices was ***degrading*** to them, and the more improper as their election into the Legislature implied that they had the confidence of the people; that it was ***inconvenient***, because the Senate might be supposed to contain the fittest men. He hoped to see that body become a School of Public Ministers, a nursery of Statesmen: that it was ***impolitic***, because the Legislature would cease to be a magnet to the first talents and abilities.

II Farrand, Records of the Federal Convention of 1787, at 283 (1966 ed.) (emphasis in original).

Similarly, Gouverneur Morris of Pennsylvania observed:

---

[15] Wilson supported this compromise as a proper balance that would prevent corruption while continuing incentives for the most talented individuals to serve in the Legislature:

The proper cure he said for corruption in the Legislature was to take from it the power of appointing to offices [*cf. supra* note 14]. One branch of corruption would indeed remain, that of creating unnecessary offices, or granting unnecessary salaries, and for that the amendment would be a proper remedy. He animadverted on the impropriety of stigmatizing with the name of venality the laudable ambition of rising into the honorable offices of the Government . . . . the members of the Legislature have perhaps the hardest [and] least profitable task of any who engage in the service of the state. Ought this merit to be made a disqualification?

*Id.* at 387. Mason and other Anti-Federalists opposed Madison's compromise, with Mason calling it "but a partial remedy for the evil" of corruption. *Id.*

> Why should we not avail ourselves of [Members'] services [in the Executive or Judicial Branches] if the people chuse to give them their confidence. There can be little danger of corruption either among the people or the Legislatures who are to be the Electors. If they say, we see their merits, we honor the men, we chuse to renew our confidence in them, have they not a right to give them a preference; and can they be properly abridged of it.

*Id.* at 286-87. And, Wilson, perhaps addressing the goals of the Anti-Federalists, opined that "nothing seemed to be wanting to prostrate the Nat[iona]l Legislature, but to render its members ineligible to Nat[iona]l offices, [and] by that means take away its power of attracting those talents which were necessary to give weight to the Govern[ment] and to render it useful to the people." *Id.* at 288.

Despite the August debate, Madison's compromise had still not been formally adopted when August drew to a close. On September 1, 1787, the Convention's Committee of Eleven reported out the following language:

> The Members of each House shall be ineligible to any civil Office under the authority of the United States during the time for which they shall respectively be elected[.]

*Id.* at 483. Reiterating their view that appointment of Members should be limited only in situations where there is a possibility of self-dealing or undue Executive influence, the Federalist Delegates proposed limiting the prohibition to only those offices "created or the emoluments whereof shall have been increased" during the Member's current term. *Id.* at 492. This limiting language, similar to Madison's proposed compromise, passed the Convention on a vote of five to four with one abstention. *Id.*

The Convention thus adopted Madison's argument that the goal of deterring Congressional self-dealing and Executive influence over the votes of sitting Members of Congress should be balanced by the goal of leaving the door open as wide as possible to allow

Members to move to the Executive and Judicial Branches. Under this compromise, the purpose of the Ineligibility Clause is to ensure that the best qualified persons are available for Executive and Judicial service as long as their service is consistent with the need to prevent Congressional self-dealing and undue Executive influence over the Legislature.[16]

The construction of the phrase "shall have been encreased during" advanced by Defendants is the only construction that is consistent with this purpose. First, the purposes that the Framers had for creating ineligibility in some cases – namely to prevent self-dealing by Congress and undue influence over Congress by the President – would not be served where any increase has been repealed. Secretary Clinton will not benefit from any increases enacted during her most recent term, and thus there is no danger of self-dealing. Nor is there any way in which the setting of the emoluments could be the result of or the cause for undue influence by the President.

Moreover, not only would barring Secretary Clinton's appointment have served none of the purposes served by the Ineligibility Clause, it would actively disserve one of the key

---

[16] *See* Joseph Story, Commentaries on the Constitution of the United States, § 864 (1970 ed.) (noting that the purpose of the Ineligibility Clause was "to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness"); The Federalist No. 76 (Hamilton), at 283 (McLean 1788) (stating that the Ineligibility Clause is one of the "important guards against the danger of executive influence upon the legislative body"); The Federalist No. 55 (Madison), at 147 (McLean 1788) (noting that the Ineligibility Clause prevents the Executive from "purchas[ing] the guardians of the people" with offices).

A later attempt to enact a stricter Ineligibility Clause was defeated in 1826. *See* 19th Cong. 52, at 1-6 (Mar. 1, 1826) (proposing that the Constitution be amended as follows: "No Senator or Representative shall be appointed to any civil office, place, or emolument, under the authority of the United States, until the expiration of the Presidential term in which such person shall have served as a Senator or Representative").

purposes behind the compromise clause that was adopted.  The drafting history makes clear that

the Framers wanted to prevent a Member from unduly profiting from an increased salary while at

the same time retaining eligibility for appointment when there could be no such undue profit, so

as to maintain the highest incentive for the most qualified individuals to serve in the Legislative,

Executive, and Judicial Branches.  This goal is reached if the phrase "shall have been encreased"

is interpreted to mean increased on net from the beginning of the Member's term to the time of

her appointment.  In contrast, this goal is not met under Plaintiff's "historical fact" construction

as that construction would disqualify a Member from Executive and Judicial service even where

there is no possibility that she would benefit from a higher salary.  Indeed, because under current

law all federal offices receive annual raises in January of each year, Plaintiff's construction

would essentially disqualify every Member of Congress from every Executive and Judicial office

for the duration of his or her term – precisely the rule that Framers *rejected* because it would

deprive the federal government of needed talent.[17]

### C.   Consistent Constitutional Practice Demonstrates that the Ineligibility Clause Bars Appointment Only Where the Emoluments Have Been Increased on Net During the Member's Current Term

The Supreme Court has observed that "traditional ways of conducting

government . . . give meaning to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401

(1988); *see also Thornton*, 514 U.S. at 816 (finding that consistent Congressional practice

provides "evidence of the general consensus" of the meaning of the Constitution); *Powell v.*

---

[17] Plaintiff makes no secret of the fact that barring all Members from Executive and Judicial service for the entirety of their respective terms is the outcome that he seeks in this case. *See* Compl. ¶ 14 (contending that Secretary Clinton "will not be eligible to hold *any civil office* under the authority of the United States until the second, six-year term to which she was elected expires in January 2013" (emphasis supplied)).

32

*McCormack*, 395 U.S. 486, 502 (1969) (finding a history of Congressional practice to be persuasive in determining the meaning of the relevant Constitutional clause). In the case of the Ineligibility Clause, more than a century of consistent practice by the elected branches demonstrates an understanding that the interpretation of the Clause advanced by Defendants is the correct interpretation. Indeed, while this matter was once the subject of intense debate, even the vocal minority that once took Plaintiff's position on the meaning of the Ineligibility Clause has died out, and Defendants' interpretation is now universally embraced in Congress and by the Executive.

By the time of Secretary Clinton's appointment, Members had been appointed to Executive Office under similar circumstances (*i.e.*, the salary of the office had been increased and then the increase repealed during the Member's then-current term) at least half a dozen times by Presidents of both parties. In 1876, President Grant appointed Senator Lot Morrell to be Secretary of the Treasury. *See* Senate Report 93-499, at 5 (Nov. 13, 1973). During Morrell's then-current Senate term, the salary of cabinet officials, including the Treasury Secretary, had been raised from $8,000 per year to $10,000 per year and then returned to $8,000 per year. *See id.* Morrell was nominated and confirmed as Secretary of the Treasury and there is no known record of any opposition to his appointment based on the Ineligibility Clause. *See id.*

A somewhat different reaction greeted the nomination, by President (and later Chief Justice) William Howard Taft, of Senator Philander Knox to be Secretary of State. In 1907, while Knox was a Senator, Congress increased the salary of cabinet officials, including the Secretary of State, from $8,000 per year to $12,000 per year. *See* Act of May 22, 1908, ch. 186, 35 Stat. 184, 197. After President Taft expressed an intention to nominate Knox, legislation was

introduced in Congress to reduce the salary of the Secretary of State to $8,000 per year.  *See* Act of March 4, 1909, ch. 297, 35 Stat. 845, 861.  A vigorous debate over the meaning of the Ineligibility Clause ensued.  *See* 43 Cong. Rec. 2390-415 (1909).  Ultimately, the position that Knox was constitutionally eligible to serve at the lower salary prevailed.  The legislation passed the House 173-110 and the Senate unanimously.  43 Cong. Rec. 2415 (1909) (House); 43 Cong Rec. 2205 (Senate).  Knox was confirmed unanimously.  44 Cong. Rec. 6-7 (1909).

The Congressional debate over interpretation of the Ineligibility Clause resumed in 1973 when President Nixon expressed his intent to nominate Senator William Saxbe to be Attorney General.  Saxbe's Senate term had begun in January 1969, and during that term, the salary of the Attorney General had increased from $35,000 per year to $60,000 per year.  The Executive Branch sought legislation to reduce the salary of the Attorney General to $35,000.  Senator Robert Byrd led a vigorous opposition to the bill, arguing that it would be insufficient to satisfy the Ineligibility Clause.  *See* Hearing Before the Committee on the Judiciary on S. 2673, 93rd Cong. (Nov. 19, 1973); 119 Cong. Rec. 37,017-26 (1973); *see also* 119 Cong. Rec. 38,315-48 (Nov. 28, 1973) (Senate debate); 119 Cong. Rec. 39,234-45 (House debate).  Despite his strenuous arguments and a hearing in which he called several law professors to testify, Senator Byrd failed to persuade more than a small minority of his colleagues.  The legislation passed the House by a vote of 261-129 and the Senate by a vote of 75-16.  *See* 119 Cong. Rec. 39,245 (1974) (House); *id.* at 38,347-48 (Senate).  In a vote of 75-10, the Senate confirmed Saxbe. *See* 121 Cong. Rec. 42,018 (1975).

The confirmation of Saxbe as Attorney General marked the end of the debate in the political branches over the proper interpretation of the Ineligibility Clause.  In 1975, when

President Ford appointed Representative Robert Casey to a seat on the Federal Maritime Commission, Congress passed legislation reducing the salary of his seat on the Commission (but not the seats of the other Commissioners) for the duration of his Congressional term. *See* Act of May 3, 1980, Pub. L. No. 96-241, 94 Stat. 343. Casey was confirmed by voice vote with recorded opposition from only one Senator – Senator Byrd. *See* 121 Cong. Rec. 42,158 (1975).

In 1980, even Senator Byrd capitulated to the view that had come to be held by the overwhelming majority of his colleagues. That year, President Carter appointed Senator Edmund Muskie to be Secretary of State. Legislation reduced the Secretary of State's salary to the level at which it had been prior to Muskie's then-current Senate term, *see* Act of May 3, 1980, Pub. L. 96-241, 94 Stat. 343 (1980), and Muskie was confirmed with the votes of 94 of his Senate colleagues including that of Senator Byrd. *See* 126 Cong. Rec. 10,279 (1980). Indeed, in a speech reminiscent of the Federalist Delegates' speeches on the importance of having qualified persons serving in all branches of government, Senator Byrd was effusive in his praise of Muskie's nomination and his conviction that Muskie's Senate service made him uniquely qualified to be Secretary of State at that particular time. *See* 126 Cong. Rec. 10,272-73 (1980) ("I know of no man in America better suited to meet the challenges of these difficult times than Ed Muskie. . . . [T]he State Department's gain is the Senate's loss. What matters is that the Nation continues to benefit from the services of Ed Muskie.").[18] Only two Senators opposed

---

[18]As Chief Justice Marshall observed in *M'Culloch*, the fact that once-controversial legislation has won over its former critics counsels strongly in favor of its Constitutionality. *See* 17 U.S. at 402 (noting that the challenged bill initially "was opposed with equal zeal and ability" by those concerned about the Constitutional balance between Congress and the States but then events "convinced those who were most prejudiced against the measure of its necessity," and holding that it "would require no ordinary share of intrepidity, to assert that a measure adopted under these circumstances, was a bold and plain usurpation, to which the constitution gave no countenance").

Muskie's confirmation, and neither appeared to be motivated by Ineligibility Clause concerns, as both had voted in favor of confirming Saxbe. *See* 121 Cong. Rec. 42,018 (1975).

In 1993, President Clinton nominated Senator Lloyd Bentsen to be Secretary of Treasury. The salary of cabinet officials, including the Secretary of the Treasury, had been increased by the Ethics and Government Reform Act of 1989, Pub. L. 101-194, § 703(a)(1), 103 Stat. 1748 (1989), during Bentsen's then-current Senate term. Congress passed legislation reducing the salary of Secretary of the Treasury to the level at which it had been at the beginning of Bentsen's term. *See* Act of Jan. 19, 1993, Pub. L. 103-2, 107 Stat. 4 (1993). Bentsen was confirmed as Secretary of the Treasury without opposition. *See* 139 Cong. Rec. 389 (1993). Senator Byrd was an enthusiastic supporter of the nomination. *See* 139 Cong. Rec. 388 (1993) ("I am pleased to support the nomination of Lloyd Bentsen for Secretary of the Treasury of the United States. . . . This well-deserved nomination caps off a highly successful public service career.").[19]

Thus when the Secretary of State Emoluments Act described above was passed, the issue of the proper interpretation of the Ineligibility Clause had been long settled in Congress. On January 21, 2009, Senator Clinton was confirmed as Secretary of State by a vote of 94-2; and neither of the opposing Senators cited the Ineligibility Clause as a basis for his vote. *See* 155

---

[19] Senator Byrd's speeches in favor of the confirmations of Muskie and Bentsen, which discussed each man's Senate accomplishments and their relevance to the Cabinet Office he was being appointed to, might be seen as a vindication of the Framers' decision to adopt a narrow Ineligibility Clause so as to allow the United States to benefit from the service of the most qualified individuals. Similar comments were made about Secretary Clinton. *E.g.*, 155 Cong. Rec. S679 (Jan. 21, 2009) (statement of Sen. Lugar) ("She has longstanding relationships with many world leaders that could be put to great use in the service of our country. Her time in the Senate has given her a deep understanding of how U.S. foreign policy can be enriched by establishing a closer relationship between the executive and legislative branches."); *id.* at S692-93 (statement of Sen. Reid) ("Senator Clinton is uniquely capable and profoundly prepared to lead our State Department at a time of unprecedented global challenges.").

Cong. Rec. S693 (Jan. 21, 2009).[20]

   This long history of Congressional and Presidential practice  thus provides an additional reason to interpret the Ineligibility Clause in the way which best effectuates the intent of the Framers and allows service where there is no possibility of unjust enrichment or undue Executive influence.[21]

----

   [20] Secretary Clinton is one of two individuals who moved directly from the Senate to President Obama's cabinet.  The other is Interior Secretary Salazar.  Legislation nearly identical to the Secretary of State Emolument Act was enacted to reduce the emoluments of the Office of Secretary of the Interior to the level of January 1, 2005.  *See* Pub. L. 111-1, § 1, 123 Stat. 3 (Jan. 16, 2009).  Secretary Salazar was confirmed without opposition by the Senate on a voice vote.  155 Cong. Rec. S663 (Jan. 20, 2009).

   [21] In addition to the practice by Presidents Ulysses Grant, William Howard Taft, Richard Nixon, Gerald Ford, Jimmy Carter, William Jefferson Clinton, and Barack Obama of appointing one or more Members to Executive Office under circumstances similar to the ones here, the Department of Justice has on numerous occasions endorsed the efficacy of legislation reducing the salary of an office as a means of complying with the Ineligibility Clause.  Assistant Attorney General Charles Russell took this position with respect to the prospective appointment of Senator Knox, *see* 43 Cong. Rec. 2402-03 (1909), as did Acting Attorney General Robert Bork and Assistant Attorney General for the Office of Legal Counsel Robert G. Dixon with respect to the prospective appointment of Senator Saxbe, *see* S. Rep. 93-499, at 5-7 (Nov. 13, 1973); Hearing Before the Committee on Post Office and Civil Service on S. 2673, 93rd Cong., at 8-16 (Nov. 18, 1973); Hearing Before the Committee on the Judiciary on S. 2673, 93rd Cong., at 69-74 (Nov. 19, 1973).  *See also* 3 Op. O.L.C. 298, 300 (1979); 3 Op. O.L.C. 286, 289-90 (1979). Assistant Attorney General for the Office of Legal Counsel Charles Cooper reached the opposite conclusion in a 1987 unpublished memorandum.  *See* Memorandum for the Counselor to the Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, Re: Ineligibility of Sitting Congressman to Assume a Vacancy on the Supreme Court (Aug. 24, 1987) (attached as Ex. 2). However, the Office of Legal Counsel has now concluded that the 1987 opinion does not reflect the best reading of the Ineligibility Clause, and in a written opinion, the Office has advised that a sitting member of Congress may be appointed to an office for which the salary has been increased during the member's term, provided the salary increase is rolled back before the appointment.  *See* Memorandum for the Attorney General, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, Re: Validity of Statutory Rollbacks as a Means of Complying with the Ineligibility Clause (May 20, 2009) (attached as Ex. 1).

## **CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss should be granted.

May 20, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director


  */s/ Jeffrey M. Smith*
JEFFREY M. SMITH (D.C. Bar # 467936)
ERIC J. SOSKIN (PA Bar # 200663)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW,
Washington, D.C. 20001
Room 7144
Tel: (202) 514-5751
Fax: (202) 616-8202

*Counsel for Secretary of State Hillary Rodham
Clinton and the United States Department of State*