# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID C. RODEARMEL,         )
                                      )
                 Plaintiff,      )     No. 1:09-cv-00171-RBW-JR
                                        )
v.                                   )     Honorable Karen LeCraft Henderson
                                        )     Honorable James Robertson
HILLARY RODHAM CLINTON, et al.  )     Honorable Reggie B. Walton
                                        )
              Defendants.    )
_____)

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

JUDICIAL WATCH, INC.

Paul J. Orfanedes
D.C. Bar No. 492716
James F. Peterson
D.C. Bar No. 450171
501 School Street, S.W., Suite 700
Washington, D.C. 20024
(202) 646-5172

July 2, 2009                                    *Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    The Ineligibility Clause and the Appointment of Mrs. Clinton . . . . . . . . . . . . . . 1

      B.    Plaintiff's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Defendants' Motion to Dismiss Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Standard of Review of Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Plaintiff Has Alleged a Concrete, Particularized Injury
                Caused By Defendants' Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            3.    Plaintiff's Injuries Are Redressable by This Court . . . . . . . . . . . . . . . . . 15

            4.    Plaintiff's Complaint Amply States a Claim that Mrs. Clinton's
                Appointment Is Contrary to the Unambiguous
                Language of the Ineligibility Clause and Cannot Be "Fixed"
                By Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                  a.    The Text of the Ineligibility Clause Is Clear and Precise . . . . . . 21

                  b.    A Plain Language Interpretation Without Any
                      Legislative "Fix" Is Consistent With and Promotes
                      the Framers' Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                  c.    Disregard of the Plain Language of the Ineligibility
                      Clause Does Not Justify Further Violations . . . . . . . . . . . . . . . . 28

      B.    Plaintiff Is Entitled to Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            1.    Legal Standard for Motion for Summary Judgment . . . . . . . . . . . . . . . . 1

2.      Plaintiff Is Entitled to Summary Judgment on Count I
        of the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3.      Plaintiff is Entitled to Summary Judgment on Count II
        of the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## Cases

*Aguayo v. Richardson*,
473 F.2d 1090 (2d Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974) . . . . . . . . . . . . . . . . .8

*Andrade v. Lauer*, 729 F.2d 1475
(D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Bender v. Williamsport Area School District*,
475 U.S. 543 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Board of Education v. Allen*,
392 U.S. 236 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-12

*Board of Educ. v. New York State Teachers Retirement Sys.*,
60 F.3d 106 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Buckley v. Valeo*,
424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*City of South Lake Tahoe v. California Regional Planning Agency*,
625 F.2d 231 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Clarke v. United States*,
705 F. Supp. 605 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 12

*Colm v. Vance*,
567 F.2d 1125 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 34

*Columbia Cat Fanciers, Inc. v. Koehne*,
96 F.2d 529 (D.C. Cir. 1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ex Parte Levitt*,
302 U.S. 633 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*In re: Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lake County v. Rollins*,
     130 U.S. 662 (1889) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lujan v. Defenders of Wildlife*,
     504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Marbury v. Madison*,
     5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McClure v. Carter*,
     513 F. Supp. 265 (D. Idaho 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nguyen v. United States*,
     539 U.S. 69 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Regents of the Univ. of Minn. v. NACC*,
     560 F.2d 352 (8th Cir.), *cert. denied*, 434 U.S. 978 (1977) . . . . . . . . . . . . . . . . . . . . . . 8

*Ryder v. United States*,
     515 U.S. 177 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Schlesinger v. Reservists Committee to Stop the War*,
     418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tao v. Freeh*,
     27 F.3d 635 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Sprague*,
     282 U.S. 716 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Valley Forge Christian College v. Americans United For Separation*
     *of Church and State*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Warth v. Seldin*,
     422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Constitutional Provisions, Statutes, and Other Authorities**

U.S. Const., art. I, § 6, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. art. I, § 9, cl. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

# TABLE OF AUTHORITIES (cont.)

U.S. Const., art. I, § 10, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. Const., art. I, § 10, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22 U.S.C. § 2651a(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 U.S.C. § 3901(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22 U.S.C. § 3904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 U.S.C. § 3921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 U.S.C. § 3942(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 U.S.C. § 4010(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Public Law No. 110-455, 122 Stat. 5036 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Miscellaneous**

17 Op. Att'y Gen. 365 (1882) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 29, 30, 31

21 Op. Att'y Gen. 211 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

31 Op. O.L.C. ___ (2007); 2007 OLC LEXIS 3 (April 16, 2007) . . . . . . . . . . . . . . . . . . . . 6

119 CONG. REC. 38,331 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 401
    (Thomas M. Cooley ed., 4th ed. 1873) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES:
    PART I, APPOINTMENTS AND PROCEEDINGS, 90 (Maeva Marcus & James
    R. Perry, eds. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 (1911) . . . . . . . . . 24, 25, 26, 27

John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder*
    *in a Federalist Constitution*, 24 HOFSTRA L. REV. 89 (1995) . . . . . . . . . . . .22, 25, 27, 28

Memorandum for the Counselor to the Atty. General, from Charles J. Cooper
    Re: Ineligibility to Assume a Vacancy on the Supreme Court
    (Aug. 24, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Memorandum for Attorneys of the Office Re: Best Practices for OLC Opinions
    by Principal Deputy Assistant Attorney General Steven G. Bradbury
    (May 16, 2005), available at http://www.usdoj.gov/olc/best-practices-memo.pdf . . . . . 32

Michael S. Paulsen, *Is Lloyd Bentsen Unconstitutional?*,
    46 STAN. L. REV. 907 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

Todd B. Tatelman, Congressional Research Service Report for Congress,
    *The Emoluments Clause: History, Law, and Precedents* at 4
    (January 7, 2009) (available at www.crs.gov) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Plaintiff David C. Rodearmel, by counsel, respectfully submits this opposition to Defendants' motion to dismiss. Because no issues of material fact are in dispute, Plaintiff cross-moves for summary judgment and submits this memorandum in support of his cross-motion for summary judgment.

## MEMORANDUM OF LAW

## I. INTRODUCTION AND BACKGROUND.

### A. The Ineligibility Clause and the Appointment of Mrs. Clinton.

On January 21, 2009, Hillary Rodham Clinton was sworn in as U.S. Secretary of State. Prior to this, Mrs. Clinton served as a U.S. Senator from the State of New York. Compl. at ¶ 9. Mrs. Clinton was elected to her first, six-year term in the U.S. Senate in November 2000. *Id.* She was reelected to a second, six-year term in the U.S. Senate in November 2006. *Id.* Her second term in the U.S. Senate began in January 2007 and does not expire until January 2013. *Id.*

During Mrs. Clinton's tenure in the U.S. Senate, the compensation paid to the U.S. Secretary of State increased several times, including as many as three times since Mrs. Clinton began her second, six-year term in the U.S. Senate in January 2007: (i) by Executive Order 13420, issued December 21, 2006, the U.S. Secretary of State's salary was increased to $186,600, effective on the first day of the first applicable pay period beginning on or after January 1, 2007; (ii) by Executive Order 13454, issued January 4, 2008, the U.S. Secretary of State's salary was increased to $191,300, effective on the first day of the first applicable pay period beginning on or after January 1, 2008; and (iii) by Executive Order 13483, issued on December 18, 2008, the U.S. Secretary of State's salary was increased to $196,700, effective on the first day of the first

applicable pay period beginning on or after January 1, 2009.   Compl. at ¶ 10; Defendants'

Memorandum in Support of Defendants' Motion to Dismiss ("Defs' Mem.") at 2.

The U.S. Constitution states, in pertinent part:

No Senator or Representative shall, during the Time for which he was elected, be
appointed to any civil Office under the Authority of the United States, which shall
have been created, or the Emoluments whereof shall have been encreased during
such time; and no Person holding any Office under the United States, shall be a
Member of either House during his Continuance in Office.

U.S. Const., art. I, § 6, cl. 2.

The office of U.S. Secretary of State is a "civil Office under the Authority of the United

States" as described in article I, section 6, clause 2 of the U.S. Constitution, and the

"emoluments" of that office increased during the time Mrs. Clinton was elected to serve and did

serve as U.S. Senator from the State of New York.  Compl. at ¶ 13.

The U.S. Congress recognized the restrictions article I, section 6, clause 2 of the U.S.

Constitution places on Mrs. Clinton's eligibility to serve as the U.S. Secretary of State, when, on

December 10, 2008, it passed a Joint Resolution, effective at noon on January 20, 2009, reducing

the "compensation and other emoluments" of the office of the U.S. Secretary of State to those in

effect on January 1, 2007:

Section 1.  COMPENSATION AND OTHER EMOLUMENTS ATTACHED TO
THE OFFICE OF THE SECRETARY OF STATE.

(a)  In General. -- The compensation and other emoluments attached to the office
of Secretary of State shall be those in effect January 1, 2007, notwithstanding any
increase in such compensation or emoluments after that date under any provision
of law, or provision which has the force and effect of law, that is enacted or
becomes effective during the period beginning at noon of January 3, 2007, and
ending at noon of January 3, 2013.

*See* Public Law No. 110-455, 122 Stat. 5036.  *Id.*; Defs.' Mem. at 2-3.  The Joint Resolution was

signed by President George W. Bush and became law on December 19, 2008.  However, the Joint

Resolution does not and cannot change the historical fact that the "compensation and other

emoluments" of the office of the U.S. Secretary of State increased during Mrs. Clinton's tenure in

the U.S. Senate, including as many as three times during the second, six-year term to which she

was elected.  *See* Defs.' Mem. at 2 n.2.

As alleged in the Complaint, Mrs. Clinton is constitutionally ineligible to serve as the

U.S. Secretary of State by reason of article I, section 6, clause 2 of the U.S. Constitution.  Compl.

at ¶ 14.  She will not be eligible to hold any civil office under the authority of the United States

until the second, six-year term to which she was elected expires in January 2013.

The question before the Court is whether the Joint Resolution "fixes" Mrs. Clinton's

constitutional ineligibility.  Plaintiff submits that it does not.

**B.** **Plaintiff's Background.**

As a commissioned U.S. Foreign Service Officer, Plaintiff serves under, takes direction

from, and reports to the U.S. Secretary of State.  *See* attached Declaration of David C. Rodearmel

("Rodearmel Decl.") at  ¶ 2; Compl. at ¶¶ 6, 15.

Plaintiff has been a commissioned U.S. Foreign Service Officer at the U.S. Department of

State since 1991.  Rodearmel Decl. at  ¶ 1; Compl. at ¶ 6.  He currently holds the rank of FSO O-

2.  Rodearmel Decl. at  ¶ 2; Compl. at ¶ 6.  Plaintiff also is a retired U.S. Army Judge Advocate

General Reserve Officer with the rank of Lieutenant Colonel.  Rodearmel Decl. at  ¶ 4; Compl. at

¶ 6.  Prior to becoming a Foreign Service Officer, Plaintiff served as a military lawyer and an

intelligence officer in the U.S. Army.  Plaintiff has received numerous awards and

commendations from both the U.S. Department of State and the U.S. military. *Id.* Plaintiff also has had numerous teaching assignments, including serving as an Assistant Professor of Political Science at the U.S. Air Force Academy, and as an Instructor of International Law, U.S. Constitutional Law, and other legal areas for the Defense Institute of International Legal Studies and the University of Maryland Berlin Education Center. Plaintiff holds a Bachelor of Arts degree from Brigham Young University in Provo, Utah, a Juris Doctorate from the University of Washington in Seattle, Washington, a Master of Laws from the Judge Advocate General's School, U.S. Army, in Charlottesville, Virginia, and a Master of Arts degree from the U.S. Naval War College in Newport, Rhode Island. *Id.*

Plaintiff is being aggrieved by the actions of Mrs. Clinton and the U.S. Department of State. Decl. at ¶ 5; Compl. ¶ 16. Namely, Plaintiff is being required to serve under, take direction from, and report to Mrs. Clinton, who is constitutionally ineligible to be appointed to or serve as U.S. Secretary of State until at least 2013, when her current U.S. Senate term expires. *Id.*

Plaintiff alleges that by being required to serve under, take direction from, and report to Mrs. Clinton, Plaintiff is harmed in his employment. Rodearmel Decl. at ¶ 6; Compl. at ¶¶ 17-19. This is because requiring Plaintiff to serve under, take direction from, and report to a constitutionally ineligible superior is in direct and unequivocal conflict with the oath Plaintiff took to defend and bear true faith and allegiance to the U.S. Constitution and to faithfully discharge the duties of his office. *Id.* Because Mrs. Clinton is constitutionally ineligible to serve as U.S. Secretary of State, Plaintiff cannot serve under Mrs. Clinton without violating his oath. Should Plaintiff refuse to serve under, take direction from, or report to Mrs. Clinton, Plaintiff

would be at substantial risk of disciplinary action, including removal, for insubordination or other, related grounds. Rodearmel Decl. at ¶ 7; Compl. at ¶ 17. Requiring Plaintiff to serve under, take direction from, and report to Mrs. Clinton materially and fundamentally changes the terms and conditions of Plaintiff's employment as a U.S. Foreign Service Officer at the U.S. Department of State. Compl. at ¶ 18. Not only does being required to serve under, take direction from, and report to Mrs. Clinton violate Plaintiffs' oath if he is to continue in his employment as a U.S. Foreign Service Officer at the U.S. Department of State, but it constructively discharges him from his employment as a U.S. Foreign Service Officer if he is to remain faithful to his oath. *Id.* at ¶ 19.

## II.    ARGUMENT.

### A.    Defendants' Motion to Dismiss Should be Denied.

#### 1.    Standard for Review of Motion to Dismiss.

To establish constitutional standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

#### 2.    Plaintiff Has Alleged a Concrete, Particularized Injury Caused By Defendants' Conduct.

Plaintiff is one of approximately 6,500 commissioned U.S. Foreign Service officers at the U.S. Department of State. Compl. at ¶ 6. Plaintiff was nominated to this position by the President and confirmed by the U.S. Senate, as are all U.S. Foreign Service Officers.[1] *See* 22 U.S.C. § 3942(a)(1). The U.S. Foreign Service is distinct from other types of federal

---

[1]      Plaintiff was nominated by President George H. W. Bush and confirmed by the U.S. Senate in 1991. Rodearmel Decl. at ¶ 1; Compl. at ¶¶ 6-7.

employment in that it is a corps of highly-trained, career professionals dedicated to the specific field of foreign affairs. *See, e.g.*, 22 U.S.C. § 3901(a)(2) ("The scope and complexity of the foreign affairs of the Nation have heightened the need for a professional foreign service that will serve the foreign affairs interests of the United States in an integrated fashion and that can provide a resource of qualified personnel for the President, the Secretary of State, and the agencies concerned with foreign affairs"). As a U.S. Foreign Service Officer, Plaintiff also is an "Officer of the United States," a position to which is delegated a portion, albeit small, of the sovereign powers of the United States. 31 Op. O.L.C. ___ (2007); 2007 OLC LEXIS 3, **12-74 (April 16, 2007).

When Plaintiff became a commissioned U.S. Foreign Service Officer and an Officer of the United States, he took an oath to support, defend, and bear true faith and allegiance to the Constitution and to "well and faithfully discharge" the duties of his office.[2] Rodearmel Decl. at ¶ 6; Compl. at ¶ 7. Plaintiff alleges that he is being injured in his employment by being required to serve under, take direction from, and report to a constitutionally ineligible superior, Mrs. Clinton. Compl. at ¶ 17 Rodearmel Decl. at ¶ 5. Plaintiff alleges that this requirement is in direct and unequivocal conflict with his oath and that he cannot serve under Mrs. Clinton without violating his oath.[3] Compl. at ¶ 17; Rodearmel Decl. at ¶ 6. Plaintiff also alleges that, should he refuse to

---

[2]    Plaintiff also took this same oath when he became a U.S. military officer in 1977. He currently is a retired U.S. Army Judge Advocate General Reserve Officer with the rank of Lieutenant Colonel. Rodearmel Decl. at ¶ 4; Compl. at ¶¶ 6-7.

[3]    Defendants point to a statement in Plaintiff's Complaint in which Plaintiff asserts that he has "remained true to his oath throughout his career," as if to imply that he has not suffered any injury. Defendants' Memorandum in Support of Defendants' Motion to Dismiss ("Defs' Mem.") at 3, *citing* Plaintiff's Compl. at ¶¶ 7-8. Defendants then ignore the very next

serve under, take direction from, or report to Mrs. Clinton, he will be at substantial risk of disciplinary action, including removal, for insubordination or other, related grounds.  Compl. at ¶ 17; Rodearmel Decl. at ¶ 7.  Plaintiff further alleges that being required to serve under, take direction from, and report to a constitutionally ineligible superior materially and fundamentally (and adversely) changes the terms and conditions of his employment as a U.S. Foreign Service Officer.[4]  Compl. at ¶ 18.

Both the U.S. Supreme Court and this Court have recognized that placing a plaintiff in a position where he either must violate his oath of office or risk substantial, adverse consequences constitutes a direct, personal, and concrete injury for purposes of standing.  In *Board of Education v. Allen*, 392 U.S. 236 (1968), a local school board brought an action challenging the constitutionality of a state statute that required local public school authorities to lend textbooks free of charge to private parochial schools.  The Court found there could be "no doubt" that the school board members had a personal stake in the outcome of litigation sufficient to confer standing:

> Appellants have taken an oath to support the United States Constitution. Believing [the state statute] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step -- refusal to comply with [the state statute] -- that would be likely to bring their expulsion from office . . . .

---

statement in which Plaintiff asserts that he "intends to remain so through the duration of his employment as a U.S. Foreign Service Officer at the U.S. Department of State."  *Id.* at 8.

[4]     Although Defendants do not even attempt to address the issue, Plaintiff clearly has a property interest in his continued employment as a U.S. Foreign Service Officer that is being harmed.  *Colm v. Vance*, 567 F.2d 1125, 1129, n.3 (D.C. Cir. 1977).

*Allen*, 392 U.S. at 241, n.5. This Court reached a substantially similar conclusion in *Clarke v. United States*, 705 F. Supp. 605 (D.D.C. 1988). In *Clarke*, the members of the City Council of the District of Columbia brought suit to challenge a federal statute that required them to adopt an amendment to the District of Columbia Human Rights Act or face a loss of federal funding. The Court found that the members had "oath" standing, citing the Supreme Court's ruling in *Allen*:

> Alternatively, the court finds plaintiffs have oath of office standing, under the principles recognized by the Supreme Court in [*Allen*]. In *Allen*, the Court found that legislators who had taken an oath to uphold the Constitution had standing to challenge the constitutionality of a law when they risked a concrete injury by refusing to enforce the law. In that case, plaintiffs faced a choice of violating their oaths by enforcing a law which they believed to be unconstitutional or risk expulsion from their jobs. Plaintiffs here are similarly placed. Because Congress has conditioned all District funds on the Council's vote, the Council members must either vote in a way which they believe violates their oaths, or face almost certain loss of their salaries and staffs as well as water, police and fire protection.

*Clarke*, 705 F. Supp. at 608 (internal citations omitted). Other courts have reached this conclusion as well. *See Regents of the Univ. of Minn. v. NACC*, 560 F.2d 352, 363-64 (8th Cir.), *cert. dismissed*, 434 U.S. 978 (1977); *Aguayo v. Richardson*, 473 F.2d 1090, 1100 (2d Cir. 1973), *cert. denied*, 414 U.S. 1146 (1974).

If anything, Plaintiff's injury is more concrete and compelling than the circumstances of the board members in *Allen* and the city council members in *Clarke* because Plaintiff's injury is far more directly and inextricably intertwined with his employment. Because Plaintiff is a U.S. Foreign Service Officer and an employee of the Department of State, he must serve under, take direction from, and report to Mrs. Clinton.[5] Requiring Plaintiff to serve under, take direction

---

[5] By way of example, one of Plaintiff's duties includes preparing numerous Eastern Europe country reports for the Secretary of State's annual International Religious Freedom Report to Congress.

from, and report to a constitutionally ineligible superior in violation of his oath is not merely an "emotional response" that Plaintiff, who in addition to being a U.S. Foreign Service Officer and an Officer of the United States is a highly trained lawyer, retired Judge Advocate General Reserve Officer, and instructor of international and U.S. Constitutional law, might have to seeing Mrs. Clinton's name on official documents or passing Mrs. Clinton in the hallway, as Defendants dismissively contend. It is a fundamental and material change in the terms and conditions of Plaintiff's employment. Mrs. Clinton and the Department of State have placed Plaintiff in the position of either violating his oath or disregarding his chain of command, an action which would result in almost certain disciplinary action, including removal, being taken against Plaintiff. While the school board members in *Allen* eventually may have had to face dissatisfied voters or lawsuits brought against them in their official capacities and the city counsel members in *Clarke* may have had to face a shortage of public funds, including funds to pay their salaries and a cutback in public services, such circumstances are not nearly as personal or direct as the injury Plaintiff has suffered to his employment at the Department of State.[6] If Plaintiff remains true to his oath, he faces the very real risk of being discharged from his highly specialized, chosen profession. If the plaintiffs in *Allen* and *Clarke* had standing, then Plaintiff surely does.

---

[6] Defendants try to avoid the conclusion that Plaintiff has standing to bring this lawsuit by asserting that President Obama, rather than Mrs. Clinton or the Department of State, caused Plaintiff's injury. Mrs. Clinton obviously accepted the appointment and now occupies the position of Secretary of State, and the Department of State, which Mrs. Clinton now heads, requires Plaintiff to serve under, take direction from, and report to Mrs. Clinton. If anything, there is an even more direct causal relationship between Plaintiff's injury and Mrs. Clinton's and the Department of State's conduct because, while President Obama nominated Mrs. Clinton for the position, the Senate had to confirm her and, ultimately, Mrs. Clinton had to accept and occupy the position.

Defendants' attempt to distinguish *Allen* fails.[7]  Defendants' assertion that the state law at issue in *Allen* required the school board members in that case to "actively execute the law's commands" is indistinguishable from the federal law's command that Plaintiff serve under, take direction from, and report to the Secretary of State.  *See, e.g.*, 22 U.S.C. § 2651a(a)(3)(A) ("The Secretary shall administer, coordinate, and direct the Foreign Service of the United States"); § 3904 ("Members of the Service shall, under the direction of the Secretary, represent the interest of the United States  . . . "); § 3921 (. . . the Secretary of State shall administer and direct the Service and shall coordinate its activities with the needs of the Department of State and other agencies."); and § 4010(1)(a) ("The Secretary may decide to separate any member from the Service for such cause as will promote the efficiency of the Service."); at Defs. Mem. at 10.  Just as the school board members in *Allen* had taken an oath that they believed was inconsistent with the state law's commands, Plaintiff has taken an oath that is inconsistent with serving under, taking direction from, and reporting to a constitutionally ineligible superior.

While Defendants also try to denigrate Plaintiff's injury as a mere "abstract outrage," it is a very real conflict that Plaintiff must face every day he goes to work.  Nor is Plaintiff merely a casual witness to unconstitutional conduct, as Defendants also contend.  *Id.*, at 8, 10.  Plaintiff is not sitting on the sidelines like the plaintiffs in *Valley Forge Christian College v. Americans United For Separation of Church and State*, 454 U.S. 464 (1982) and *In re:  Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008), who only claimed to be observers to what they contended were violations of the Establishment Clause.  Plaintiff is being required to serve under, take direction from, and report to a constitutionally ineligible superior while having sworn an oath to support,

---

[7]        Defendants do not even attempt to distinguish *Clarke*.

defend, and bear truth faith and allegiance to the Constitution and to "well and faithfully discharge" the duties of his office. Not only is Plaintiff being required to act contrary to his oath, but requiring him to do so is a material, fundamental, and adverse change in the terms and conditions of Plaintiff's employment that affects Plaintiff in a direct and personal way, if not making him a participant in unconstitutional conduct. Nor does it matter that there may be thousands of other foreign service officers at the Department of State, hundreds of thousands of other employees of the U.S. Government, or even millions of active-duty and reserve members of the U.S. Armed Forces who also swore an oath to the Constitution. The law is well established that it is irrelevant whether an injury is shared by a large number of other possible litigants so long as the plaintiff has alleged a sufficient injury to himself. *Warth v. Seldin*, 422 U.S. 490 (1975). What is important is that Plaintiff alleges that he has been injured in a direct and personal way, and he has done so.

This case is not at all like *City of South Lake Tahoe v. California Regional Planning Agency*, 625 F.2d 231 (9th Cir. 1980). In that case, the City of South Lake Tahoe and members of the city council challenged the constitutionality of certain state land use regulations and regional and transportation plans. Among other theories of standing, members of the city council asserted "oath" standing under *Allen.* While the ruling contains *dicta* in which the Court questioned the continuing applicability of *Allen*, the Court's ultimate holding was that the city council's injury was official, not personal: "We hold, therefore, that the councilmembers' interest here is 'official' rather than 'personal,' and therefore . . . the councilmembers' claim to standing is deficient." *City of South Lake Tahoe*, 625 F.2d at 238. By contrast, Plaintiff's "oath" injury is not "official," because, as noted, it directly impacts the conditions and circumstances of

his employment, if not his ability to continue his employment.  Moreover, as this Court noted in *Clarke*, the U.S. Supreme Court subsequently reaffirmed *Allen* in *Bender v. Williamsport Area School District*, 475 U.S. 543, 544-45, n.7 (1986).[8]  *Clarke*, 705 F. Supp. at 608, n.4.

Nor is Plaintiff's injury anything like the generalized harm alleged by the reservists in *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974).  In *Schlesinger*, a group of reservists opposed to the Vietnam War sought to prevent Members of Congress from serving in the Armed Forces Reserves, citing the Incompatibility Clause.  The reservists argued that membership in the Armed Forces Reserves by Members of Congress "deprives or may deprive the individual and all other citizens and taxpayers of the United States of the faithful discharge by [M]embers of Congress who are members of the Reserves of their duties as [M]embers of Congress, to which all citizens and taxpayers are entitled."  *Schlesinger,* 418 U.S. at 212.  The Supreme Court found the reservists lacked standing:

> The very language of respondents' complaint . . . reveals that it is nothing more than a matter of speculation whether the claimed nonobserveance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist Members of Congress.  And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury.

*Id.* at 217.  Again, Plaintiff has alleged far more than a mere generalized injury common to all citizens or simply taxpayer standing.  He has alleged direct injury to the oath he took as a U.S. Foreign Service Officer and an Officer of the United States and fundamental, material, and adverse changes to the terms and conditions of his employment at the Department of State.

---

[8]     The Court in *Bender* declined to find that a *single* member of a school board had standing to file a notice of appeal from a declaratory judgment entered against all of the members of the board, in their official capacities, after the board voted not to take an appeal.  Obviously, *Bender* was resolved on the unique facts of that case.

*Ex Parte Levitt*, 302 U.S. 633 (1937) does not provide any assistance to Defendants either. In that one paragraph opinion, the Court held:

> The motion papers disclose no interest upon the part of the petitioner other than that of a citizen and a member of the bar of this Court. That is insufficient. It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient he has merely a general interest common to all members of the public.

*Id.* Again, Plaintiff has demonstrated much more than a general interest common to all members of the public. In addition, members of the bar of the Supreme Court obviously are not employees of the Supreme Court. They do not get their pay checks from the Supreme Court. Nor do they serve under, take direction from, or report to the justices of the Supreme Court in anything like the way a U.S. Foreign Service Officer serves under, takes direction from, and reports to the Secretary of State. Plaintiff's relationship to the Secretary of State is not at all analogous to the relationship between a member of the Supreme Court bar and a Supreme Court justice. Defs' Mem. at 9.

*McClure v. Carter*, 513 F. Supp. 265 (D. Idaho 1981) is of no avail to Defendants. That lawsuit concerned the efforts by a U.S. Senator to invoke the Ineligibility Clause to challenge the appointment of former Congressman Abner J. Mikva to the D.C. Circuit. The Senator did not invoke his oath of office, but instead contended that his special duties and responsibilities as a senator gave him standing. *McClure*, 513 F. Supp. at 270. The Court found that the appointment of Congressman Mikva to the federal bench did not impair the effectiveness of the Senator's vote and, therefore, that the Senator lacked standing. *Id.* By contrast, requiring Plaintiff to serve under, take direction from, and report to a constitutionally ineligible superior impairs Plaintiff's

13

effectiveness as a U.S. Foreign Service Officer and an Officer of the United States because doing so is in direct conflict with Plaintiff's oath. It also fundamentally, materially, and adversely alters the terms and conditions of Plaintiff's employment at the Department of State.

Finally, *Board of Education v. New York State Teachers Retirement System*, 60 F.3d 106 (2d Cir. 1995) ("*Teachers Retirement*") does not help Defendants to avoid reaching the merits of Plaintiff's constitutional claim either. In that case, the school board officials who brought the action did not allege that compliance with the state law at issue would require them to violate their oaths or otherwise adversely affect the terms and conditions of their employment. *Teachers Retirement*, 60 F.3d at 112. Nor did they allege that their positions as officials or funding for their schools would be in jeopardy if they failed to follow the law at issue. *Id.* Unsurprisingly, the Court found their complaint to be deficient. By contrast, Plaintiff has alleged precisely what the Court in *Teachers Retirement* found lacking in that case. In addition to alleging that serving under, taking direction from, and reporting to Mrs. Clinton directly and unequivocally conflicts with his oath and that refusing to serve under, take direction from, or report to Mrs. Clinton places him at substantial risk of disciplinary action, including removal, Plaintiff has alleged that he has suffered a material, fundamental, and adverse change in the terms and conditions of his employment. Compl. at ¶¶ 17-18. Consequently, Plaintiff has alleged that he is suffering a concrete, personal injury by reason of Defendants' conduct.

### 3. Plaintiff's Injuries Are Redressable by This Court.

Defendants' "redressability" argument also misses its mark.  Plaintiff's Complaint seeks both declaratory and injunctive relief.  In addition to asking the Court to declare Mrs. Clinton's appointment to be unconstitutional and seeking an injunction prohibiting Mrs. Clinton from continuing to serve as Secretary of State during the period of her constitutional ineligibility, Plaintiff's Complaint more narrowly asks that an injunction be crafted enjoining the Department of State from requiring Plaintiff to serve under, take direction from, and report to Mrs. Clinton.[9] Such an injunction would recognize Mrs. Clinton's constitutional ineligibility and provide Plaintiff with relief without necessarily requiring Mrs. Clinton to step down.

Nonetheless, even without a more narrowly-tailored remedy, this is not a case about the removal of an appointee lawfully nominated by the President and confirmed by the Senate, as Defendants would have the Court mistakenly believe.  Nor is it about "attempted judicial usurpation" of the president's removal power.  It is about Mrs. Clinton's eligibility to hold any civil office of the United States during the time for which she was elected to the U.S. Senate. Because Mrs. Clinton was reelected to the Senate in 2006 and the emoluments of the office of Secretary of State increased during the term for which Mrs. Clinton was elected, she is constitutionally ineligible to serve as Secretary of State and cannot lawfully hold that office until her current term expires in 2013.  Her appointment was void *ab initio*.  It is a legal nullity.  To declare Mrs. Clinton constitutionally ineligible to serve as the Secretary of State and to enjoin her

---

[9]    In this regard, Plaintiff does not seek to have the Department of State "remove its own department head," nor does he seek declaratory relief or an injunction against the President. Defendants' arguments to this effect are inconsequential.

from serving in that capacity is not the equivalent of removing an appointee from a lawfully occupied office.  That the Constitution limits the President's choices in making appointments does not infringe or otherwise implicate his power to remove lawful appointees.  The President's power to remove lawfully appointed federal officials is not implicated in any way.  This is even more readily apparent with respect to Plaintiff's request that the Court fashion an appropriate injunction enjoining the Department of State from requiring him to serve under, take direction from, and report to Mrs. Clinton.

At the same time, it undoubtedly is within the Court's power to "say what the law is" with respect to the constitutionality of Mrs. Clinton's appointment and to give effect to its ruling. *Marbury v. Madison*, 5 U.S. 137 (1803).  The separation of powers doctrine does not prohibit this Court from exercising its powers to remedy an unconstitutional appointment.

There is no question that both Mrs. Clinton and the U.S. Department of State are properly before the Court.  Neither Mrs. Clinton nor the U.S. Department of State challenge this Court's exercise of personal jurisdiction over them, and it is a matter of public record that Mrs. Clinton maintains a residence in the District of Columbia.  The Court clearly has the authority to declare Mrs. Clinton constitutionally ineligible to serve as Secretary of State until the period of her ineligibility expires and to enjoin her from serving in that capacity.  It also has the authority to craft an appropriate injunction enjoining the U.S. Department of State from requiring Plaintiff to serve under, take direction from, or report to a constitutionally ineligible superior.  In this regard, Plaintiff need not have named the President as a defendant in this lawsuit, nor is there any need to add him as a defendant at this time, because Plaintiff does not seek any relief of the President,

and Plaintiff can be afforded complete relief without doing so. Thus, Plaintiff's injury can be redressed through the issuance of a declaratory judgment and an appropriate injunction.

None of the authorities cited by Defendants squarely address Plaintiff's legal objection to serving under a constitutionally ineligible superior. Both *Nguyen v. United States*, 539 U.S. 69 (2003) and *Ryder v. United States*, 515 U.S. 177 (1995) concerned challenges to the composition of appellate panels that upheld the defendants' convictions. The Court in those cases simply vacated the appellate courts' rulings and remanded them for proper appellate proceedings because it found the original appellate panels were not properly constituted. *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984) concerned a challenge by U.S. Department of Justice employees to a reduction in force, although in that case the Court notably found the employees had standing to bring a direct challenge to the constitutionally of the appointment of the supervisors who had planned and implemented the reduction in force. *Andrade* supports, not undermines, Plaintiff's claims.

In addition, the functional relief Plaintiff requests is entirely consistent with the U.S. Supreme Court's holding in *Buckley v. Valeo*, 424 U.S. 1 (1976). As originally structured, two members of the Federal Election Commission were to be appointed by the Speaker of the U.S. House of Representatives, two other members were to be appointed by the President *pro tempore* of the U.S. Senate, and the commission as a whole was empowered to undertake litigation to enforce the provisions of the statute. The Court found that the non-presidential appointees could not participate in the enforcement actions of the commission without violating art. II, sec. 2, cl. 2 of the Constitution. *Buckley*, 424 U.S. at 140. Rather than declaring the statute at issue to be unconstitutional, the Court took a functional approach to the statute's constitutional infirmity by

finding that the commission could not undertake any such enforcement functions. *Id.* at 141.

Plaintiff's narrowly tailored request that the Court enjoin the U.S. Department of State from requiring him to serve under, take direction from, and report to Mrs. Clinton mirrors the functional approach taken by the U.S. Supreme Court in *Buckley*. Nor does this more limited relief implicate the President's "removal" power in any way. Plaintiff's injury thus can be redressed by the Court.

Finally, and contrary to Defendants' suggestion, Plaintiff need not have filed a *quo warranto* action in order to obtain relief. As the Court in *Andrade* noted, the writ of *quo warranto* originated in feudal times when public offices were similar to a form of property right and a *quo warranto* action was like an action of ejectment in which the only party who could bring a lawsuit was a claimant who sued to regain possession from one who was unlawfully in possession. *Andrade*, 729 F.2d at 1498. Obviously, Plaintiff does not seek to occupy the office of Secretary of State himself. Thus, a *quo warranto* action has no applicability here. Nonetheless, the Court in *Andrade* declared that "equity will not be barred from issuing an injunction to restrain invalidly appointed officers if the alternative remedy of *quo warranto* is inadequate." *Id.*, *citing Columbia Cat Fanciers, Inc. v. Koehne*, 96 F.2d 529, 532 (D.C. Cir. 1938). The Court described the long-outdated *quo warranto* remedy as a "cumbersome" procedure that "could easily operate to deprive a plaintiff with an otherwise legitimate claim of the opportunity to have his case heard" and an "extremely difficult and uncertain remedy." *Id.* The appropriate course to take, according to the Court, was to avoid an outcome that would make it impossible for the plaintiffs to "bring their assumedly substantial constitutional claim and

would render legal norms concerning appointment and eligibility to hold office unenforceable." *Id*.

*   *   *

In sum, Plaintiff has alleged a concrete injury to his continued employment as an Officer of the United States in that he is being required to serve under, take direction from and report to a constitutionally ineligible superior, Mrs. Clinton, in violation of the oath he has taken to support, defend, and bear true faith and allegiance to the Constitution of the United States. Moreover, Plaintiff's injuries are fully redressable by this Court, which, consistent with its power to "say what the law is" and to give effect to its rulings, can and should declare that Mrs. Clinton is constitutionally ineligible to serve as Secretary or State, enjoin her from continuing to serving in that capacity, and enjoin the U.S. Department of State from requiring Plaintiff to serve under, take direction from and report to her.

> **4.    Plaintiff's Complaint Amply States a Claim That Mrs. Clinton's Appointment Is Contrary to the Unambiguous Language of the Ineligibility Clause and Cannot Be "Fixed" By Congress.**

The Constitution is clear and precise regarding the limitations on Members of Congress ("Members") accepting positions in the other branches. Article I, section 6, clause 2 of the U.S. Constitution states, in pertinent part:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

It is undisputed that the office of U.S. Secretary of State is a "civil Office under the Authority of the United States" and the "emoluments" of that office increased during the time Mrs. Clinton was elected to serve and did serve as U.S. Senator from the State of New York.[10]  Accordingly, under the plain language of the Ineligibility Clause, Mrs. Clinton is ineligible to serve as U.S. Secretary of State until January 2013.

Defendants argue that this violation of the Ineligibility Clause has been "fixed." Specifically, a legislative "rollback" of the salary of the office of Secretary of State allegedly remedies the violation because, according to Defendants' view, the emoluments of the office will not have increased "on net."

Defendants' "interpretation" of the Ineligibility Clause, as well as the validity of the legislative "fix" meant to restore Mrs. Clinton's eligibility, are at odds with the plain language of the provision.  The words "on net" are nowhere in the Ineligibility Clause and a rollback of pay cannot alter the historical fact that the increase occurred.  Thus, in order to avoid this plain language interpretation, Defendants ask the Court to find to find an ambiguity in an otherwise unambiguous clause of the Constitution.  The Court need not do so.

---

[10]     As Defendants concede, the pay of the Secretary of State increased as a result of  a series of cost of living adjustments implemented in 2006 through 2008.  *See* Defs.' Mem. at 2 n.1.  Under the Ineligibility Clause, a Member of Congress can become ineligible for appointment to a federal office even if Member did not vote for a particular increase or even after the Member has resigned her seat, if the increase occurs during the term for which the Member was elected.  *See* 17 Op. Att'y Gen. 365 (1882) (former senator ineligible for appointment because office was created "during the time for which he was elected.").

### a.       The Text of the Ineligibility Clause Is Clear and Precise.

An analysis of a constitutional provision always begins with a review of the plain language of the text.  In interpreting constitutional text, courts are "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2788 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).  Furthermore, the purpose behind a provision "is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument." *Lake County v. Rollins*, 130 U.S. 662 (1889); 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 401, at 296 (Thomas M. Cooley ed., 4th ed. 1873) ("Where the words are plain and clear . . . there is generally no necessity to have recourse to other means of interpretation.")

Here, Defendants attempt to evade the plain language of the Ineligibility Clause by creating an ambiguity where none exists.  The language of the provision is clear, precise, and readily understood.[11]  The fact that the language (and grammar) is readily understood is, of course, why the political branches have resorted to attempted "end runs" around the provision,  as happened in this case, by reducing the compensation of an office.  In any event, no ambiguity in the Ineligibility Clause justifies looking beyond the plain language of the provision.

---

[11]       Defendants attempt to introduce as evidence in support of their position quotations from three alleged works of 18th century literature, claiming that "shall have been increased" in that era means something other than what it does today.  Defs.' Mem. at 22-23.  Defendants concede that the word "increase" retains the same meaning today as it did then.  *Id.* at 22. n.9.  None of these unrelated works of literature establish, however, that increased means "increased on net."

This is most particularly clear when the Ineligibility Clause is compared to other constitutional provisions regularly interpreted by the courts. For example, because the language of the Fifth Amendment's Due Process Clause is not capable of precise definition, courts routinely must and do interpret its meaning. In contrast, the Ineligibility Clause is unambiguous and provides clear limitations on eligibility – setting forth exactly who is limited by the provision, the offices to which eligibility is limited, the events which trigger ineligibility, and the precise duration of the ineligibility.

In this way, the Ineligibility Clause is comparable to other bright line restrictions included in the Constitution, such as the minimum age requirement to be "eligible" to hold the office of President. As one commentator has noted, the obvious purpose of this provision is to ensure that only a person with a certain level of maturity can hold the office. John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 HOFSTRA L. REV. 89, 140 (1995) (hereafter "O'Connor").[12] Presumably no one would suggest that the literal interpretation of that age limitation might be waived simply because a person younger than 35 happens to be unusually mature. Nor would an "on net" interpretation of the 35-years-old eligibility requirement be proper. It is essentially arguing that a person is eligible to be president if the person reached the age of 35 at some point during the four-year term, and therefore "on net" satisfied the age requirement. Hence, in this instance, there is no reason to ignore the

---

[12]     *See also* Michael S. Paulsen, *Is Lloyd Bentsen Unconstitutional?*, 46 STAN. L. REV. 907 (1994) (concluding that Bentsen's appointment and attempted legislative "fix" were "flagrant and irremediable violation" of Ineligibility Clause) (hereafter "Paulsen").

unambiguous language of the Ineligibility Clause simply because a legislative "fix" purportedly satisfies the purpose behind the provision.[13]

Moreover, adherence to the plain language of the Ineligibility Clause is required because, as demonstrated elsewhere in the Constitution, the Framers clearly knew how to allow for "exceptions" when they intended to do so. In particular, when the Framers intended that a disqualification be removable by subsequent legislation, they did so. This can be seen in a nearby provision in the Constitution, also addressing "emoluments," which provides that "no Person holding any Office of Profit or Trust under [the United States] shall, *without the Consent of the Congress*, accept of any present, Emolument, Office, or Title, or any kind whatever, from any King, Prince, or foreign State. U.S. Const. art. I, § 9, cl. 8 (emphasis added). In other words, at the discretion of Congress, the Framers allowed for the possibility that this restriction on emoluments could be waived. This is notably different from the Ineligibility Clause, which includes no similar exception for Congress to act.

Other constitutional provisions with "exceptions" include the prohibition on States from laying "Imposts or Duties" except as required for executing inspection laws "without the Consent of the Congress." Art. I, § 10, cl. 2. Similarly, no State may enter into compacts with another state or with a foreign power "without the Consent of Congress." Art. I, § 10, cl. 3. These provisions all indisputably demonstrate that the Framers knew exactly how to allow for a legislative exception to a constitutional prohibition. In this case, the Ineligibility Clause contains

---

[13]    The "on net" approach to constitutional violations is similarly flawed when viewed in other contexts. It is the equivalent of arguing that repeated enactments of laws by Congress violating the First Amendment should be excused because at some point, or "on net," Congress did finally adhere to the First Amendment.

no such exception to a Member's ineligibility.  Congress cannot add an exception that the

Framers plainly understood how to include, but did not.

Hence, the language of the Ineligibility Clause is clear and precise.  No legislatively

enacted "exception" to restore a Member's eligibility is included in the provision.  The Court

should decline Defendants' invitation to create one.

> **b.**     **A Plain Language Interpretation Without**
> **Any Legislative "Fix" Is Consistent With**
> **<u>and Promotes the Framers' Purposes.</u>**

Since Defendants have not established that the Ineligibility Clause is open to more than

one construction, it is neither necessary nor proper to examine the history of the Ineligibility

Clause.  *Lake County v. Rollins*, 130 U.S. 662 (1889).  In this instance, however, the purposes of

the Framers in adopting the Ineligibility Clause support a plain language interpretation of the

provision.  Moreover, entirely absent from the historical record is any support for Defendants'

preferred "on net" interpretation of the Ineligibility Clause.  Nor does the historical record

provide any basis whatsoever for the conclusion that a Member's ineligibility could be "fixed" by

Congress.

As Defendants note, the Ineligibility Clause was the result of a carefully crafted

compromise between the Framers.  Defs.' Mem. at 26.  The initial proposal considered by the

Framers would have made all Members  "ineligible to any office . . . of the United States" during

their terms and an unspecified number of years beyond.  Farrand, THE RECORDS OF THE FEDERAL

CONVENTION OF 1787, 217, 228-29 (1911).  While some like Alexander Hamilton opposed any

limitations on eligibility, those who feared the creation of a strong Executive advocated a

complete bar on movement between the legislature and other branches in order to maintain a

balance between the three branches.  *See* Defs.' Mem. at 27-28.  James Madison stated that "I am . . . of the opinion that no office ought to be open to a member, which may be created or augmented while he is in the legislature."  1 Farrand, at 380.  Edmund Randolph was against any movement, stating that he "was inflexibly fixed against inviting men into the Legislature by the prospect of being appointed to offices."  *Id.* at 491.

The Framers' determination to maintain strict separation between the branches also is demonstrated by the closely related "Incompatibility Clause" that immediately follows the Ineligibility Clause.  U.S. Const., art. I, § 6, cl. 2 ("and no person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.").  When read together with the Ineligibility Clause, this further shows how the Framers sought to maintain the balance between the coordinate branches.

In addition to this separation of powers concern, Anti-Federalists were intent on restricting the growth of the federal government and increases in the compensation of executive offices.  *See* O'Connor, at 156-74.  They believed that increasing compensation would tend to increase the size of the national government and thereby its involvement in citizens' affairs.  The Ineligibility Clause would work to limit this tendency by reducing the attractiveness of Executive branch officer to Members by disqualifying Members from holding them.  As George Mason stated:

> Are we not struck at seeing the luxury and venality which has already crept in among us?  If not checked we shall have ambassadors to every petty state in Europe – the little republic of St. Marino not excepted.  We must in the present system remove the temptation . . . .  Why has the power of the [British] crown so remarkably increased the last century? . . . [B]y the sole power of appointing the increased officers of government, corruption pervades every town and village in the kingdom . . . .

1 Farrand at 380-81 (quoted in part in Defs.' Mem. at 28). Hence, the "corruption" that particularly concerned the Anti-Federalists was the creation of offices with increasingly lavish salaries to which legislators would seek appointment and with which the Executive would reward them.

Other prominent Anti-Federalists confirmed this view. James Wilson stated that the purpose of the Ineligibility Clause was to prevent "that of creating unnecessary offices, or granting unneceasry [sic] salaries." 1 Farrand at 387. Elbridge Gerry, believing that the Ineligibility Clause would reduce Members' temptation to create lucrative offices for their own benefit, even stated that "[i]t is the opinion of a great many that [such offices] ought to be discontinued . . . ." 2 Farrand at 285. Hence, it is clear that the Ineligibility Clause was intended to address "the unnecessary creation of offices, and increase of salaries, [as these] were the evils most experienced." 1 Farrand, at 386.

The Framers' primary concerns, therefore, were broad and intended to affect the behavior of the legislature as a whole. As the Department of Justice's Office of Legal Counsel has explained:

> The Founders had serious reservations about the wisdom of giving to the executive the power to appoint legislators to lucrative and prestigious executive and judicial offices. They also sought to avoid the spectacle of legislators seeking an office throughout their term at the expense of their constituents. They therefore tried to limit the instances in which the executive could offer such enticements to legislators. Thus, to the extent that lowering salaries of vacant offices increases the frequency of such appointments, it serves to frustrate the intentions of the Framers.

*See* Defs.' Exh. 2 at 6 (Mem. for the Counselor to the Atty. General, from Charles J. Cooper Re: Ineligibility to Assume a Vacancy on the Supreme Court (Aug. 24, 1987) (hereafter "1987 OLC Opinion").[14]

As this OLC opinion notes, temporarily decreasing the salary of an office actually undermines the purpose behind the Clause. By restoring eligibility for these offices through a legislative artifice, it effectively removes any incentive for Members not to pursue such offices at the "expense of their constituents." The Anti-Federalists particularly feared the emergence of a "permanent political class" which would want to increase the power and size of the central government by taxing the nation. O'Connor at 158-61. If federal offices were available to them, Members would tend to become part of this political class and detached from their local communities. *Id.*

Similarly, with the availability of a legislative "fix," Members have no incentive to restrain the overall growth in compensation of these offices because they know that their disqualification can be removed by Congress. As one commentator has summarized:

> The debates at the Constitutional Convention support the view that the [Ineligibility] Clause was intended to have its effect at the legislative stage, when Congress is considering legislation that would be a disqualifying event. The debates also demonstrate, however, that the predominant purpose behind reducing Congress's bias was not for general anticorruption; rather, the overriding purpose of the [Ineligibility] Clause was to restrain the inevitable growth of the national government through the means of reducing Congress's incentive to create lucrative federal offices.

---

[14]     A legislative "fix" also is ineffectual, and further violates the spirit of the Ineligibility Clause, because nothing prevents Congress from reducing the salary of the office the day before the Member is nominated, and then restoring the full salary the day after the Member assumes the office. *See* 1987 O.L.C. Op. at 6-7. This further demonstrates how a legislative "fix" effectively removes any incentive for Congress to restrain the salaries of these offices, given that a "fix" is available to remove their ineligibility for any particular office.

O'Connor at 167. Only if the Ineligibility Clause is interpreted consistent with its plain language, disqualifying Members from holding these offices, are the broad purposes behind the Ineligibility Clause given full effect.

Finally, it is clear that the Ineligibility Clause was carefully crafted by the Framers, representing a balancing of concerns between those who wanted no restrictions on legislators holding federal offices and those who believed in a complete prohibition. Hence, a compromise provision was adopted with a limited period of ineligibility and with no exceptions. Any legislative "fix" is nothing more than an evasion of this carefully considered compromise that resolved an issue of great concern to the Framers. A compromise of such weighty concerns should not br casually ignored or modified for current convenience.

### c. Disregard of the Plain Language of the Ineligibility Clause Does Not Justify Further Violations.

Finally, Defendants argue that "consistent constitutional practice" supports their view that only "net increases" run afoul of the Ineligibility Clause. Even if this were correct, which it is not, past violations of the plain language of the Constitution do not justify further violations and should not be tolerated.

First, history shows that until relatively recently the Ineligibility Clause was readily understood and applied consistent with its plain language. The earliest instance in which the Ineligibility Clause seems to have been at issue – and most contemporaneous with the drafting of the Constitution – was when President George Washington nominated then-Governor William Paterson of New Jersey as an Associate Justice of the U.S. Supreme Court. *See* Todd B. Tatelman, Congressional Research Service Report for Congress, *The Emoluments Clause:*

28

*History, Law, and Precedents* at 4 (January 7, 2009) (available at www.crs.gov). Governor

Paterson previously had been a member of the U.S. Senate when the law creating the new judicial

office was enacted, and even though Paterson had resigned to become governor, the term for

which he had been elected to the Senate would not have ended until March 4, 1793. On February

28, 1793, President Washington notified the Senate that:

> It has since occurred that [Paterson] was a member of the Senate when the law creating
> that Office was passed, and that the time for which he was elected is not yet expired. I
> think it my duty therefore to declare, that I deem the nomination to have null by the
> Constitution.

*See* 1 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES: PART I,

APPOINTMENTS AND PROCEEDINGS, 90 (Maeva Marcus & James R. Perry, eds. 1985). President

Washington then resubmitted the nomination on March 4, 1793, thereby complying with the

plain terms of the Ineligibility Clause.

Nearly one hundred years later, this plain language interpretation of the Clause again

continued to be strictly followed. In one case, Senator Kirkwood of Iowa had been elected to a

term expiring in 1883. Kirkwood resigned from the Senate in 1881 to become Secretary of the

Interior and, after leaving that position, sought to assume the post of tariff commissioner in 1882.

U.S. Attorney General Benjamin Harris Brewster issued an opinion that Kirkwood could not

assume the position of tariff commissioner, even though he was no longer a member of the

Senate when the tariff commissioner position was created. The Attorney General's opinion

found nothing ambiguous about the Clause and no need to review its purposes:

> It is unnecessary to consider the question of the policy which occasioned this
> constitutional prohibition. I must be controlled exclusively by the positive terms
> of the provision of the Constitution. The language is precise and clear, and, in my
> opinion, disables him from receiving the appointment. The rule is absolute, as

expressed in the terms of the Constitution, and behind that I can not go, but must accept it as it is presented regarding it application in this case.

17 Op. Att'y Gen. 365 (1882). Again, nothing about the language (or grammar) of the Ineligibility Clause was found to be ambiguous.

This plain language interpretation was reaffirmed by a different Attorney General twelve years later. In the case, Senator Matthew Ransom had been elected to a term expiring on March 3, 1895. On February 23, 1895, President Grover Cleveland nominated Senator Ransom to be ambassador to Mexico, despite that the salary of the position had increased in 1891 during Ransom's tenure in the Senate. On March 4, 1895, the day after his Senate term expired, Senator Ransom received his commission. Acting Attorney General Holmes Conrad issued an opinion that, because Senator Ransom's appointment was made while he was still in the Senate, "Mr. Ransom was not, in my opinion, eligible to appointment to that office." 21 Op. Att'y Gen. 211 (1895).[15]

As Defendants note, beginning with the nomination of Senator Philander Knox in 1909 and then, in particular, the nomination of William Saxbe as Attorney General in 1973, the employment of the "Saxbe Fix" to "work around" the Ineligibility Clause has become more frequent. It has also remained controversial.

The Saxbe nomination in 1973 was hotly debated, but the Office of Legal Counsel concluded that "the weight of authority seems to believe that the practice is unconstitutional."

---

[15]     *See also* 33 Op. Att'y Gen. 88 (1922). Applying strict reading of the Ineligibility Clause, Attorney General Harry Daugherty concluded that the nomination of Senator William Kenyon to a federal court of appeals was not precluded since the increase in salary occurred during the Senator's previous term in office, not the term during which he was appointed. *See* OLC Opinion of December 31, 1996 re: nomination of Bill Richardson as United States Ambassador to the United Nations (reaffirming prior position).

1987 OLC Op. at 5 n. 6 (noting that "[a]t those hearings, Professors Phillip Kurland, Willard Lorenson, William Swindler, and Paul Mishkin all opposed the reduction in pay of the attorney general to enable Senator Saxbe to take the office as unconstitutional," with only Professor William Van Alstyne taking an opposite view).  Another notable critic of the constitutionality of the "Saxbe Fix" was then professor, now Justice, Stephen G. Breyer.  In a letter addressed to Senator Robert C. Byrd, Professor Breyer wrote:

> An office for which Congress has once voted a pay increase has been made more attractive through a pay increase even if Congress passes remedial legislation. The reason is simply that in such a case Congress is infinitely more likely to re-vote the pay increase as soon as the Senator's disqualification expires than if Congress had never voted a pay increase for the office.

*See* 119 Cong. Rec. 38,331 (1973).

More recently, in 1987, the possible nomination of Senator Orrin Hatch to the U.S. Supreme Court apparently was derailed because of a plain language interpretation of the Ineligibility Clause.  *See* Defs. Exh. 2 (1987 OLC Op.); *see also* Paulsen at 912-14.  The 1987 OLC opinion is unequivocal in that, because of an increase in salaries of Supreme Court Justices, "all those congressmen now in office" are ineligible for "the current vacancy on the Supreme Court."  1987 OLC Op. at 4.  As the 1987 OLC opinion makes clear, the historical fact that salaries of Supreme Court Associate Justices were increased cannot be altered or "fixed" by a subsequent reduction in salary.

Disturbingly, OLC's consistent legal advice apparently was altered for purposes of this specific litigation.  *See* Defs. Exh. 2.  The Office of Legal Counsel's internal policy had been that "[a]s a prudential matter, OLC should avoid opining on questions likely to be at issue in pending or imminent litigation involving the United States as a party (except where there is a need to

resolve a dispute within the Executive Branch over a position to be taken in litigation).  *See*

"Memorandum for Attorneys of the Office Re: Best Practices for OLC Opinions" by  Principal

Deputy Assistant Attorney General Steven G. Bradbury (May 16, 2005), available at

http://www.usdoj.gov/olc/best-practices-memo.pdf.  However, the same day Defendants

submitted their opposition in this case, OLC conveniently issued a new opinion, presumably at

the request of Defendants, so that Defendants could include it in their submission.  As a

prudential matter, Plaintiff submits that OLC's "newly minted" legal opinion should not be given

any weight.

Despite the OLC's recent change of heart, these examples demonstrate that, in both the

early years of the nation and more recently, no "consistent constitutional practice" has been

followed to justify Defendants' "on net" interpretation or any legislative "fix" to a Member's

ineligibility.  On the contrary, the history shows that the plain language of the Ineligibility Clause

has been readily understood, but at times circumvented for expediency by the political branches.

These "end runs" around the plain language of the provision certainly do not justify any further

violations.

     **B.**     <u>**Plaintiff Is Entitled to Summary Judgment**</u>**.**

          **1.**     **Legal Standard for Motion for Summary Judgment.**

Summary judgment is appropriate if the record, viewed in the light most favorable to the

nonmoving party, reveals that there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994);

Fed. R. Civ. P. 56(c).  Similarly, in ruling on cross-motions for summary judgment, the court

shall grant summary judgment if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines*, 167 F. Supp. 2d 75, 85 (D.D.C. 2001).

**2. Plaintiff Is Entitled to Summary Judgment on
Count I of the Complaint.**

In Count I of his Complaint, Plaintiff seeks declaratory and injunctive relief for Defendants' violation of article I, section 6, clause 2 of the U.S. Constitution. This provision states that no member of Congress shall "be appointed to any civil Office" to which the "Emoluments . . shall have been encreased" during the member's term. U.S. Const., art. I, § 6, cl. 2.

There is no genuine dispute of material fact that in November 2006 Mrs. Clinton was elected to a term in the U.S. Senate and that this term does not expire until January 2013. Plaintiff's Rule 7(h) Statement of Facts Not In Dispute In Support of Plaintiff's Cross-Motion for Summary Judgment ("Plf's Stat.") at para. 1. Nor is there any genuine dispute of material fact that, during the time for which Mrs. Clinton was elected to the U.S. Senate, the compensation paid to the U.S. Secretary of State has increased. *Id.* at para. 2. Likewise, there is no genuine dispute of material fact that Plaintiff is a commissioned U.S. Foreign Service Officer and that he serves under, takes direction from, and reports to the U.S. Secretary of State. *Id.* at paras. 6-7. Nor do the parties dispute that Plaintiff has taken an oath to defend and bear true faith and allegiance to the U.S. Constitution and to faithfully discharge the duties of his office, and that, if Plaintiff should refuse to serve under, take direction from, or report to Mrs. Clinton, Plaintiff

would be at substantial risk of disciplinary action, including removal, for insubordination or other, related grounds. *Id.* at paras. 8-9.

As demonstrated in section II(A)(4), *supra*, Mrs. Clinton's appointment and continuance in office as U.S. Secretary of State violates article I, section 6, clause 2 of the U.S. Constitution and Congress' effort to correct this constitutional ineligibility with a "Saxbe Fix" fails. Consequently, Plaintiff is entitled to summary judgment on Count I of the Complaint as a matter of law.

### 3. Plaintiff Is Entitled to Summary Judgment on Count II of the Complaint.

In Count II of Complaint, Plaintiff seeks redress under the Fifth Amendment to the U.S. Constitution for injury to his property right in his continued federal employment. Again, there are no genuine disputes of material fact at issue in this matter, and Plaintiff clearly enjoys a property right in his continued employment as a U.S. Foreign Service officer. *Colm*, 567 F.2d at 1129, n.3. Plaintiff has demonstrated that he is suffering injury to his property right in his continued federal employment by reason of Mrs. Clinton's appointment and continuance in office. Namely, Plaintiff has taken an oath to defend and bear true faith and allegiance to the U.S. Constitution and to faithfully discharge the duties of his office, yet he is being required to serve under, take direction from, and report to a constitutionally ineligible superior, Mrs. Clinton Plf's Stat. at paras. 6-9. Not only does this materially, fundamentally, and adversely change the terms and conditions of Plaintiff's employment as a U.S. Foreign Service Officer, but requiring Plaintiff to serve under, take direction from, and report to a constitutionally ineligible superior violates his oath, and should Plaintiff refuse to serve under, take direction from, or report to Mrs.

Clinton, he would be at substantial risk of disciplinary action, including removal, for insubordination or other, related grounds. *Id.* Because Mrs. Clinton's appointment and continuance in office as U.S. Secretary of State violates article I, section 6, clause 2 of the U.S. Constitution and Congress' effort to correct this constitutional ineligibility with a "Saxbe Fix" fails (*see* Section II(A)(4), *supra*), the injury Plaintiff is suffering to his property right in his continued federal employment is without due process of law and in violation of the Fifth Amendment. Consequently, Plaintiff is entitled to summary judgment on Count II of the Complaint as well.

## III. <u>CONCLUSION.</u>

Plaintiff has alleged more than ample facts to establish his standing to challenge Mrs. Clinton's appointment. Plaintiff also has demonstrated that Mrs. Clinton's appointment is contrary to the plain language of the Ineligibility Clause and cannot be "fixed" by Congress. The increasing use of legislative "fixes" to evade the plain language of a provision of the Constitution is properly before this Court. Plaintiff respectfully submits that if our government and courts will not observe even the plain and unambiguous provisions of the Constitution, then we are cut adrift from the anchor of law and liberty and the rule of law is in jeopardy. Defendants' motion to dismiss should be denied in its entirety, and summary judgment should be entered in favor of Plaintiff.

Respectfully submitted,

JUDICIAL WATCH, INC.

/s/  Paul J. Orfanedes
D.C. Bar No. 492716

/s/  James F. Peterson
D.C. Bar No. 450171
501 School Street, S.W., Suite 700
Washington, D.C.  20024
(202) 646-5172

Dated:  July 2, 2009                                    *Attorneys for Plaintiff*