# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID C. RODEARMEL, )
                                  )
      Plaintiff, )
                                    )     No. 1:09-cv-00171-RBW-JR
v. )
                                    )     Honorable Karen LeCraft Henderson
HILLARY RODHAM CLINTON, *et al.* )     Honorable James Robertson
                                    )     Honorable Reggie B. Walton
      Defendants. )
_____ )

## DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

TONY WEST
Assistant Attorney General

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director

JEFFREY M. SMITH (D.C. Bar # 467936)
ERIC J. SOSKIN (PA Bar # 200663)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW,
Washington, D.C. 20001
Room 7144
Tel: (202) 514-5751
Fax: (202) 616-8202

*Counsel for Secretary of State Hillary Rodham Clinton and the United States Department of State*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. This Case Should Be Dismissed for Lack of Standing . . . . . . . . . . . . . . . . . . . 1

    A. Plaintiff's Abstract Outrage Is Not a Concrete Harm Providing
       "Oath of Office" Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B. Plaintiff's Harm is Not Particularized to Him. . . . . . . . . . . . . . . . . . . . . . 5

    C. Plaintiff's Alleged Injury Is Not Judicially Redressable . . . . . . . . . . . . . . . 7

II. Secretary Clinton's Appointment is Consistent With the Ineligibility Clause . . . . . . . 11

    A. The Text of the Ineligibility Clause Does Not Prevent Secretary Clinton's
       Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B. Plaintiff's Proposed Interpretation of the Ineligibility Clause Is Inconsistent
       with the Purposes of the Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C. The History of Constitutional Practice Is Consistent and Supports Defendants'
       Interpretation of the Ineligibility Clause . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D. The Reasoning Contained in Department of Justice Legal Opinions Persuasively
       Supports the Interpretation of Defendants . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## Cases

AFGE v. Veneman, 284 F.3d 125(D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Allen v. Wright, 468 U.S. 737(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

American Legal Foundation v. FCC, 808 F.2d 84 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . 1

Bergen v. Edenfield, 701 F.2d 906(11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Board of Educ. v. New York State Teachers Retirement Sys.,
60 F.3d 106 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Board of Education v. Allen, 392 U.S. 236 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Bowsher v. Synar, 478 U.S. 714 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bryant v. Yellen, 447 U.S. 352 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Buckley v. Valeo, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Clarke v. United States, 705 F. Supp. 605 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cole v. Richardson, 405 U.S. 676 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Connor v. Williams, 404 U.S. 549 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

County of Del. v. DOT, 554 F.3d 143 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Dalack v. Village of Taquesta, Fla., 434 F. Supp. 2d 1336 (S.D. Fla. 2006) . . . . . . . . . . . . . 4

Doe v. Chao, 540 U.S. 614 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Edmond v. United States, 520 U.S. 651 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ex Parte Levitt, 302 U.S. 633 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

McClure v. Carter, 513 F. Supp. 265 (D. Idaho 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise,
501 U.S. 252 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Mistretta v. United States, 488 U.S. 361 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Myers v. United States, 272 U.S. 52 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Nguyen v. United States, 539 U.S. 69 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Northern Pipeline Const. Co. v. Marathon Pipeline Co., 458 U.S. 50 (1982) . . . . . . . . . . . . . . . 8

Powell v. McCormack, 395 U.S. 486 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279
    (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8

Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . . 10

South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231
    (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

Town of Charlestown, Rhode Island v. United States, 696 F. Supp. 800
    (D.R.I. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S. Term Limits v. Thornton, 514 U.S. 779 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Baucum, 80 F.3d 539 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Warth v. Seldin, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Constitutional Provisions, Statutes, and Other Authorities**

119 Cong. Rec. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

122 Stat. 5036 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

43 Cong. Rec. 2403 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

S. Rep. 93-499 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Pub. L. 110-455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S. Const. Art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Const. art. I § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 Op. Att'y Gen. 211 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Anti-Federalists, 79 Tex. L. Rev. 849, 877 (Mar. 2001) . . . . . . . . . . . . . . . . . . . . . . . 16

Federalist Constitution, 24 Hofstra L. Rev. 89 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Robert H. Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L.J. 1, 1-15
     (Fall 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Vasan Kesavan and Michael Stokes Paulsen, The Interpretive Force of the Constitution's Secret
     Drafting History, 91 Geo. L.J. 1113, 1152 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Plaintiff has requested that this Court remove Secretary of State Hillary Rodham Clinton from office because, in his view, the Ineligibility Clause of the Constitution bars her appointment. *See* Dkt. # 1. In their Motion to Dismiss, Defendants demonstrated that Plaintiff lacked Article III standing and that, in any event, his claims lacked legal merit. *See* Dkt. # 12-1 (hereinafter "Def's Opening Mem."). In his response, Plaintiff fails to demonstrate the type of concrete and particularized injury required for judicial adjudication of his claims or to articulate a judicially-available remedy to assuage his alleged injury. *See* Dkt. # 17 (hereinafter Pl's Mem.). With regard to the merits of his claims, Plaintiff offers an *ipse dixit* interpretation of the Ineligibility Clause and an unpersuasive analysis of the Clause's purpose and history. In fact, the Government's reading of the Clause is fully consistent with the plain text, and the purpose and history of the Clause demonstrate that Defendants' interpretation is correct. Accordingly, Secretary Clinton's appointment was valid, and Plaintiff's Complaint should be dismissed.

## ARGUMENT

### I.     This Case Should Be Dismissed for Lack of Standing

"It is a fundamental precept of our constitutional system that the judiciary is limited to deciding 'cases' and 'controversies,'" and the Constitutional doctrine of standing assures that "legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *American Legal Foundation v. FCC*, 808 F.2d 84, 88 (D.C. Cir. 1987) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). To demonstrate that he has standing, Plaintiff must allege that he suffers "a concrete and particularized injury that is: actual or imminent[,]

caused by or fairly traceable to the act being challenged in the litigation, and redressable by the court." *County of Del. v. DOT*, 554 F.3d 143, 147 (D.C. Cir. 2009) (quoting *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007)) (internal quotation marks and numbering omitted). In his Complaint and his Opposition to Defendant's Motion to Dismiss, Plaintiff fails to meet the constitutional requirements of injury and redressability.

### A. Plaintiff's Abstract Outrage Is Not a Concrete Harm Providing "Oath of Office" Standing

As Defendants noted in their Motion to Dismiss, it is well-established that individuals lack standing to challenge the eligibility of a presidential appointee in the absence of a concrete harm caused by a particular action. *See, e.g., Ex Parte Levitt*, 302 U.S. 633 (1937); *McClure v. Carter*, 513 F. Supp. 265 (D. Idaho 1981). Congress recognized the strict requirements of Article III standing in the Secretary of State Emoluments Act, permitting a constitutional challenge to be brought under the act only by a plaintiff "aggrieved by an action of the Secretary of State. Pub. L. 110-455, 122 Stat. 5036 (codified at 5 U.S.C. § 5312 note); *see Doe v. Chao*, 540 U.S. 614, 624 (2004). Because Plaintiff alleges only an "abstract injury" produced by the Secretary's presence in office in conjunction with his interpretations of the Constitution and of his oath of office, rather than a concrete injury caused by a particular action of the Secretary, Plaintiff lacks Article III standing.

Plaintiff's principal response is to invoke "oath of office" standing under *Board of Education v. Allen*, 392 U.S. 236 (1968). But Plaintiff's claim to oath of office standing relies on a fundamental misreading of *Allen*. *Allen* recognizes at most a narrow category of injury, limited to situations in which a plaintiff faces a direct and imminent choice between "violating [his]

oath" by complying with a new, specific, and unconstitutional command, or losing his job. *See* Def's Opening Mem., at 9-10. Here, Plaintiff fails to meet one of the basic prerequisites for oath of office standing: that he allege that Defendants have imposed on him any new, specific and unconstitutional action that he is required to take in violation of his oath. *See id.;* 392 U.S. 241 at n.5 (describing the choice). In *Allen* itself, for example, the plaintiff legislators were required "to purchase and to loan" textbooks to parochial schools using public funds, a requirement they alleged violated the Establishment Clause of the First Amendment. *See* 392 U.S. at 239 n.3, 240-41 (describing the New York law at issue and plaintiffs' claims). Likewise, in *Clarke v. United States*, the district court case that Plaintiff cites, Congress required the plaintiff councilmen to adopt specific legislation, allegedly in violation of the Free Speech Clause of the First Amendment.[1] *See* 705 F. Supp. 605, 606-07 (D.D.C. 1988) (setting forth the text of the so-called 'Armstrong Amendment' and plaintiffs' allegation that "the Act coerces political speech"). In contrast, as Plaintiff himself concedes, Defendants have not imposed any new, unconstitutional mandate on Plaintiff. Instead, the action that he is being required to take, purportedly in violation of his oath, is that "every day he [go] to work," a requirement that existed before Secretary Clinton's Appointment, and that he does not allege is itself unconstitutional. *See* Pl's Mem., at 10. Plaintiff is thus far outside the scope of "oath of office" standing.[2]

---

[1] As previously explained, cases in the Second and Ninth Circuits confirm this prerequisite to *Allen* standing. *See* Def's Opening Mem., at 9-10 (citing *Board of Educ. v. New York State Teachers Retirement Sys.*, 60 F.3d 106, 112 (2d Cir. 1995); *South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231 (9th Cir. 1980)).

[2] As explained in Defendants' Opening Memorandum, this narrow limitation on "oath of office" standing is necessary to avoid converting every oath-taking federal employee "into potential litigants, or attorneys general," whenever their interpretation of the Constitution differs from that of their superiors.

Because he cannot satisfy this essential element of *Allen* standing, Plaintiff misconstrues his oath to create an affirmative obligation on his part to cease "serving under, taking direction from, and reporting to" his superiors while Secretary Clinton is in office. *See* Pl's Mem., at 6-7, 9. Yet Plaintiff ignores the Supreme Court's interpretation of an oath to "support," "uphold," and "defend" the Constitution as a general pledge to behave lawfully, not to vindicate an oath-taker's personal interpretation of the Constitution through resignation or litigation. *See Cole v. Richardson*, 405 U.S. 676, 682-85 (1972). As Defendants discussed previously, the obligation imposed by his oath does not "literally impos[e] any specific responsibilities for action," such as requiring him to protest Secretary Clinton's appointment by resigning, refusing to accept her instructions, or declining to send reports to her. *Dalack v. Village of Taquesta, Fla.*, 434 F. Supp.2d 1336, 1346 (S.D. Fla. 2006); *see also* Def's Opening Mem., at 8-9. Rather, the oath's purpose is "to assure that those in positions of public trust were willing to commit themselves to live by the constitutional processes of our system." *Cole*, 405 U.S. at 684. Here, where the President and Senate have considered Secretary Clinton's eligibility and respectively appointed and confirmed her as Secretary of State, Plaintiff's mere disagreement with the outcome of that Constitutional process and alleged willingness to resign over it does not satisfy Article III's injury-in-fact requirement.[3] *See Town of Charlestown, Rhode Island v. United States*, 696 F. Supp. 800, 810-11 (D.R.I. 1988) (an oath-taker's "censures of conscience" are not "the injurious consequences contemplated [in] the injury in fact requirement of Article III").

---

[3] For the same reasons, Plaintiff's "property interest in his continued employment" and claim of a "change in the terms and conditions" of that employment are immaterial to the question of his standing. Because he can only suffer any harm to these interests through his self-imposed obligation to promote his personal interpretation of the Ineligibility Clause, they do not form an independent basis for standing.

**B.      Plaintiff's Harm is Not Particularized to Him.**

Plaintiff also lacks standing because his injury is not particularized – instead, it is a "generalized grievance" suffered in identical measure by a multitude of individuals. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Where an injury is "widely shared, [and] also of an abstract and indefinite nature . . . for example, injury to the interest in seeing that the law is obeyed," the basic elements of standing have not been satisfied. *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1293 n.1 (D.C. Cir. 2007).  Because such generalized injuries are best resolved legislatively, rather than judicially, this requirement is another necessary corollary to the "single basic idea" of Article III standing – "the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Plaintiff does not dispute that his alleged "injury" is shared by "hundreds of thousands . . . or even millions" of others "who also swore an oath to the Constitution." Instead, he claims that "it is irrelevant whether an injury is shared by a large number of other possible litigants," as long as that group is narrower than an "injury common to all citizens," or taxpayers. *See* Pl's Mem., at 11-12 (citing *Warth*, 422 U.S. at 490).  But *Warth* makes cleaer that a "'generalized grievance' shared in substantially equal measure by all or *a large class* of citizens" is inadequate to satisfy Article III's command that an injury be particularized. *Warth*, 422 U.S. at 499-500 (emphasis added).  As the Ninth Circuit sensibly recognized, Plaintiff's theory of standing would "convert all officials" – certainly a "large class" – "into potential litigants or attorneys general" every time they witnessed any conduct by any superior they believed to be unconstitutional. *South Lake*

*Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231 (9th Cir. 1980).[4] Such an approach would distort Article III's requirements beyond recognition.

Nor does Plaintiff's alleged "injury" in any way limit the potential identity of plaintiffs with standing to the oath-takers at the Department of State, as he suggests in a footnote. *See* Pl's Mem., at 9, n.6. As Defendants have explained, the plain text of the Constitutional Clause to which Plaintiff asserts his commitment and fidelity limits the actions of the President: "No Senator or Representative shall . . . *be appointed* . . . ." (emphasis added); *Myers v. United States*, 272 U.S. 52, 163-64 (holding Appointments to be an incontrovertibly executive power). The allegedly-unconstitutional act of which Plaintiff complains is therefore the act of the President in making that appointment, underscoring just how "pervasively shared" any injury from an appointment would be. *See Valley Forge*, 454 U.S. at 475. In this situation, where Plaintiff's alleged injury is based on the purportedly-unconstitutional action of the President, Plaintiff is situated no differently than any other Executive Branch actor who swears an oath to the Constitution. Plaintiff's misguided attempt to substitute Secretary Clinton as the relevant constitutional actor because "ultimately, Mrs. Clinton had to accept and occupy the position" thus disregards the plain text of the very Clause of the Constitution he seeks to enforce. *See* Pl's Mem., at 9, n.6; Def's Opening Mem. at 11 & n.4.[5]

---

[4] Plaintiff correctly observes that the *South Lake Tahoe* ruling "contains dicta in which the Court questioned the continuing applicability of *Allen*," and that *Allen* was "subsequently reaffirmed." Pl's Mem., at 11-12. The *South Lake Tahoe* Court's analysis of the consequences of Plaintiff's overbroad misreading of *Allen* nonetheless remains persuasive.

[5] Other Constitutional provisions directly limit the ability of Members of Congress to "accept" certain titles and Emoluments. *See, e.g.*, U.S. Const. art. I § 9 ("[N]o person holding any Office of Profit or Trust . . . shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State.").

Because of the "abstract and indefinite nature" of Plaintiff's injury, his inability to distinguish himself from others is fatal to his quest for standing. *See Public Citizen*, 489 F.3d at 1293 n.1.

### C.     Plaintiff's Alleged Injury Is Not Judicially Redressable

Plaintiff also lacks standing because his purported "injury" is not judicially redressable, because this Court lacks the power to remove Secretary Clinton from office. Plaintiff does not deny that "the exclusive power of removal of principal officers in executive agencies is vested by the Constitution in the President," except in cases of impeachment. *See Def's Opening Mem.*, at 13-16. Rather, Plaintiff seeks to obscure this fundamental defect in his theory of standing by contending that redress does not require removal at all. But that contention blinks reality, and would require this Court to ignore the obvious thrust of Plaintiff's complaint.

Plaintiff contends first that because (in his view) Secretary Clinton is "constitutionally ineligible to serve," granting his requested relief would not constitute "removing an appointee" at all. Pl's Mem., at 15. But that is implausible. Because the President and the Senate have satisfied the constitutionally-required procedures for appointment and confirmation, there can be no doubt that Secretary Clinton currently holds the office of Secretary of State and any Order directing her to surrender the office would constitute removal.

Plaintiff argues to the contrary, asserting that Secretary Clinton's appointment "was void

---

Notably, although Plaintiff quotes this precise language elsewhere in his brief, declaring that "the Framers clearly knew how to allow for 'exceptions,'" he ignores that this same Clause demonstrates that "the Framers clearly knew how" to impose Constitutional obligations on Members of Congress, as opposed to the President. *See* Pl's Mem., at 23.

*ab initio* [and] a legal nullity." *Id.* Plaintiff points to no authority, however, for the proposition that an appointment in violation of the Ineligibility Clause – or any other constitutional limitation on appointments – is a "legal nullity" or is "void *ab initio*." Indeed, there is ample precedent suggesting the contrary. Far from being "legal nullities," the actions of federal officers appointed with constitutional deficiencies have been affirmed as binding on numerous occasions. *See, e.g.,* *Buckley v. Valeo*, 424 U.S. 1, 142 (appointments to Federal Election Commission in violation of the Constitution "should not affect the validity of the Commission's administrative actions and determinations to this date"); *Connor v. Williams*, 404 U.S. 549, 550-51 (1972) (applying only prospective relief upon concluding that legislators had been elected from unconstitutionally-drawn districts); *see also Northern Pipeline Const. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 88 (1982). Similarly, as explained in Defendants' prior brief, the relief granted in successful challenges to appointments is narrower than removal, reflecting that the actual consequences of a deficient appointment fall short of the legal invalidity Plaintiff hypothesizes. *See, e.g., Nguyen v. United States*, 539 U.S. 69, 83 (2003); *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252 (1991). Just as there is no basis for the argument "that if an Act of Congress is unconstitutional, it is void *ab initio*" so that actions taken pursuant to the Act are of no effect, *United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996), there is likewise no basis for plaintiff's contention that if an appointment is unconstitutional, it is void "ab initio" so that undoing the appointment is not removal at all.

Similarly unpersuasive is Plaintiff's passing contention that he does not require removal, but only an injunction "enjoining the Department of State from requiring Plaintiff to serve under, take direction from, and report" to Secretary Clinton. Pl's Mem., at 15. Yet Plaintiff's request

for an injunction that would somehow carve him out of the Department of State hierarchy, such that he would no longer "serve under, take direction from, and report to" the Secretary, Pl's Mem., at 17-18, is unprecedented. It is also unworkable. Given that Secretary Clinton, as head of the Department of State, is also atop the hierarchy for each of Plaintiff's superiors, presumably they – and thus, their other subordinates – would have to be similarly carved out of the Department of State, lest Plaintiff continue to indirectly serve under the Secretary. That would leave Plaintiff as a free-floating employee of the Department of State, answering only (perhaps) to the President. Perhaps for this reason, Plaintiff does not even try to suggest the contours of such an injunction or to incorporate any description of such an injunction into his proposed Order. *See* dkt. no. 17-2. In any event, as Defendants noted previously, such an injunction would be the functional equivalent of ordering the Department of State to remove its own department head. *See* Def's Opening Mem., at 17-18.

Once it is clear that removal is what Plaintiff seeks, his claim to standing fails. As is true for federal judges,"[t]he only mechanism for removal . . . provided in the Constitution is the impeachment process," aside, of course from termination by the President. *Bergen v. Edenfield*, 701 F.2d 906, 908 (11th Cir. 1983). Plaintiff fails to identify a single case in which a Court has ordered removal of an officer appointed by the President. *See* Pl's Mem., at 15-19. Moreover, as Defendants have made clear, innumerous cases implicitly recognize the constitutional limitation on judicial removal by authorizing only relief that falls short of removal. *See* Def's Opening Mem., at 15-16 & n.5. Plaintiff's cursory attempts to distinguish these cases do not dispute this point. The power of removal is a "powerful tool for control," and cannot be extended beyond the limits set forth in the Constitution without upsetting the basic separation of powers. *See Edmond*

9

*v. United States*, 520 U.S. 651, 664 (1997); *Bowsher v. Synar*, 478 U.S. 714, 726-27 (1986).

Indeed, it is in part for that reason that Article III requires here that Plaintiff allege a concrete injury resulting from a particularized action of the Secretary. In that circumstance, this Court might well be able to redress the alleged concrete injury, by invalidating the challenged particularized action. Here, because no such action is alleged, Plaintiff must seek a remedy – removal – that this Court lacks the power to provide. Plaintiff's "desire for sweeping relief" has resulted in a dispute that is not "capable of judicial resolution." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 at 221-22 (1974). Plaintiff thus lacks standing to proceed.

*** 

Specific injury and redress are the essence of Article III's case or controversy requirement, which ensure that even Constitutional disputes are presented in "form[s] traditionally capable of judicial resolution [with] the essential dimension of specificity." *Schlesinger*, 418 U.S. at 220.[6] Plaintiff has identified no analogous case finding standing either in an individual seeking removal of a Cabinet official or of a federal employee challenging the constitutional interpretation of his superiors. Plaintiff thus seeks that a new category of standing be carved out for himself: standing by federal employees to challenge the Constitutionality of the Appointments of the President. Plaintiff's position is at odds with Article III's limits of jurisdiction to actual "cases" or "controversies" and should be rejected.

---

[6] Plaintiff's complaint that a "*quo warranto* action has no applicability here" further underscores the lack of a judicially-cognizable dispute between the parties here. Plaintiff does not appear to dispute that a *quo warranto* action may provide an opportunity for a Court to resolve disputes over the applicability of the Ineligibility Clause. *See* Def's Opening Mem., at 16-17, n.6.

## II. Secretary Clinton's Appointment is Consistent With the Ineligibility Clause

Article I, Section 6, Clause 2 of the United States Constitution, known as the Ineligibility Clause, states:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time[.]

U.S. Const. Art. I, § 6, cl. 2. It is undisputed that the emoluments of the office of the Secretary of State are the same now as they were when then-Senator Clinton began her Senate term. Under a plain meaning approach, the emoluments of the office have not been "encreased," and appointment of Secretary Clinton is constitutional.

Plaintiff argues to the contrary, doggedly contending that the word "increased" is capable of but a single meaning. In fact, the relevant phrase – "shall have been increased during" – is open to at least two constructions – "shall have been increased at any historical point" or "shall have been increased on net." *See* Def's Opening Mem., at 21-24. A review of the purpose and history of the Clause demonstrates that the latter construction is the correct one, and that Secretary Clinton's appointment was Constitutional. *See* Def's Opening Mem., at 25-37.

### A. The Text of the Ineligibility Clause Does Not Prevent Secretary Clinton's Appointment

As Defendants discussed in their Opening Memorandum, the Ineligibility Clause may be read in at least two distinct ways. First, the Clause may prohibit an Appointment following an act "at any historical point" to increase the emoluments of the civil office in question. Alternatively, it may also be read to prohibit an Appointment only at a time when the emoluments of the civil office exceed those "that existed at the commencement of the Member's

11

term of election." Nothing in the text of the Clause itself indicates which of these interpretations is correct,[7] but the latter, "on net" interpretation of the increase prohibited by the Clause is the one best supported by the Clause's history and purpose. *See* Def's Opening Mem., at 21-37.

Plaintiff's only response is his *ipse dixit* claim that "[t]he language of the provision is clear, precise, and readily understood." *See* Pl's Mem., at 21. By "declar[ing] generally that the meaning is 'plain,'" without any analysis of the text or grammar of the Clause, Plaintiff has missed "a critical analytical step" required to evaluate the meaning of the Ineligibility Clause. *See AFGE v. Veneman*, 284 F.3d 125, 128 (D.C. Cir. 2002). As the Court of Appeals has observed, the text of a statute – and likewise the Constitution – "can be clear or unclear depending on what question we want it to answer." *Id.* Here, where the question is whether the Clause permits an appointment following passage of a roll-back statute, Plaintiff's cursory conclusion that "the language (and grammar) is readily understood" is inadequate. Pl's Mem., at 21.

Plaintiff's unsubstantiated assertion is particularly unpersuasive because his brief lacks any analysis of the text or grammar of the Clause. It also lacks any examples of similar usage of the phrase "shall have been increased during." Rather, Plaintiff focuses on whether the word "increased" on its own means "increased on net," while nowhere responding to Defendants' analysis – and citation to grammatical authorities – regarding the ambiguity generated by the different possible roles the word may serve in the phrase as a whole. *Compare* Pl's Mem., at 21,

---

[7] Puzzlingly, Plaintiff believes that Defendants are arguing that the Clause had a different meaning in the past than it has today. *See* Pl's Mem., at 21, n.11. To the contrary, Defendants' discussion of the Clause is equally applicable to its meaning in the 18th and 21st centuries – as evidenced by Defendants' use of present-day and past examples and grammatical authorities. *See* Def's Opening Mem., at 21-24.

n.11 (discussing whether "increased means 'increased on net'") *with* Def's Opening Mem., at 21-24.[8]

The reasonableness of the "on net" interpretation of the phrase is a matter of everyday usage, not advanced grammar. To reiterate a single example of the ambiguity as previously presented, suppose that a statute stated: "No Senator or Representative shall purchase a stock index fund tracking any index, which shall have been created, or the value whereof shall have been encreased during the preceding year." *See* Def's Opening Mem., at 21; *see also* Amici Br. at 14-15 (agreeing that "the examples in the government's memorandum" support an interpretation "consistent with the government's position"). Under Plaintiff's interpretation, a Member of Congress would be prohibited from purchasing an index fund tracking the Dow Jones Industrial Average during 2009 – even though the Dow lost about a third of its value in 2008 – because the Dow had some positive days during that period.

Having avoided grappling with the ambiguity of the meaning of "shall have been increased," Plaintiff then addresses his remaining arguments to the irrelevant question of whether the Ineligibility Clause permits any exceptions. *See* Pl's Mem., at 22-24. This comparison to clauses such as the Minimum Age Clause of Article II and the Emoluments Clause of Article I, § 9 fails to address the actual ambiguity of the Ineligibility Clause: what the Constitution actually prohibits with the words "shall have been increased." Under the interpretation of the President,

---

[8] Given the absence of support for his position that the text is "clear and precise," it is hardly surprising that Plaintiff casually dismisses the contrary analysis proffered by seven distinguished experts in the science of language, stating that "the meaning of the Ineligibility Clause is not plain," and that there are "several possible readings" of the Clause. *See* Dkt. # 15-2 at 1 (Memorandum of Professors of Linguistics as *Amici Curiae*) (hereinafter Amici Br.); Dkt. # 21 (Plaintiff's Opposition to Proposed *Amici* Brief).

the Senate, and Defendants, Congress did not create an "exception" to the requirement, as Plaintiff posits. Rather, it has ensured that the Secretary of State's current Emoluments have not been increased above the level of January 1, 2007, prior to when then-Senator Clinton commenced her elected term. *See* Secretary of State Emoluments Act at § 1(a). Accordingly, the Ineligibility Clause does not prohibit Secretary Clinton's service, and there is no need for Congress to carve out an "exception" of the type imagined by Plaintiff.

**B.    Plaintiff's Proposed Interpretation of the Ineligibility Clause Is Inconsistent with the Purposes of the Clause**

Plaintiff concedes that the Ineligibility Clause was "a carefully crafted compromise" between those who were concerned about Congressional self-dealing and undue Executive influence and those who wanted to permit the Federal government from benefitting from the service of qualified individuals, including Members of Congress. Pl's Mem., at 24. Nevertheless, Plaintiff argues that the Court should interpret the Clause according to the purposes advanced only by one side in that compromise. *See id.* at 24-26, 28 (citing John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89 (1995) (hereinafter, "*Intruder*"). Plaintiff's approach is ill-founded because his argument presents an idiosyncratic and flawed interpretation of the Clause.

At the outset, "both supporters and opponents of the [government's "on net" interpretation of the Ineligibility Clause] have agreed that [it] is consistent with the purpose underlying the Emoluments Clause." *Intruder*, at 147. Indeed, even the principal authority cited by Plaintiff concedes that Defendants' interpretation of the purposes has been accepted with "near unanimity," *id.* at 148, and he traces this consensus to at least the writing of Justice Story,

14

*see* 1 Joseph Story, Commentaries on the Constitution of the United States, § 864 (1970 ed.).

Thus, Plaintiff's conclusion that only his interpretation "is consistent with and promotes the

Framers' purposes" overstates the slender reed of authority on which it is based. Pl's Mem.,

at 24.

More importantly, Plaintiff's interpretation both neglects subsequent changes to the anti-

Federalists' original proposal and suggests that modern constitutional interpretation follow an

illogical path. First, while the initially proposed version of the Ineligibility Clause may well have

been intended to weaken the effectiveness of the National government, the Federalist majority at

the Convention recognized this purpose and amended the clause to prevent this mischief. *See*

Def's Opening Mem., at 26-32. For example, Federalist Delegate James Wilson described his

opposition to the early version of the proposed Clause saying that "nothing seemed to be wanting

to prostrate the Nat[ional] Legislature, but to render its members ineligible to Nat[ional] offices,

[and] by that means take away its power of attracting those talents which were necessary to give

weight to the Govern[ment] and to render it useful to the people."[9] II Farrand, Records of the

Federal Convention of 1787, at 288. Charles Pinckney similarly observed that a broad

ineligibility would be "degrading" to Members, would be "inconvenient" for the Executive

Branch "because the Senate might be supposed to contain the fittest men," and would be

"impolitic" because it would deter individuals with "the first talents and abilities" from serving

in the Congress. *Id.* at 283. Recognizing the debilitating effect that a broad Ineligibility Clause

---

[9] Plaintiff describes Wilson as an Anti-Federalist, Pl's Mem. at 27, but this is incorrect. Wilson was a leading proponent of the National government created by the new Constitution, and his advocacy is a major reason why his home state of Pennsylvania became the second state (after Delaware) to ratify the Constitution. Wilson was later appointed by President Washington to be an original member of the Supreme Court.

would have on the National government, James Madison, proposed the "carefully crafted compromise" that Plaintiff acknowledges. *See* Pl's Mem., at 24. Despite their opposition, the anti-Federalists failed to prevent the enactment of the Madisonian compromise. *See* Def's Opening Mem., at 27-30. Accordingly, although the Clause exists because of the efforts of anti-Federalists, the purpose reflected by its ultimate text as enacted is as Defendants described: to maximize, consistent with the prevention of corruption and undue Executive influence, the eligibility of qualified individuals to serve in Executive and Judicial Branch offices. *See* Def's Opening Mem., at 30-31.

Relatedly, the theory of the Ineligibility Clause as a poison pill that Plaintiff embraces is logically unsound. It makes no sense to interpret a Constitutional clause in a way that would undermine the overall Constitutional design. *See* Vasan Kesavan and Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 Geo. L.J. 1113, 1152 (2003) ("[T]here is one important reason to prefer the public writings of the Federalists to those of the Anti-Federalists in constitutional interpretation: The Federalists won, whereas the Anti-Federalists did not"); Paul Finkelman, *Book Review: Turning Losers Into Winners: What If Anything Can We Learn from the Anti-Federalists*, 79 Tex. L. Rev. 849, 877 (Mar. 2001) ("[U]sing the [A]ntifederalists to divine the intentions of the [F]ramers is fraught with immense problems and is fundamentally misconceived."). The Constitution should be interpreted according to the understandings of those Framers who supported it, those citizens who ratified it, and the people whom it still serves. *Cf. Bryant v. Yellen*, 447 U.S. 352, 376 (1980) ("Statements by the opponents of a bill and failure to enact suggested amendments, although they have some weight, are not the most reliable indications of congressional intention."). Its individual

provisions should not be construed as "intruders" left to defeat the Framers' national experiment by those who would have preferred a dis-United States from the beginning.

## C.   The History of Constitutional Practice Is Consistent and Supports Defendants' Interpretation of the Ineligibility Clause

In their Opening Memorandum, Defendants demonstrated how the consistent Constitutional practice of Presidents and Congress since 1876 demonstrates an understanding that Defendants' interpretation of the Ineligibility Clause is correct. *See* Def's Opening Mem., at 32-37.[10] Defendants' examples included six appointments in which "the salary of the office had been increased and then the increase repealed during the Member's then-current term," including five appointments to Cabinet positions. Def's Opening Mem. at 33. In response, Plaintiff provides three putative counter-examples, none of which has any relevance to the issue in this case.

Contrary to Plaintiff's suggestion, the delays of the appointments of Governor Paterson to the Supreme Court and of Senator Kirkwood to the post of tariff commissioner had nothing to do with any increase in emoluments. As Plaintiff acknowledges, these nominations were to newly-created offices, not to offices whose emoluments had increased. *See* Pl's Mem., at 29. Thus, they have no relevance to the interpretation of the phrase "shall have been increased." Plaintiff's reliance on the example of Senator Ransom's nomination to be an ambassador is equally inapposite. In contrast to the numerous appointments discussed by Defendant in which a

---

[10] Defendants cited three Supreme Court cases supporting their contention that this consistent Constitutional practice should be taken as weighty evidence as to the meaning of the Constitution. *See id.* at 32-33 (citing *Mistretta v. United States*, 488 U.S. 361, 401 (1988); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 816 (1995); *Powell v. McCormack*, 395 U.S. 486, 502 (1969)). Plaintiff cites no authority that would undermine these cases, but rests solely on his demonstrably incorrect claim that the practice has not been consistent.

salary increase had been subsequently repealed – as in the case of Secretary Clinton – in Ransom's case, Congress had raised the salary and had taken no action to repeal the increase. *See* 21 Op. Att'y Gen. 211 (1895). Thus, there was no question but that the emoluments of the ambassadorship were higher at the time of appointment than at the beginning of Ransom's Senate term and the only debate was over whether the "appointment" occurred before or after the expiration of the Senate term, an issue irrelevant to this case.[11] *See id.*

Plaintiff next advances the theory that at the time of Senator Saxbe's nomination, the issue of the correct interpretation of the Ineligibility Clause was "hotly debated." Pl's Mem., at 30. It certainly is true, as Defendants' Opening Memorandum describes, that Plaintiff's "any historical point" interpretation of the Clause was vigorously advanced by Senator Byrd who held a hearing at which he invited academics who shared his view (and one opponent of his position for "balance"). *See* Def's Opening Mem., at 34; Hearing Before the Committee on the Judiciary on S. 2673, 93rd Cong. (Nov. 19, 1973). But, as Plaintiff cannot deny, Senator Byrd's strenuous opposition was spectacularly unsuccessful in convincing his colleagues, and Senator Saxbe was confirmed as Attorney General by a vote of 75-10. *See* Def's Opening Mem., at 34. Moreover, the small contingent of Senators who once took Plaintiff's position has melted away and now even Senator Byrd has acquiesced to Defendants' view of the Ineligibility Clause, namely that a Member of Congress may be confirmed to a Cabinet post following legislative action to roll back the emoluments to their pre-term level. *See id.* at 34-36.

---

[11] Plaintiff's fourth attempt at a counter-example, that "in 1987, the possible nomination of Senator Orrin Hatch to the U.S. Supreme Court apparently was derailed" because of the Ineligibility Clause, is based on pure speculation. Pl's Mem., at 31.

Then-Professor Breyer's view of Senator Saxbe's nomination is equally unpersuasive. As Breyer states, his view was not arrived at through careful reasoning: he "ha[d] just read [Byrd's] interesting analysis of the Disqualification Clause" and stated that he would "like to add one thought." *See* 119 Cong. Rec. 38,331 (1973). This thought, he cautioned, was "not offer[ed] as an expert opinion, for I have not researched the question." *Id.* Nor, upon examination, is his conclusion convincing. Breyer suggested that, notwithstanding the rollback legislation, the emoluments were higher because "an office for which Congress has once voted a pay increase has been made more attractive [because] in such a case Congress is infinitely more likely to revote the pay increase as soon as the Senator's disqualification expires." *Id.* Under this interpretation, ineligibility under the Clause would turn on the subjective expectations of a nominee, which would be a judicially unmanageable result.[12]

---

[12] Even O'Connor observes that such a result would restrict eligibility far more than the Framers intended:

> [Breyer's theory] would lead to absurd results that essentially would make it impossible for a sitting Member of Congress to be appointed to federal office under any circumstances, in direct contravention to the intent of the Framers. . . . Breyer's view would have an emoluments increase occur upon . . . ridiculous occasions. The very existence of inflation certainly increases the likelihood that the pay of federal offices will be increased, as would unsubstantiated rumors that the commission intended to recommend a pay increase to the President. In fact, Breyer's letter concerning the Saxbe nomination confirms that his view leaves no logical stopping point for his all-encompassing definition of increased emoluments. . . . This view of previously repealed legislation as an increased emolument demonstrates that Breyer's standard would leave the question of the onset of increased emoluments very much in the eye of the beholder, an amorphous inquiry absolutely devoid of judicially cognizable standards.

*Intruder*, at 121-22.

**D.    The Reasoning Contained in Department of Justice Legal Opinions Persuasively Supports the Interpretation of Defendants**

Plaintiff makes vigorous objection to the Office of Legal Counsel Opinion recently issued by Acting Assistant Attorney General David Barron. *See* Pl's Mem., at 31-32 (referencing Def's Opening Mem. Ex. 1, dkt. # 12-2 (hereinafter "2009 Barron Opinion"). As an initial matter, Plaintiff's emphasis on the OLC opinion is misplaced, given that Defendants only cited the 2009 Barron Opinion in a footnote and did not (and do not) seek the Court's deference to it. Rather, it is Plaintiff who asserts – incorrectly – that his position is persuasive because it is supported by "OLC's consistent legal advice." Pl's Mem., at 31. However, as noted in the 2009 Barron opinion, the 1987 Cooper Opinion relied on by Plaintiff was not in accord with prior views of the Department of Justice and did not consistently guide subsequent Executive Branch practice. *See* 2009 Barron Opinion at 1; Def's Opening Mem. Ex. 2, dkt. #12-3 (hereinafter "1987 Cooper Opinion").

Many prior Department of Justice opinions concluded that a Member of Congress could be appointed, consistent with the Constitution, following a statutory roll back of increased emoluments. In 1909, Assistant Attorney General Charles Russell opined that the appointment of a Member to an office whose salary has been raised and then lowered to the prior amount did not violate the Ineligibility Clause, finding that "[a]n examination of the commentaries on the Constitution and of the debates in the convention which framed it leaves no doubt that the purpose, and the sole purpose, of [the Ineligibility Clause] was to destroy the expectation a Representative or Senator might have that he would enjoy the newly created office of the newly created emoluments." 43 Cong. Rec. 2403 (1909) (citing four historical sources). Similarly, in

1973, Acting Attorney General Robert Bork, a prominent legal scholar well-known for his strict construction of the Constitution's text, *see generally* Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 1, 1-15 (Fall 1971), came to the same conclusion which he expressed to Congress during the Saxbe debates:

> The purpose of the [Ineligibility Clause] is clearly met if the salary of an office is lowered after having been raised during the Senator's or Representative's term of office. The Senators and Representatives know that, because of the constitutional provision, they cannot be appointed to an office with a higher salary than was provided at the beginning of their current term of office, so the expectation of a higher salary cannot influence their votes on legislation to raise salaries of Federal officers.

> [Reducing the Salary of the office of Attorney General] should remove any constitutional question which may be raised concerning the appointment of Senator Saxbe to be Attorney General of the United States.

S. Rep. 93-499, at 6 (Nov. 13, 1973); *accord* Hearing Before the Committee on Post Office and Civil Service on S. 2673, 93rd Cong., at 8-16 (Nov. 18, 1973) (testimony of Acting Attorney General Bork). The Assistant Attorney General for the Office of Legal Counsel, Robert Dixon, concurred:

> [I]f I could summarize what I have derived from various quotations [from the Framers] regarding the lesson of history to be derived from the Constitutional Convention, it would go as follows . . . . I would say that a major purpose of the ineligibility clause according to its originator [Madison] is the prevention of the evils which would arise if legislators could benefit from the creation of new offices or increase in the emoluments of existing ones.

> There is a concurrent consideration noted [at the Convention] by Mr. Pinkney and also by Mr. Madison and Mr. Wilson and one perhaps more relevant to the present day that the question of improper motivation for salary increases.

> Neither the public, the executive branch, nor the legislative branch is well served by a prohibition so broad that it over corrects and needlessly deprives Members of Congress of opportunities for public service in appointive offices.

Hearing Before the Committee on the Judiciary on S. 2673, 93rd Cong., at 67-68 (Nov. 19, 1973).

In 1979, DOJ's Office of Legal Counsel issued two published opinions which reiterated this conclusion, 3 Op. O.L.C. 298, 300 (1979); 3 Op. O.L.C. 286, 289-90 (1979), and in 1980, in reference to the nomination of Senator Muskie to be Secretary of State, OLC issued an unpublished opinion again advising that the Ineligibility Clause permits appointment of a Member to an office whose salary has been raised and then lowered to its earlier level. *See* Def's Opening Mem. Ex. 1, at 3 (citing Memorandum for Alan A. Parker, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel (May 8, 1980)).

The subsequent contrary view expressed in the 1987 Cooper Opinion is not persuasive. It contains no linguistic or historical analysis of the type contained in the briefs in this case and in the 2009 Barron Opinion. *Compare id.* at 1 *with* 2009 Barron Opinion, at 4-5 (discussing the two plausible constructions of the clause and noting that this was recognized as early as 1909). Moreover, the 1987 Cooper Opinion does not appear to reflect the complete historical record, citing only three instances of individuals (Morrill, Knox, and Saxbe) who "were nominated and confirmed after Congress reduced the salaries of the vacant offices," and omitting the subsequent examples of Casey and Muskie – the very nominations during which Congress had come to a complete consensus on the meaning of the Ineligibility Clause. *See* Def's Opening Mem., at 34-36. In contrast, the 2009 Barron Opinion addresses these flaws and is extensively reasoned, considerations that the Court may note when deciding which of these opinions is persuasive.

In sum, while the Court must make its own judgment as to the meaning of the Ineligibility Clause, it should be aware that Plaintiff's suggestion that his position is supported by "consistent

legal advice" by DOJ is incorrect. The weight of longstanding Executive Branch views and practice supports the position advanced by Defendants. Moreover, Defendants submit that the reasoning contained in the DOJ opinions taking Defendants' position (and, in particular, the 2009 Barron Opinion) is substantially more persuasive than that contained in the 1987 Cooper Opinion.

## CONCLUSION

For the reasons stated above and in Defendants' Opening Memorandum, Defendants' Motion to Dismiss should be granted and Plaintiff's Motion for Summary Judgment should be denied.

August 10, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

JENNIFER R. RIVERA
Branch Director

SUSAN K. RUDY
Assistant Branch Director

*/s/ Eric J. Soskin*
JEFFREY M. SMITH (D.C. Bar # 467936)
ERIC J. SOSKIN (PA Bar # 200663)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW,
Washington, D.C. 20001
Room 7144
Tel: (202) 514-5751
Fax: (202) 616-8202