STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID C. RODEARMEL,

                    Plaintiff,

          v.

HILLARY RODHAM CLINTON, et al.,

                    Defendants.

No. 1:09-cv-00171-RBW-JR
Hon. Karen LeCraft Henderson
Hon. James Robertson
Hon. Reggie B. Walton

**Memorandum of Professors of Linguistics
as *Amici Curiae* in Support of
the Defendants' Motion to Dismiss the Complaint**

This memorandum is submitted on behalf of seven professors of linguistics—
Hana Filip, PhD.; Georgia M. Green, PhD.; Jeffrey P. Kaplan, PhD., J.D.; Jason Mer-
chant, PhD.; Barbara Partee, PhD.; Roger Shuy, PhD.; and Thomas Wasow, Ph.D.—for
the purpose of challenging the plaintiff's argument that Secretary Clinton's appointment
violated the plain meaning of the Ineligibility Clause.

More particularly, we will show that on the point at issue here, the meaning of the
Ineligibility Clause is not plain. The plaintiff's interpretation represents only one of
several possible readings. The clause can also be reasonably read in a way that permits a
Senator or Representative's eligibility for appointment to be restored by reducing the
salary of the position in question to what it was when the Senator or Representative's
term began.

The ambiguity in the Ineligibility Clause relates to the phrase *shall have been
encreased*. Plaintiff's argument assumes that a position's salary has been increased during
a Senator or Representative's term if at any point in that term the salary went up, even if
it later went back down by the same amount. This interpretation corresponds to what

linguists would refer to as an EXPERIENTIAL reading. But the language can also be understood to have a RESULTATIVE reading. On the latter interpretation, the salary can be said to "have been increased" only if it went up and stayed up through the time of the appointment. This reading of *have been encreased* is comparable to the interpretation of *I have caught a cold* as meaning that the speaker had gotten sick and was still sick.

The resultative reading of the Ineligibility Clause is the same in substance as the government's "on net" interpretation; the difference is merely a matter of how the interpretation is described. What we hope to do here—or at least one of the things—is to explain why this interpretation is a plausible one and therefore why the Ineligibility Clause is ambiguous.

### Interest of *Amici*

Amici are professors of linguistics—the science of language. *Hana Filip, PhD.* is Assistant Professor of linguistics at the University of Florida. *Georgia M. Green, PhD*. is Professor, emerita, of linguistics at the University of Illinois at Urbana-Champaign and Professor, emerita, Beckman Institute. *Jeffrey P. Kaplan, PhD., J.D.* is Professor of linguistics and Chair of the Department of Linguistics and Asian/Middle Eastern Languages at San Diego State University. *Jason Merchant, PhD*. is Associate Professor of linguistics at the University of Chicago. *Barbara H. Partee, PhD.* is Distinguished University Professor Emerita of Linguistics and Philosophy at the University of Massachusetts. *Roger W. Shuy, PhD*. is Distinguished Research Professor of Linguistics, Emeritus, Georgetown University. *Thomas Wasow, PhD.* is Clarence Irving Lewis Professor of Philosophy and Professor and Chair of Linguistics at Stanford University.

In cases, such as this one, where a court must interpret a legal text, linguistics can augment the judge's toolkit by providing methods and insights that do not usually play a role in legal analysis. The analysis we set out here can be helpful to the Court in deciding what interpretations the text of the Ineligibility Clause can reasonably bear.

## Statement of the Case

The Ineligibility Clause—also known as the Emoluments Clause—prohibits the appointment of Senators or Representatives to "any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during [the time for which they were elected.]"[1] Plaintiff seeks a declaration that this provision renders Hillary Clinton ineligible to serve as Secretary of State because Cabinet secretaries (along with other federal employees) received cost-of-living increases in their salaries during Ms. Clinton's most recent Senate term. The increases in the Secretary of State's salary were wiped out by statute before Ms. Clinton's appointment, so that the Secretary's salary was returned to what it had been when Sen. Clinton's term began. But the plaintiff insists that Ms. Clinton nevertheless remained disqualified from being Secretary of State and that her appointment to that position violated the Constitution.

The plaintiff contends that the reduction in the Secretary's salary is constitutionally irrelevant because it does not change the "historical fact" that the previous increases had occurred.[2] That position was stated in greater detail by Prof. Michael Stokes Paulsen

---

1. U.S. Const., Art. I, § 6, cl. 2.

2. Judicial Watch, *Rodearmel v. Clinton*, http://www.judicialwatch.org/rodearmel-v-clinton (visited May 30, 2009).

in an article about the appointment of Lloyd Bentsen as Secretary of the Treasury under similar circumstances:

> The text of the [Ineligibility] Clause could not be plainer: The disability arises by virtue of the emoluments for the office having "*been* encreased" "*during*" "the Time for which [Bentsen] was elected." There is no proviso for annulling the violation by decreasing the emoluments at some later  time…. [T]he statute cannot repeal history; it cannot undo the fact that the emoluments of the office *had been* "encreased" during the period for which Bentsen had been elected to the Senate.[3]

Under this reading, the statement "the emoluments…have been encreased" is true if there occurred during the relevant time period what we will call an EVENT OF INCREASE—i.e., an action increasing the emoluments.

However, a competing interpretation has also been advanced, beginning at least 100 years ago. Under this interpretation, the emoluments of a position are understood to "have been encreased" only if the higher salary resulting from an event of increase remained in effect at the time of the Senator or Representative's appointment to a civil office. This view was first expressed by Representative Marlin Olmstead in 1909.[4] More recently, at least two prominent legal scholars—Eugene Volokh and Laurence Tribe—have at least tentatively expressed the same view.[5]

---

3. Michael Stokes Paulsen, *Is Lloyd Bentsen Unconstitutional?*, 46 Stan. L. Rev. 907, 908–09 (1994) (emphasis in the original; paragraph break omitted). *See also* John F. O'Connor, *The Emoluments Clause: An Anti-Federalist Intruder in a Federalist Constitution*, 24 Hofstra L. Rev. 89, 135–41 (1995).

4. 43 Cong. Rec. 2411 (1909) (remarks of Rep. Olmsted), *quoted in* Memorandum for the Attorney General, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Validity of Statutory Rollbacks as a Means of Complying with the Ineligibility Clause* 4 (May 20, 2009) (Ex. 1 to Gov't Memo. in Support of Mtn. to Dismiss).

5. Eugene Volokh, *Hillary Clinton and the Emoluments Clause*, Volokh Conspiracy, http://volokh.com/posts/1227548910.shtml (posted Nov. 24, 2008; last visited June 17, 2009); Larry Tribe, *Is Hillary Clinton Unconstitutional?*, Balkinization, http://balkin.blogspot.com/2008/12/is-hillary-clinton-unconstitutional.html (posted December 2, 2008; last visited June 17, 2009).

### Argument

While Plaintiff's interpretation of the Ineligibility Clause is reasonable, it is only one of several reasonable interpretations. There are in addition two separate but related readings of the Ineligibility Clause under which the reduction of the Secretary of State's salary was effective in eliminating any bar against appointing Sen. Clinton as Secretary of State. Under the first interpretation, the word *encreased* is understood as a verb and the phrase *shall have been encreased* is interpreted as an instance of the resultative perfect. Under the second, *encreased* is understood as an adjective, and the state of increase that it describes is understood as obtaining at the time of the appointment.

**A.  The phrase *shall have been encreased during such time* can be interpreted "resultatively"—i.e., as meaning that the state of increase continued in existence through the time of Sec. Clinton's appointment.**

**1.** The phrase *shall have been encreased* is in what is conventionally called the FUTURE PERFECT TENSE.[6] This is a compound tense, which means that it has two components: FUTURE and PERFECT. The use of a future tense places the action described by the verb (*encrease*) at a point later in time than when the statement was made. And the use of a perfect tense places that action at a point in the future that is earlier than some other future time that serves as a reference point. Thus, the Ineligibility Clause concerns salary increases occurring after the Constitution was adopted (the adoption being regarded as the time the statement was made), but before the hypothesized appointment

---

6.  Not all linguists would agree with this terminology. Some would regard the perfect as coming under the rubric of ASPECT rather than tense. *E.g.*, Bernard Comrie, *Aspect* ch. 3 (1976). In addition, some linguists would argue that while there are various ways in which the English language allows us to refer to a future *time*, the language does not, strictly speaking, have a grammatical category that can be described as a future *tense*. *E.g.*, Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 208–10 (2002).

of a particular Senator or Representative to a "civil Office" (that appointment being the reference point).

For the purposes of this case, what is important is the use in the Ineligibility Clause of the perfect tense, not the use of the future tense. This is the case because it is the use of the perfect that affects the reader's understanding of the relationship in time between the increase and the appointment. Thus, the ambiguities that we will discuss affect both the future perfect and the present perfect.[7] We will therefore focus on the various ways in which perfect-tense constructions, can be interpreted, without distinguishing between the future perfect and the present perfect.

**2.** The perfect tense can be used in English to convey a variety of different meanings.[8] As a result, Plaintiff's interpretation of the Ineligibility Clause represents only one of several ways in which the Clause can reasonably be understood.

As we have noted, the plaintiff's interpretation represents what linguists generally refer to as the experiential reading. In such a reading, the event described by the verb is understood only as having occurred at a point in time earlier than the reference point.

---

7.   *See, e.g.*, Renaat Declerck, *Tense in English* 375 (1991); Anita Mittwoch, *The English Resultative perfect and its relationship to the Experiential perfect and the simple past tense*, 31 Ling. & Phil. 323, 325 (2008).

8.   *E.g.*, Robert I. Binnick, *Time and the Verb* 98–99 (1991); Comrie, *Aspect*, *supra* n. 6, at 56–60; *The Cambridge Grammar of the English Language*, *supra* n. 6, at 141–46; Ilse Depraetere, *On the resultative character of present perfect sentences*, 29 J. Pragmatics 597, 597–98 (1998); Sabine Iatridou et al., *Observations about the form and meaning of the Perfect*, in Artemis Alexiadou et al., *Perfect Explorations* 153, 154–56 (2003); James McCawley, *Tense and time reference in English*, in *Studies in Linguistic Semantics* 97 (Charles Fillmore & D. Terence Langendoen, eds. 1971); Anita Mittwoch, *The English Resultative perfect and its relationship to the Experiential perfect and the simple past tense*, 31 Ling. & Phil. 323, 323–24 (2008); Roumyana Pancheva*, The aspectual makeup of Perfect participles and the interpretations of the Perfect*, in Artemis Alexiadou et al., *Perfect Explorations* 277, 277–78 (2003); Paul Portner, *The (Temporal) Semantics and (Modal) Pragmatics of the Perfect*, 26 Linguistics & Philosophy 459, 459–66 (2003).

Sentences using the experiential perfect include example (1), which comes from the complaint:

> (1)   "Plaintiff also <u>has had</u> numerous teaching assignments, including serving as an Assistant Professor of Political Science at the U.S Air Force Academy, and as an Instructor of International Law, U.S Constitutional Law, and other legal areas for the Defense Institute of International Legal Studies and the University of Maryland Berlin Education Center."[9]

All that this sentence conveys about the teaching assignments is that at some point before the complaint was filed, they occurred. The sentence gives no reason to think that these occurrences brought into existence some resultant state that continued through the filing of the complaint.

But now consider two other sentences—also taken from the complaint—in which the perfect tense is used to convey a different meaning:

> (2)   "Plaintiff <u>has remained</u> true to his oath throughout his career…."[10]

> (3)   "Plaintiff <u>has been</u> a commissioned U.S Foreign Service Officer in the U.S Department of State since 1991."[11]

Unlike (1), which refers to the occurrence in the past of discrete and self-contained events, the use of the perfect tense in these sentences indicates that some specified state (remaining true to an oath, being a commissioned officer) existed throughout the period identified in the sentence, and was still in existence when the sentences were written. This type of interpretation is referred to as the UNIVERSAL or CONTINUATIVE perfect.

A third interpretation—the one that is consistent with the government's on-net interpretation—is the resultative reading. This reading combines aspects of both the

---

9.  Compl. ¶ 6.

10. Compl. ¶ 8.

11. Compl. ¶ 6.

experiential and universal/continuative interpretations. Like the experiential perfect, the resultative perfect is understood as indicating that a discrete event occurred at some point prior to the reference time; in the case of the resultative perfect, that event must be one that results in a change of state of some sort (for example, *increase*, *break* or *melt*). And as with the universal/continuative perfect, that changed state is understood to continue through the reference time.

A classic example of the resultative perfect is *I have caught a cold*, which in most contexts is interpreted to mean that the speaker caught a cold and still has it, not that there was at least one time in his life when he caught a cold. The state resulting from the event of catching a cold—namely, having a cold—is understood as continuing in existence through the time that the sentence is uttered.

Real-life examples of the resultative perfect are all around us. Here are some that we found on the website of the organization representing Plaintiff in this case:

(4)     "In the past decade Judicial Watch <u>has become</u> the nation's 'True Independent Counsel.'"[12]

(5)     "The Constitution thus prohibits members of Congress from being appointed to a civil office (such as a cabinet post) during the term for which they were elected (even if they <u>have resigned</u>), if the salary for that post was increased during that term."[13]

(6)     "The Obama administration <u>has now nominated</u> four more members of Congress to cabinet positions which will require the "Saxbe Fix" to attempt to avoid the Constitution's Disability Clause: Senators Hillary Clinton (State), Ken Salazar (Interior), Judd Gregg (Commerce), and Representative Hilda Solis (Labor)."[14]

---

12. Judicial Watch, *Our Programs*, http://www.judicialwatch.org/programs.shtml (last visited June 14, 2009) (underlining added).

13. Judicial Watch, *Q & A: Rodearmel v. Clinton* at 1, http://www.judicialwatch.org/documents/2009/rodearmel-v-clinton-faq.pdf (last visited June 14, 2009) (underlining added).

14. *Id.* at 1–2.

Example (4) is understood (and most likely intended) to mean not only that there was a point when Judicial Watch became the nation's True Independent Counsel, but that it still retains that status. In (5), the hypothesized state of having resigned is necessarily understood as continuing through (and beyond) the time the sentence was written, because once a Senator or Representative resigns, he or she cannot un-resign. And in the case of (6) it is understood that as of the time of the writing, the nominations had not been withdrawn.

The resultative perfect was also in use at the time of the Framing, as shown by these examples from James Madison's notes of the debates at the Constitutional Convention:

(7)  "Bad as the Constitution <u>has been made</u> by expunging the restriction on the Senate concerning money bills he did not wish to make it worse by expunging the present Section."[15]

(8)  "Nothing can be more ideal [= imaginary[16]] than the danger apprehended by the States, from their being formed into one nation. Massts. was originally three colonies, viz old Massts. Plymouth-& the province of Mayne. These apprehensions existed then. An incorporation took place; all parties were safe & satisfied; and every distinction is now forgotten. The case was similar with Connecticut & Newhaven. The dread of union was reciprocal; the consequence of it equally salutary and satisfactory. In like manner N. Jersey <u>has been made</u> one society out of two parts…."[17]

(9)  "As to the 1st. point [that state legislatures had no authority to ratify a new constitution], he observed that a new sett of ideas seemed to have crept in since the articles of Confederation were established. Conventions of the people, or with power derived expressly from the people, were not then

---

15. 2 *The Records of the Federal Convention of 1787* at 287 (Max Farrand, ed. 1911) (underlining added; available on Google Books)

16. *See* 1 *New Shorter Oxford English Dictionary* 1303 (1993)(sense A3).

17. 1 *The Records of the Federal Convention of 1787* at 462 (Max Farrand, ed. 1911) (underlining added; available on Google Books).

> thought of. The Legislatures were considered as competent. Their ratification <u>has been acquiesced in</u> without complaint."[18]

Like the examples from the Judicial Watch website, each of these sentences is understood (and presumably intended) to mean not only that the event described by the verb had occurred, but that the resulting state—the perceived badness of the proposed constitution, the unity of New Jersey, the acceptance of the ratification of the Articles of Confederation by state legislatures—was still in existence when the statement was made.

The Ineligibility Clause, too, can be understood resultatively. Under such an interpretation, one could say that the Secretary of State's salary "has been increased" during Sec. Clinton's most recent Senate term only if (1) the salary went up during that term and (2) the higher salary was still in effect when Sec. Clinton was appointed.

In concluding that this interpretation is possible, we are relying on more than just our intuitions as speakers of English. First, the conclusion is supported by a recent article that spells out conditions in which a resultative interpretation will generally be unavailable.[19] None of those conditions applies here, so to the extent the list is exhaustive, one would expect that a resultative interpretation would be possible here.

Second, the availability of a resultative reading is to be expected based on the nature of the event described by the verb *encreased*.[20] As used in the Ineligibility Clause,

---

18. 2 *The Records of the Federal Convention of 1787* at 91 (Max Farrand, ed. 1911) (underlining added; available on Google Books).

19. Anita Mittwoch, *The English Resultative perfect and its relationship to the Experiential perfect and the simple past tense*, 31 Ling. & Phil. 323, 328–33 (2008) (reproduced in Appendix A to this memorandum).

20. The discussion in this paragraph of the text draws on a concept known as EVENT STRUCTURE. For an overview of the theoretical work on that subject, see, e.g., Beth Levin & Malka Rappaport Hovav, *Lexical Conceptual Structure* § 5, to appear in *Semantics: An International Handbook of Natural Language Meaning* (Claudia Maienborn, Klaus von Heusinger & Paul Portner, eds., forthcoming 2009) (draft available at http://www.stanford.edu/~bclevin/

the verb *encrease* describes an event that is actually composed of two sub-events: (1) the action by the Congress providing for the salary to increase, and (2) the resulting change in the amount of the salary. That is to say, both sub-events are needed in order to provide the conditions on which one could truthfully say, *Congress has increased the emoluments* or *The emoluments have been increased by Congress.* Thus, the concept of a changed result state, which is central to the resultative perfect, is LEXICALIZED, meaning that it is inherent in the meaning of the verb as it is used in the Ineligibility Clause. (This is not the case when the verb is used intransitively, as in *the salary increased*; in that case, the only event described by the verb is the change of state.) This concept of verbs as describing events and sub-events helps to explain what makes an experiential interpretation differ from a resultative interpretation. An experiential interpretation (such as the interpretation advocated by the plaintiff here) highlights the action sub-event, as well as perhaps the moment of transition. In a resultative interpretation, on the other hand, neither sub-event is highlighted at the expense of the other.

Third, the conclusion that a resultative reading is available is supported by the evidence of actual usage. By using Google, one can find examples of word strings such as *shall have been increased during* and then evaluate them to see whether *increased* is being used resultatively. We have undertaken that exercise, and the results show, we think, that language such as is used in the Ineligibility Clause is in fact used and under-stood resultatively. More particularly, we have found sentences in which the relevant language is used in a way (and in a context) that in our view is understood and probably

---

hsk08rev.pdf) and Carol Tenny & James Pustejovsky, *A History of Events in Linguistic Theory*, in *Events as Grammatical Objects* 3 (Carol Tenny & James Pustejovsky, eds. 2000) (available at http://www.cs.brandeis.edu/~jamesp/articles/history-of-events.pdf).

intended resultatively. A few of these examples are reproduced below, and more can be found in Appendix B.

(10)    "With the completion of the Columbia, a large twin-screw ship for the Glasgow-New York service, and the Olympia for the Indian service, now on the stocks in Scotland, the Anchor Line fleet <u>will have been increased during</u> the year by four large passenger steamships, a record, it is claimed never before made."[21]

(11)    "The mains, which extended for a length of 10 miles in the previous year, <u>have been increased during</u> the year 1891 to 12½ miles."[22]

(12)    "Beacon hill and the eminences west of it were levelled, and their materials served to fill up the millpond, which the mill proprietors (the successors of Henry Simons, &c. see p. 124) obtained the consent of the town to do, May 14, 1804…. When the pond is wholly filled up, the area of the peninsula <u>will have been increased</u> about 43 acres."[23]

(13)    [Regarding a bill introduced in the House of Commons to provide for compensating tenants for substantial improvements they make to the property:]
        "It proposed to give equally to tenants holding from year to year and on lease, compensation for the erection of new buildings and the repair of old ones, and for planting and raising fences; and 'for effecting permanent improvements by draining, quarrying, reclaiming, inclosing, spade-trenching, or any other means by which the value of such lands <u>shall have been increased</u>.'"[24]

(14)    "When at any time, under the operation of this order, the number of captains absent from a corps of the line, <u>shall have been increased</u> beyond two, no other captain shall be taken from such corps for the staff or other

---

21. *New Anchor Liner Here; The Perugia to Ply Between New York and Italian Ports*, New York Times, September 11, 1901, page 11 (underlining added; available on Google Books).

22. Board of Directors, Kensington & Knightsbridge Electric Co., Report by the Directors presented at the fifth ordinary general meeting, in IX The Electrical Engineer (New Series) 262 (March 11, 1892) (underlining added; available on Google Books).

23. Caleb Hopkins Snow, *A history of Boston: the metropolis of Massachusetts, from its origin to the present period; with some account of the environs* 325–26 (2d ed. 1828) (underlining added; available on Google Books).

24. 2 George Lewis Smith, *Ireland: Historical and Statistical* 442 (1847) (underlining added; available on Google Books).

detached employ, till the number of its absentees in that grade be reduced to one."[25]

(15)    [From a letter from Samuel Johnson to James Boswell:]
        "Dear Sir,
        "Apologies are seldom of any use. We will delay till your arrival the reasons good and bad which have made me such a sparing and ungrateful correspondent. Be assured for the present that nothing has lessened either the esteem or love with which I dismissed you at Harwich. Both <u>have been encreased</u> by all that I have been told of you by your self or others, and when you return, you will return to an unaltered and I hope unalterable friend."[26]

Given these examples, one would expect that the phrase *shall have been encreased during that Time* can similarly be understood on a resultative reading. And it is easy to think of contexts in which a perfect-tense use of *increase* would in fact be interpreted in that way. Suppose that a job applicant asks about the potential for future salary increases and in response is told, "I can't predict the future, but during the past three years, the salary has been increased 5% each year." The applicant would surely feel misled if, after taking the job, she learned that each increase had been a temporary one lasting only two weeks. And her anger would hardly be assuaged if the employer were to argue that the statement was true on an experiential reading, in that events of increase had in fact occurred each year.

**B.  *Encreased* can also be understood as an adjective, and under such a reading it can be interpreted resultatively.**

As we have noted, *increased* can be interpreted as an adjective as well as a verb. Under such an interpretation, it is subject to much the same ambiguity as the verbal

---

25.  Order regarding absence of regimental captains on staff employ (issued May 25, 1835) in 18 East India Company, The Asiatic Journal and Monthly Miscellany 238 (New Series, 1835).

26.  Letter from Samuel Johnson to James Boswell dated Jan. 14, 1766), in 1 *The Letters of Samuel Johnson* 261 (Bruce Redford, ed. 1994) (underlining added; available on Google Books).

interpretation. An adjectival reading is therefore consistent with the conclusion that Secretary Clinton's appointment was valid.[27]

*Increase* is one of the many verbs whose past participle can be used as an adjective:

(16)   a.   the temperature increased
       b.   an increased temperature

(17)   a.   somebody closed the door
       b.   a closed door

When used adjectivally like this, the word denotes the state resulting from the event described by the verb. The two usages are easy to tell apart when the word occurs before the noun it modifies, because verbs seldom appear in that position. But adjectives can also appear in phrases that follow the noun, in constructions such as *the door is closed*. When such constructions are used, it is harder to tell the adjectival interpretation from the verbal, because the two meanings are similar to one another. Therefore, a given instance of this construction may be ambiguous between the two interpretations.

The language of the Ineligibility Clause is such an instance; indeed, the government's argument emphasizes the possibility of an adjectival reading more than that of a perfect-tense verbal reading.[28] While we tend to think that the latter reading is the more natural one, an adjectival reading is certainly possible. What is important for purposes of this case is that even if *encreased* is used in the Ineligibility Clause as an adjective, the

---

27. The linguistic literature on the issues discussed in this section includes *Cambridge Grammar of the English Language*, *supra* n. 6, at 78–79; David Embick, *On the Structure of Resultative Participles in English*, 35 Linguistic Inquiry 355 (2004); and Anna Kibort, *The Ins and Outs of the Participle–Adjective Conversion Rule*, in *Proceedings of the LFG05 Conference*, *University of Bergen* 205 (Miriam Butt & Tracy Holloway King, eds. 2005), available at http://csli-publications.stanford.edu/LFG/10/lfg05kibort.pdf (last visited June 8, 2009).

28. Gov't Mem. in Support of Mtn. to Dismiss 22–24.

phrase *shall have been encreased during that Time* can still be interpreted to mean that the state described by the adjective is understood as continuing in existence through the reference time.

This conclusion is supported by the examples in the government's memorandum[29] (and the additional examples we provide in Appendix C), in all of which *increased* can be interpreted as an adjective and in all of which a resultative or continuative interpretation seems more natural than an experiential interpretation. This can be explained at least in part by the fact that when *encreased* is interpreted as an adjective, phrases such as *shall have been encreased* remain perfect-tense constructions. Specifically, when *encreased* is understood as an adjective, *have been* represents the perfect-tense form of *be*. That being so, the phrase can be understood as an example of the continuative perfect. Such a reading of the Ineligibility Clause would be consistent with the government's position in this case, because it would mean that the clause would be triggered only if the increased state of the salary remained in effect through the appointment date.

## Conclusion

For these reasons, the Court should find the Ineligibility Clause to be ambiguous.

Respectfully submitted,

/s/ *Neal Goldfarb*
Neal Goldfarb, No. 337881
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
(202) 454-2826
ngoldfarb@butzeltp.com

*Attorney for* Amici

---

29. Gov't Mem. in Support of Mtn. to Dismiss 23–24.

# Appendix A

322                                                                P. Horwich

condition' has ever been characterized that is strong enough to fix a meaning.[17] Indeed this is a well-known further objection to truth-based semantic theories and, indirectly, to the traditional adequacy conditions that motivate them.

Thus, when it comes to semantics, truth has really got nothing to do with it. And this should hardly be surprising. After all (as the deflationists have shown), what's truth but a secondary notion.[18]

## References

Chiercia, G. (2000). *Meaning and grammar: An introduction to semantics* (2nd ed.). Cambridge, London: MIT Press.

Chomsky, N. (2000). *New horizons in the study of language and mind*. Cambridge: Cambridge University Press.

Davidson, D. (1967). Truth and meaning. *Synthese, 17,* 304–323.

Dowty, D., Wall, R., & Peters, S. (Eds.) (1981). *Introduction to montague semantics*. Dordrecht: Reidel.

Fodor, J., & Lepore, E. (2002). *The compositionality papers*. Oxford: Oxford University Press.

Heim, I., & Kratzer, A. (1998). *Semantics in generative grammar*. Oxford: Blackwell.

Horwich, P. (1997). The composition of meanings. *The Philosophical Review, 106*(4), 503–532.

Horwich, P. (1998a). *Truth* (2nd ed.). Oxford: Oxford University Press.

Horwich, P. (1998b). *Meaning*. Oxford: Oxford University Press.

Horwich, P. (2005). *Reflections on meaning*. Oxford: Oxford University Press.

Horwich, P. (2008). Ungrounded reason. *Journal of Philosophy*, November-December Issue.

Larson, R., & Segal, G. (1995). *Knowledge of meaning: An introduction to semantic theory*. Cambridge, MA: MIT Press.

17 An instance of this problem is that sentences with different meanings (e.g. "1 + 1 = 2" and "2 + 2 = 4"; or "Hesperus is blue" and "Phosphorus is blue") might nonetheless be true in exactly the same possible worlds.

18 The line of thought developed here was first aired at a GLOW workshop in Geneva on 29th March 2005. In preparing that presentation I profited from several illuminating conversations with Stephen Neale. Since then, I have discussed the issues with Anne Szabolcsi, with Jason Stanley, and with Francois Recanati; and I am grateful to them too for their constructive expressions of disagreement.

---

Linguist and Philos (2008) 31:323–351
DOI 10.1007/s10988-008-9037-y

RESEARCH ARTICLE

# The English Resultative perfect and its relationship to the Experiential perfect and the simple past tense

## Anita Mittwoch

Published online: 2 October 2008
© Springer Science+Business Media B.V. 2008

**Abstract** A sentence in the Resultative perfect licenses two inferences: (a) the occurrence of an event (b) the state caused by this event obtains at evaluation time. In this paper I show that this use of the perfect is subject to a large number of distributional restrictions that all serve to highlight the result inference at the expense of the event inference. Nevertheless, only the event inference determines the truth conditions of this use of the perfect, the result inference being a unique type of conventional implicature. I argue furthermore that, since the result state is singular, the event that causes it must also be singular, whereas the Experiential perfect is purely quantificational. But in out-of-the-blue contexts the past tense is also normally interpreted as singular. This leads to a certain amount of competition between the Resultative perfect and the past tense, and it is this competition, I suggest, that maintains the conventional (non-truth conditional) result state inference.

**Keywords** Resultative perfect · Experiential perfect · Target state · Conventional implicature · Specificity · Specific event · Singular event · Past tense · Perfect

## 1 Preliminaries

In the literature on the English perfect, three main uses are commonly distinguished: Experiential (alias Existential), Resultative (alias Perfect of Result) and Universal. (Comrie 1985; Dahl 1985; Leech 1971; McCawley 1981 and many others). (1a)–(3a) give informal definitions of these uses, without any commitment that they reflect the semantics; (1b)–(3b) give examples for each use:

A. Mittwoch (✉)
The Hebrew University of Jerusalem, Jerusalem, Israel
e-mail: msanita@mscc.huji.ac.il

opening remark in (4a) *I have lost my passport* can in the right context be interpreted as Experiential. Similarly, *Ann has written a book*.

## 3 Distributional restrictions on Resultative

As mentioned in Sect. 1, the category Resultative is not clearly demarcated in the literature. I shall begin in this subsection with clear cases that everybody would include. These involve perfects whose base sentences are telic, and denote transitions consisting of an event and a result state determined by the meaning of the predicate, what Parsons (1990) calls a 'target' state. The internal argument of the event sentence is the theme and subject of the state sentence. The target states of the untensed sentences in (12a–c) are given after the double slashes:

(12)a. Ann leave her driving license at home // Ann's driving license be at (her) home.
b. John arrive in Paris // John be in Paris.
c. Mary lock the door // the door be locked.
d. Someone break my cup // my cup be broken.

An event sentence of this kind in the present perfect in its Resultative use licenses the inference that the state holds at speech time. *John has arrived in Paris* licenses the inference *John is in Paris*. I shall call this use Strong Resultatives. In Sect. 3.2 I shall discuss examples of a type often included in the literature that do not involve target states.

### 3.1 Result states that are target states

Under (a)–(g) I list distributional restrictions, or restrictions on interpretation compared with analogous sentences in the past tense; most of these restrictions serve to highlight the target state at the expense of the event:

(a) The Strong Resultative does not allow adverbs of quantity or cardinality. (13) only has an Experiential reading:

(13) I have locked the door twice.

There can be no target state of doing something twice; for (13) to be true the door would have had to be opened between the two locking events.

The next three restrictions say that semantic material that belongs only to the event component of the verb cannot be focused.

(b) The agent argument of the verb is usually, but not always, irrelevant for the result state. Compare:

(14)a. #Who has broken my cup? (# on straightforward question reading) [7]
b. # Who has locked the door?
c. # Who has opened my letter?

[7] The examples in (14) are acceptable as expressions of 'I wonder...', or as real questions tinged with anger. In the literature this restriction is often illustrated by means of examples with verbs of creation. The examples above show that it applies more generally.

(15)   Who has taken my umbrella?

(15) is acceptable since the target state of *x take my umbrella* is *x has my umbrella* or, in regimented English, *my umbrella is in x's possession*; the question implies 'Who has my umbrella?', or 'In whose possession is my umbrella?'. Similarly

(16)a. #Will the person who has broken my cup please buy me a new one.
b. Will the person who has taken my umbrella please return it.

(17)a. #It's JOHN that has broken your cup.
b. A. Bill has taken my umbrella.
B. No, it's JOHN that's taken your umbrella. [8]

A Resultative perfect with a passive agent is also somewhat infelicitous:

(18)a. ?The book has been wrongly shelved by one of the librarians.
b. The book has been borrowed by one of the teachers.

If (18a) is meant as a Resultative, the agent is irrelevant; in (18b) mention of the agent could help trace the whereabouts of the book. There are no restrictions on focusing the subject of Experiential:

(19)a. Who has broken anything, hands up?
b. Will whoever has broken anything please pay for it.
c. It's John who has broken things more often than anyone else.

(c) As noted in Michaelis (1994, p. 151), there are restrictions on manner adverbs with Resultative. Again, though, we find a contrast between adverbs that modify only the event component of the verb's meaning, as in (20) and those that denote property of the target state, as in (21):

(20)a. #She has sealed the window quickly.
b. #You've corrected the proofs too slowly.

(21)a. She has sealed the window hermetically.
b. The fragments of the manuscript have been skilfully joined together.

Note that the adverbs in (20) bear focal stress.

The example below, containing a predicate that is basically non-target state, is acceptable in a context where the playing was recorded, so that the existence of the recording can be considered a de facto target state:

(22)   She has played that passage too loudly.

[8] Michaelis (1994) attributes the infelicity of examples like (17a) to a principle stating that a Resultative perfect "cannot be used to further describe / elaborate upon" a pragmatically presupposed event". The principle may be generally correct, but it cannot explain the difference between (17a) and (17b), and several similar pairs discussed in this section.

The restriction on manner adverbs recalls the suggestion in Levin and Rappaport Hovav (1991) that there is complementarity between manner and result components of meaning lexicalized in verbs, so that only one such component can be lexicalized. In our case, a use of the perfect that includes a result state component is incompatible with manner modification of the event component.

(d) Similarly, locatives are infelicitous with Resultative, as in (23), except with verbs that incorporate a [PUT] feature, e.g. *hide, store, house* and the verbs in (24) below:

(23)a. #I have peeled the potatoes in the garden. (# on Res reading)
    b. #We have sold the books in the classroom. (# on Res reading)
    c. #Where have you found the loot? (Michaelis 1994)

(24)a. We have buried Fido in the garden.
    b. They've installed traffic lights at the corner.
    c. Where have you hidden the loot? (Michaelis 1994)

Verbs with the [PUT] feature subcategorize for the locative, and this applies also for the statal passive that figures in the result state, e.g. *the treasure is hidden stored in the attic.*

Out of context the examples under (b)–(d) that are flagged by a # would be possible as Experiential perfects. But assuming the context is about the here and now, they could not be meant as Experientials. The speaker would have to use the past tense.

(e) Sometimes a Resultative perfect lacks a reading available in the corresponding past tense sentence:

(25)a. Mary almost finished the book yesterday.
    b. Mary has almost finished the book.

(25a) has two readings: (i) Mary worked on the book but didn't quite get to the end. (ii) She did not work on the book at all yesterday, but there was a good chance she would. (25b) only has reading (i); the relevant target state is *the book is almost finished.*

(26)a. A Delaware settled in New Jersey again (last year). (von Stechow 2003, adapted from Jäger and Blütner 2003)
    b. A Delaware has settled in New Jersey again.

The target state of *settle in a place* is *live in that place.* (26a) is ambiguous between a repetitive reading of *again*, presupposing that Delawares *settled* in New Jersey in the past, and a restitutive reading, presupposing only that Delawares lived in New Jersey in the past; they could have been autochthonous (original inhabitants of New Jersey who never lived anywhere else). (26b) has only the restitutive reading.

(f) Sentences containing verbs of creation with definite objects are generally problematic in the perfect. If acceptable at all, they could only be Resultative, since an Experiential reading is ruled out by the fact that the event must be once-only. But a Resultative interpretation is usually strange for a different reason. With an indefinite object such sentences are unproblematic:

(27)a. #Mary has painted this picture. (# out of the blue)
    b. Mary has painted a picture. (ok as Resultative or Experiential)

The target state of painting a picture is the existence of the picture. What makes (27a) infelicitous is that the existence of the referent of a definite NP is usually presupposed, so that it would be odd to assert that it has come into being (Declerck 1991). But in a context in which the existence of the referent represents new information for the hearer something like (27a) is acceptable. If I show you the picture for the first time, I can say *Mary has painted this picture for you.*

(g) Whereas the Experiential perfect in the present tense can trigger Sequence of Tense phenomena in complement clauses, the Resultative perfect does not allow this possibility (Declerck (1991) citing an observation by Leuschner (1977)).

(28)a. I've always said that eight was a perfect number. (Leuschner 1977)
    b. John has convinced his coach many times that he was too weak to play the game. (Brugger 1997)
    c. John has convinced his coach that he was too weak to play the game. (Brugger 1997)
    d. I've come to the conclusion that eight was a perfect number.

(28a) and (28b) show that a present tense Experiential perfect can trigger a past tense with a simultaneous reading in the complement clause: the event of the matrix clause is contained in the interval occupied by the state denoted by the complement clause. Brugger observes that (28c), if interpreted as Resultative, strongly suggests that John convinced the coach after the game; in other words the past tense in the complement clause (only) has the so-called back-shifted reading: the weakness was prior to the convincing event. And since the complement clause in (28d) denotes an individual-level property, (28d) as a Resultative has no sensible reading.

The absence of a simultaneous reading of an embedded past tense for the Resultative is hardly surprising: if anything is unexpected here it is the behaviour of the Experiential perfect. I shall come back to this point in Sect. 6.1.[9]

I shall conclude this section with the absence of two restrictions that obtain for the Experiential. First, lifetime effects that apply to the event can be suspended if the result state still holds and is still relatively fresh, as in (29a), or alternatively worth a reminder, as in (29b):

---

[9] A number of recent studies have given the Resultative perfect a different syntactic/semantic analysis from the Experiential, basing themselves on the SOT phenomenon noted above, i.e. that a past tense in complement clause can have a simultaneous reading with an Experiential perfect but not with a Resultative perfect, as in Ex. (28) (Brugger 1977; Pancheva 2003; Kiparsky 2002) These studies show no awareness of the data that will be presented in Sect. 4.1, showing that the result inference of the Resultative perfect is not a straightforward entailment. I doubt that the SOT facts justify a separate analysis, since there is independent evidence that a simultaneous reading of an embedded past tense can be triggered contextually. In the context of a past event, it can be triggered by a noun understood as referring to past situation without a higher past tense in the linguistic context: *I know that Mary was a strange child. But her desire to marry a man who resembled her is really bizarre* (Ogihara 1989).

(29)a. Last week's match against Arsenal has improved their standing in the League table.

b. Socrates has taught us the importance of systematic definitions of the terms we use.

(30) #Columbus has discovered America.[10] (McCord 1978)

(30) does not meet either of these conditions, and so there is no imaginable motivation (other than an ironic one) for using it. In contrast to (29a and b), the unacceptable sentences in (31) focus on the event only:

(31)a. #Last week's match against Arsenal has ended in a draw.

b. #Socrates has said that one needs to define the terms one uses.

Second, the event of a Resultative does not actually have to be anterior to PEpt. Vendler (1967) (citing Gilbert Ryle, who credits Aristotle with the observation) observes that for achievements the present perfect can be used the moment the present can be used:

(32) Mary has won.

(32) can be uttered the moment Mary touches the finishing line, and licenses the target state inference that Mary is the winner. *Mary has smoked* needs to be at least partially anterior to utterance time.

---

10 McCord ascribes this example to Dietrich (1955). He regards its strangeness as due to the fact that the event is just too long ago to be included in an XN interval ending now. Portner (2003) takes this line of reasoning further, seeing a link between this example and the well-known constraint against a present perfect with a past time adverbial (*Mary has read Middlemarch yesterday*). "In some sense the discovery is too long ago", he claims; and "the event it describes does not fall within a plausible Extended now". In support of this explanation, he claims that a Past Perfect analogue of (30) is acceptable:

(i) In the final few years of the twentieth century, the world saw the advent of paperless publishing over the world wide web. *Gutenberg had discovered the art of printing* centuries before, and mass publication had followed a paper and ink model ever since....

Unlike Portner, I believe that the past perfect is ambiguous between a past of past and a past of perfect reading (cf. footnote 4); (i), with its temporal adverbial (not italicized above) has the former reading. One can find a context in which the past perfect analogue of (30) is as weird as (30) itself. Imagine that the PEpt for (ii) is a conversation taking place some time last year:

(ii) Since Wycliffe's translation of the Bible Gutenberg had discovered the art of printing.

In (ii) the *since* phrase, marking the left boundary of a XN, is diagnostic for Perfect and therefore forces a past of perfect reading.

In the right context we can get a plausible XN interval stretching back even further than the time of Columbus, as shown by (29b) above. Only Socrates is dead; the referent of *us* can include the generations between Socrates and today. The teaching and its result state can be envisaged as continuous, filling the XN interval. This may look like a Universal perfect, but the interval is not bound by a durational or *since* adverbial.

---

### 3.2 Result states that are not target states

I now turn to examples of Resultative culled from the literature that do not involve target states. I shall call these Weak Resultatives. Consider

(33a. Have you seen my slippers? (Leech 1971)

b. Mary has read Middlemarch. (Portner 2003)

c. I've knocked. (Michaelis 1994)

d. Has there been an accident? (McCawley 1971)

e. Jane: Are you coming for lunch? John: I've had lunch.

(33a) can be used to convey *Do you know where my slippers are?*, (as well as *I'm so, tell me where they are*). Knowing the location of something is a likely result state but not a target state of having seen that thing. Similarly with (33b): *Mary read Middlemarch* is telic, but does not denote a transition; knowing the content of a book is not a target state of reading it. The same applies to the expectation that someone should be coming for (32c) (as well as, incidentally, for *I've knocked twice* in the sense of 'I've given two knocks'), though this may be a desirable result. and whatever the clues that might lead one to suspect an accident, these clues do not represent a necessary result state for the base sentence *there be an accident*. In none of these sentences is there an internal argument that becomes the theme of a state sentence.

These examples share many of the restrictions noted above. The restriction on *who* questions hardly applies; unlike the sentences in (14), *Who has seen my slippers* or *Who has had lunch* are unlikely to be used in a context implying one correct answer. But *It's John who's seen your slippers* sounds as bad as *It's John who's broken your cup*. The restriction on locatives sounds wrong to hold: #*I've had lunch in the cafeteria* sounds wrong in the context of Jane's question in (33e). Regarding manner modification, *I've had lunch too quickly* could hardly be contextualized as a Resultative, but *I've eaten too quickly* can. The reason is that although *quickly* can only modify a process rather than a state, the process of eating too quickly can cause (usually unpleasant) results.[11]

However, the examples in this subsection differ from those in Sect. 3.1 in one crucial respect, which will be the subject of the next section.

### 4 What kind of inference is the continuation of the target state at PEpt?

We have seen that the result state inference is a robust part of the meaning of the Strong Resultative perfect, imposing considerable distributional constraints on the sentence as a whole. But the nature of this inference presents a tricky problem for a theory of meaning.

---

11 This also *I have drunk this beer too quickly*. Although the predicate here looks telic, it is in fact being used as an activity; the result affects the agent, not the theme.

# Appendix B

**Appendix B**
*Examples of the resulative perfect*

**Historical examples (17th–19th centuries)**

1.  Thus the seeds of genuine character will be developed ; and when the soil shall
    have been prepared by judicious management, and chastened by exposure to the
    genial rains and dews of knowledge, to the rays of brightening science, and above
    all to the light of Christianity, and the beams of religion and virtue, *the* true light
    from whose reflection alone it is that any object can appear lucid; the natural
    richness and fertility of the soil <u>will have been increased</u>, and it will have become
    capable of bearing other fruits, and maturing other principles, which if attempted
    to have been implanted at first, must necessarily have perished.

    > 2 William Newnham, *The principles of physical, intellectual, moral, and
    > religious education* 468  (1827) (underlining added; available on Google
    > Books)

2.  The volume of the voice may be but a thread, and but a span in extent; but the
    slender column of sound will rise from the chest round, pure, and free from flaw:
    its bulkier portion will be subdued to the proportions of its slenderer parts, which
    <u>will have been increased</u> in size and strength by careful culture; there will be no
    straining of weak notes or shouting on loud ones—no vain endeavour to reach
    above or below the ascertained limits of its compass.

    > Anon.*, Notes of a Music Student: English Singers and Singing*, 43
    > New Monthly Magazine 442 at 451 (1835) (underlining added;
    > available on Google Books).

3.  In express contradiction, then, to Dr. Adam Smith, Mr. M'Culloch tells us that
    *players, singers, opera dancers, and buffoons,* are productive labourers. He does
    *not tell us that gamblers, fortune-tellers, and dancing bears,* are productive
    labourers; and yet, if the former are productive labourers, so also are the latter.
    They are, in fact, one and all of them, *obtainers* of wealth, but they are not
    *producers* of it. Madlle. Jenny Lind, for example, sang a few songs at four
    concerts, which were given in Scotland in the month of September last, for which
    she received the sum of £1600. Now, the actual value of all the wealth in
    existence was precisely the same before she commenced singing, and after she
    had concluded, so far, at least, as her songs had any influence on that value: the
    only real difference resulting from her performances being, that before they took
    place, £1600 worth of marketable property existed in the hands of other people,
    whilst immediately after they were over, this wonderfully-gifted lady *had
    obtained* that value from its previous owners, upon terms and conditions mutually
    agreed upon, and therefore *equitably.* But let an equal sum of money be expended
    in the employment of a number of shipbuilders, for instance, and the result will
    be, that the *sum total* of wealth existing in the country <u>will have been *increased,*</u>
    and that to the precise amount of the difference between the value of the wealth
    created, and that of the wealth consumed by the ship-builders during the period of
    their engagement.

John Gray, *Lecture VII. Professional men, the nature of their avocations considered with reference to Money—Pecuniary provision for the conducting of such Retail and other Business as may be wholly unconnected with the proposed Standard Manufacturing and Commercial system— Fallacies of Messrs. J. R. M'Culloch and Richard Cobdeu*, in Lectures on the Nature and Use of Money: Delivered Before the Members of the "Edinburgh Philosophical Institution" During the Months of February and March, 1848, 199 at 209–10 (1848) (underlining added; available on Google Books)

4.   A sudden increase of credit afforded to particular branches of trade may sometimes be the occasion of overstocking the market with their productions. When one class fabricates more than the usual quantity of its peculiar goods, and the other classes, not having fabricated more of their peculiar goods, have not acquired an enlarged power of purchasing, the supply of this first kind of goods <u>will have been increased</u> beyond the demand, and its producers' expectations of profit be disappointed.

1 Joseph Salway Eisdell, *A Treatise on the Industry of Nations, Or, The Principles of National Economy and Taxation* 508–09 (1839) (underlining added; available on Google Books)

5.   If any further argument were required in confutation of the opinion, that the heat excited by friction is derived from a change of capacity, it might be obtained from Mr. Davy's experiment on the mutual friction of two pieces of ice, which converted them into water, in a room at the temperature of the freezing point: for in this case it is undeniable that the capacity of the water <u>must have been increased during</u> the operation; and the heat produced could not, therefore, have been occasioned by the diminution of the capacity of the ice.

Thomas Young, *A Course of Lectures on Natural Philosophy, and the Mechanical Arts* (1807), *reprinted in* XII The Critical Review (3d Series) 7, 14 (1808) (underlining added; available on Google Books)

6.   The relics of his patrimony were conveyed into strange families by the marriages of his four aunts; and his personal honours, as if they had been legally extinct, were revived by the patents of succeeding princes. But there still survived a lineal descendant of Hugh the first earl of Devon, a younger branch of the Courtenays, who have been seated at Powderham castle above four hundred years from the reign of Edward the third to the present hour. Their estates <u>have been encreased</u> by the grant and improvement of lands in Ireland, and they have been recendy restored to the honours of the peerage.

7 Edward Gibbon, *The Decline and Fall of the Roman Empire* 390 (1805) (underlining added; available on Google Books)

7.   In this manner, according to the saying of the criminals themselves, prisons are schools where all sorts of vices are taught. The malefactors become friends, and form projects, to be executed when they are liberated; they organise bands, and prepare to pursue with greater audacity their former criminal life. [¶] The greater

number of malefactors who are liberated, are incapable of gaining their livelyhood. Their immoral habits, their idleness, and even sometimes their intemperance, <u>have been encreased during</u> their confinement, and nothing can be more natural, than that they should yield again to their animal dispositions.

> Johann Gaspar Spurzheim, *A View of the Elementary Principles of Education: Founded on the Study of the Nature of Man* 315–16 (1821) (underlining added; available on Google Books)

8.   This difficulty might be obviated if the Basle Society should succeed in establishing a Bible Depository in France, from whence Bibles might easily be forwarded to the Departments beyond the Alps. In this case, several worthy men, both of the clergy and laity, would gladly undertake their distribution. The Society could not expect to sell many copies, as the necessitous situation <u>has been much increased during</u> the last twenty years by wars, earthquakes, inundations, and failure of their crops.

> *From the Report made to the German Bible Society in Basle, by a Swiss Gentleman who travelled in Italy in the Summer of* 1812, in Ninth Report of the British and Foreign Bible Society 67 at 68 (1813) (underlining added; available on Google Books)

9.   Our maior was sent for by a letter to appeare before the king and counsell the weeke before Xmas; some chief brewers of Norwich and excisemen had accused him for putting downe some alehouses, and denying to licence others, and hindring the kings profit. Butt when hee had shewen that he did butt what the law required of him, that there were still an unreasonable number of alehouses, and that they were a great occasion of debaucherie and povertie in the towne, so that the rates to the poore [a tax levied for the relief of the poor] <u>have been encreased</u> eight hundred pounds more then formerly, hee was dismissed with commendations.

> Letter from Thomas Browne to Edward Browne dated Jan. 9, 1681–2, in 1 *Sir Thomas Browne's Works, Including his Life and Correspondence* 322, 323 (Simon Wilkin, ed. 1836) (underlining added; available on Google Books)

10.   He said that when the demands of Britain should cease to be covered by the magnitude of that expenditure, and by the vast annual influx of money in the shape of loans, a state of things would arise "eminently worthy of early and serious consideration on the part of those who exercise the powers of government." The loans have ceased; the establishments have been reduced; the taxes are stationary, or nearly so, for though the assessed taxes and other imposts have been repealed since the war, several duties <u>have been increased</u>. The tea tax, coffee tax, paper tax, malt tax, tobacco tax, and glass tax <u>have been encreased</u>. It would be interesting to know the exact amount of the taxes repealed since the War, and the taxes imposed.

> Michael Staunton, *Hints for Hardinge* 24–25 (1830) (underlining added; available on Google Books)

11.     It was at length perceived that the Society might advantageously have recourse to measures, without vaunting itself, which would give greater publicity to its proceedings, and be the means of enlarging its sphere of action. In June, 1810, a Committee was appointed to consider and report the best method to be adopted for increasing the Society's influence, and for inviting a more general co-operation. The formation of District and Diocesan Committees was the expedient proposed and resorted to; and the result has been so favourable, that in less than fourteen years, the funds of the Society <u>have been encreased</u> more than four-fold.

> 1 *The Quarterly Theological Review and Ecclesiastical Record* 324 (1825) (underlining added; available on Google Books)

**Modern examples**

12.     If you have access to high quality analog sources such as 15/30 ips Dolby Spectral recordings (SR), or high quality microphones in quiet studios, then a higher bit rate is highly desirable; even if your finished recording is going to be 16 bit. This is because headroom will have to be allowed at the time of recording to prevent digital overload. Quite likely a few levels <u>will have been increased during</u> post-production. This means that you can end up delivering the equivalent of a 12-bit recording!

> Roger Derry, *PC audio editing with Adobe Audition 2.0: broadcast, desktop and CD audio production* 215–16 (3d ed. 2006) (underlining added; available on Google Books)

13.     Over the past decade, community college fee levels for credit courses have fluctuated between $11 and $26 per unit. (There continues to be no charge for noncredit courses.) The state currently has no official policy for setting CCC fees. Often, fees <u>have been increased during</u> fiscally challenging periods, and reduced when budget situations improve.

> California Legislative Analyst's Office, *2009-10 Budget Analysis Series: Higher Education Fees and Financial Aid*, http://www.lao.ca.gov/analysis _2009/highered/highered_anl09003005.aspx (underlining added)

14.     The number of watchtowers around the camp perimeter was probably larger than claimed by witnesses. The original number of three towers at the corners (with the exception of the northwest corner by the main gate) and one in the camp itself, <u>must have been increased during</u> the reorganization/rebuilding of the camp in June July 1942, prior to the increased extermination activity which began on August 1 and the employment of 1,000 'work Jews' in the camp. Evidence of three small wooden structures at 55 m. intervals along the eastern fence indicates the probable position of such additional watchtowers.

> Robin O'Neill, *Belzec: Stepping Stone to Genocide; Hitler's answer to the Jewish Question* Ch. 15, http://www.jewishgen.org/yizkor/belzec1/bel150 .html (underlining added)

15.     The Roman period evidence from the settlement indicates to what extent the elite of Pembrokeshire were influenced by Roman fashions and culture; they used a

range of manufactured goods not previously available, but they continued to build and live in roundhouses, and store grain in granaries. The scale of production, and perhaps local taxation and tribute, seems to <u>have been increased during</u> the late Iron Age and Roman period, perhaps to allow exchange of the manufactured goods, and also to pay taxation to the Roman authorities after the conquest.

> Harold Mytum *Castell Henllys: Iron Age Fort and Native Settlement of the Roman Period*, http://www.york.ac.uk/depts/arch/staff/sites/henllys/interim.htm (underlining added)

16. The United States' Strategic Petroleum Reserve (SPR) is the largest reserve of its kind, with 700 million barrels of unrefined crude oil housed in man-made, underground facilities in Texas and Louisiana. That is about as much oil as the entire world consumes in nine days. By 2015, total SPR capacity <u>will have been increased</u> from 730 million to one billion barrels.

> Kenneth D'Amica, *A Strategic Petroleum Reserve Primer*, http://www.aier.org/research/commentaries/309-a-strategic-petroleum-reserve-primer (posted June 11, 2008) (underlining added)

17. There are certain aspects of the HTML Dog redesign that have probably hindered usability to a tiny degree, in particular the graphical header and logo but the idea is that although usability has been compromised slightly, the end result is something that should be more successful long term (as discussed recently). On the other hand, the CSS file has been reduced by around 25% and many graphical elements have been pulled out so pages should load even faster and in that respect usability <u>will have been increased</u>.

> *HTML Dog, Redesign: Usability*, Dog Blog, http://www.htmldog.com/ptg/archives/000033.php (posted Feb. 23, 2004) (underlining added)

# Appendix C

**Appendix C**
*Examples of adjectival use*
(may be ambiguous between adjectival use
and use as resultative perfect)

1.      [From a letter from George Washington to the Marquis de Lafayette:]
        The last letter, which I had the pleasure of writing to you, was forwarded by Mr.
        Gouvernour Morris. Since his departure from America, nothing very material has
        occurred the minds of men, however, have not been in a stagnant State. But
        patriotism, instead of faction, has generally agitated them. It is not a matter of
        wonder, that, in proportion as we approached to the time fixed for the
        organization and operation of the new government, their anxiety should <u>have been</u>
        <u>encreased</u>, rather than diminished.
                Letter from George Washington to Marquis de Lafayette dated Jan. 29,
                1789, in 4 *The Documentary History of the First Federal Elections, 1788–*
                *1790* at 154 (Gordon DenBoer, ed. 1989) (underlining added; available on
                Google Books).

2.      [From an observation of a patient in a mental hospital:]
        He was by no means violent in his demeanour, nor in a state of insensibility; he
        talked freely, and not altogether irrationally; he told us he was aware of his own
        situation, and of his occasional violence, and confessed that he was not fit to be
        trusted without some restraint, as he could not answer for himself, and that he
        might otherwise do mischief to somebody, as he had tried to do before; his mind,
        therefore, was not in such a state as to render him insensible to his situation, nor
        to deprive him of all social enjoyments; and in proportion as his mind was
        rational, his suffering must <u>have been increased</u> during his long and dreadful
        confinement."
                Great Britain Parliament, House of Commons, Report of the Committee
                on Mad-Houses in England 138 (1815) (underlining added; available on
                Google Books).

3.      It was now six years since these affectionate brothers had beheld each other; and
        as they were precisely those years in which the form is most altered and
        increased, most probably they would not have known each other, had they met in
        any other place; but the affections of their boyish years <u>had been increased during</u>
        their absence, for esteem was now added to love, and friendship was engrafted on
        the ties of nature; so that it is scarcely possible to conceive two young, warm
        hearts more united in affection than theirs, or two people rendered more happy in
        meeting, after a long and affecting separation.
                Barbara Hofland, *The merchant's widow and her family* 219 (1814)
                (underlining added; available on Google Books)

4.      From the general principles already stated, by which all variations in the value of
        any commodity are regulated, it follows, that an extension of demand for, or a
        diminution of the quantity of a commodity, are the only occurrences that can

possibly raise its value. Now instead of the demand for gold and silver <u>having been increased during</u> the last two years, or the quantity of these metals having been diminished, it is evident that the demand must have been diminished, and the quantity increased.

> James Maitland Lauderdale, *The Depreciation of the Paper Currency of Great Britain Proved* 57 (1812) (underlining added; available on Google Books)